**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------
IN RE MAT FIVE SECURITIES            :      **Civil Action No. 08 CIV 4152 NRB**
LITIGATION                                        :
                                                           :      <u>**CLASS ACTION**</u>
--------------------------------------------------

**DECLARATION OF PHILLIP KIM IN SUPPORT OF MOTION FOR AN ORDER
PARTIALLY LIFTING THE PSLRA DISCOVERY STAY AND PERMITTING LEAD
PLAINTIFF TO CONDUCT DISCOVERY**

Phillip Kim hereby declares under penalty of perjury:

1.      I am an attorney with the Rosen Law Firm, P.A., Liaison Counsel in this action, and have personal knowledge of the facts set forth herein.  I am duly admitted to practice law in the State of New York and before this Court.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the transcript of the oral argument held on July 15, 2008 in the action entitled *Marie Raymond Revocable Trust, et al. v. MAT Five LLC, et al.*, Case No. 3843-VCL, pending the Delaware Chancery Court.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Confidential Tender and Exchange Memorandum MAT Five LLC National Portfolio, dated May 29, 2008.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Verified Class Complaint styled as *Marie Raymond Revocable Trust, et al. v. MAT Five LLC, et al.*, filed with the Delaware Chancery Court on June 19, 2008.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the docket sheet for the case entitled *Marie Raymond Revocable Trust, et al. v. MAT Five LLC, et al.*, Case No. 3843-VCL, pending the Delaware Chancery Court.

6.      Attached hereto as Exhibit 5 is a true and correct copy of an order issued by Vice Chancellor Lamb on June 26, 2008 in *Marie Raymond Revocable Trust, et al. v. MAT Five LLC, et al.*, Case No. 3843-VCL.

7.      Attached hereto as Exhibit 6 is a true and correct copy of a letter dated July 14, 2008 that was submitted to Vice Chancellor Lamb on behalf of the Lead Plaintiff.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a letter dated July 16, 2008 that was submitted to Vice Chancellor Lamb on behalf of Defendants.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a letter dated July 10, 2008 that was submitted to the Honorable Naomi Reice Buchwald.

10.      Attached hereto as Exhibit 9 is a true and correct copy of the proposed Lead Plaintiff's Request for Production of Documents.

11.     Attached hereto as Exhibit 10 is a true and correct copy of Supplemental No. 2 to

Confidential Tender and Exchange Offer Memorandum.

New York, New York

Executed: August 1, 2008                    /s/ Phillip Kim
                                            Phillip Kim

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of August, 2008, a true and correct copy of the foregoing DECLARATION OF PHILLIP KIM IN SUPPORT OF MOTION FOR AN ORDER: PARTIALLY LIFTING THE PSLRA DISCOVERY STAY AND PERMITTING LEAD PLAINTIFF TO CONDUCT DISCOVERY was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Phillip Kim*
PHILLIP KIM

# EXHIBIT 1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARIE RAYMOND REVOCABLE TRUST  :
and RICHARD and SHARON BROWER,  :
as Joint Tenants with Right of  :
Survivorship,                   :
                                :
              Plaintiffs        :
                                :
         vs.                    :      Civil Action
                                :      No. 3843-VCL
MAT FIVE LLC, MUNICIPAL         :
OPPORTUNITY FUND FIVE LLC,      :
CITIGROUP INC., CITIGROUP       :
ALTERNATIVE INVESTMENTS LLC,    :
CITIGROUP FIXED INCOME          :
ALTERNATIVES, and REAZ ISLAM,   :
                                :
              Defendants        :

                    - - -

                    Chancery Courtroom No. 12B
                    New Castle County Courthouse
                    Wilmington, Delaware
                    Tuesday, July 15, 2008
                    10:00 a.m.


BEFORE:  HON. STEPHEN P. LAMB, Vice Chancellor.


                    - - -


                 ORAL ARGUMENT

                    - - -


--------------------------------------------------------
                CHANCERY COURT REPORTERS
        500 North King Street - Suite 11400
         Wilmington, Delaware 19801-3759
                   (302) 255-0525

2

```
 1    APPEARANCES:

 2            NORMAN MONHAIT, ESQ.
              Rosenthal Monhait & Goddess P.A.
 3                -and-
              JOSEPH RUSSELLO, ESQ.
 4            ROBERT M. ROTHMAN, ESQ.
              of the New York Bar
 5            Coughlin Stoia Geller Rudman & Robbins LLP
                For Plaintiffs
 6
              MARTIN S. LESSNER, ESQ.
 7            CHRISTIAN DOUGLAS WRIGHT, ESQ.
              DAWN M. JONES, ESQ.
 8            KRISTEN SALVATORE DePALMA, ESQ.
              KERRIANNE M. FAY, ESQ.
 9            Young Conaway Stargatt & Taylor LLP
                  -and-
10            CHARLES E. DAVIDOW, ESQ.
              MICHAEL E. GERTZMAN, ESQ.
11            KRISTY M. TILLMAN, ESQ.
              KENT KEMENY, ESQ.
12            JONATHAN H. HATCH, ESQ.
              JEFFREY D. KLEINMAN, ESQ.
13            of the New York Bar
              Paul, Weiss, Rifkind, Wharton & Garrison LLP
14              For Defendants MAT Five LLC, Municipal
              Opportunity Fund Five LLC, Citigroup Inc.,
15            Citigroup Alternative Investments LLC and
              Citigroup Fixed Income Alternatives
16
              KATHLEEN McCARTHY, ESQ.
17            Director & Associate General Counsel
              Citigroup Global Markets
18
                            -  -  -
19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1                    THE COURT:  Good morning.

2                    MR. DAVIDOW:  Good morning, Your

3    Honor.

4                    MR. MONHAIT:  Good morning, Your

5    Honor.

6                    THE COURT:  Good morning, Mr. Monhait.

7                    MR. MONHAIT:  The matter before the

8    Court this morning is plaintiffs' motion for a

9    preliminary injunction in the Marie Raymond Revocable

10   Trust and Richard and Sharon Brower versus MAT Five

11   and others.  I believe Your Honor has already met, by

12   telephone, Robert Rothman and Joseph Russello of

13   Coughlin Stoia Geller Rudman & Robbins.  They have

14   both been admitted pro hac vice, and Mr. Russello will

15   be presenting argument on behalf of the plaintiffs.

16                   THE COURT:  Thank you.

17                   MR. LESSNER:  Good, morning, Your

18   Honor.  Marty Lessner on behalf of the defendants from

19   Young, Conaway.  At counsel table are Christian Wright

20   from Young, Conaway.  And from the law firm of Paul

21   Weiss, Rifkind, Wharton & Garrison are Charles

22   Davidow, Michael Gertzman, Kent Kemeny, Kristy

23   Tillman, and Kathleen McCarthy, a director and

24   associate counsel from Citigroup Global Markets, Inc.

CHANCERY COURT REPORTERS

4

1   Mr. Davidow will be presenting argument for the

2   defendants and Mr. Wright will have brief argument on

3   behalf of defendant Islam.

4                   THE COURT:  Thank you.

5                   Mr. Russello.

6                   MR. RUSSELLO:  Yes, Your Honor.  Good

7   morning, Your Honor.  May it please the Court.

8                   As you know, we're here today on the

9   injunction motion of the plaintiffs.  And really what

10  this comes down to is that the defendants, including

11  Citigroup and some affiliated entities, including

12  Citigroup Alternative Investments, have issued a

13  tender offer in connection with an interest that

14  investors were able to purchase in a private entity,

15  MAT Five LLC, which is a Delaware limited liability

16  company.

17                  We've alleged that there are certain

18  material omissions in these documents that kind of run

19  the gamut, and chances are Your Honor has seen that in

20  our papers.  But really what brings us here is that,

21  in February of 2008, margin calls were made apparently

22  on MAT Five that required allegedly the infusion of

23  cash.  And so Citigroup made an infusion of cash

24  specifically with regard to MAT Five in the amount of

5

1    $246 million and committed $1 billion.

2                    THE COURT:  You say "MAT Five."  Are

3    you referring to the national?

4                    MR. RUSSELLO:  I'm referring to

5    national, yes.  However, the way that I believe that

6    the cash infusion was made was that it was made

7    specifically to MLF5, which is the investment vehicle.

8    MAT Five holds shares of MOF Five.  When that infusion

9    was made, the terms were not set.  The defendants have

10   admitted that in a March 20th letter sent by

11   Jonathan Dorfman, who is a company head of Global

12   Fixed Income which has responsibility for this

13   particular fund.

14                    In that letter, which is attached to

15   our papers, he says that the terms and conditions have

16   not been set but they will be set in the future, and

17   that the company will be communicating with investors

18   after that time.  The infusion that was made there

19   potentially gives rise to claims that we believe are

20   addressed under the release that investors must agree

21   to in connection with a tender.  And so this sort of

22   sets the stage for what has occurred here.

23                    With regard to the specific omissions,

24   the first omission that we deal with in our papers and

CHANCERY COURT REPORTERS

6

1    that defendants address concerns the SEC investigation

2    that is currently pending against MAT Five or with

3    respect to MAT Five.  In the tender offer documents,

4    defendants disclose that Citi has received two

5    requests for documents concerning Citi managed hedge

6    funds in connection with an informal inquiry by the

7    SEC and that Citi's responding to those requests.

8                 As the facts show, in fact, this is

9    not merely an informal inquiry.  Citigroup is

10   investigating MAT Five in a Falcon Fund for possible

11   violations of the federal securities laws.

12                THE COURT:  You said the federal

13   securities laws.  You mean the SEC?

14                MR. RUSSELLO:  Yes, Your Honor.

15                THE COURT:  There is a distinction,

16   is there not, between what's called an informal

17   inquiry, which is something that's initiated by the

18   staff of the SEC and a formal investigation, which

19   only begins after the commission enters in a formal

20   order of investigation.  And until a formal order is

21   entered, there's no subpoena power, for example.  This

22   is at what stage?  It's still in the stage of informal

23   inquiry, isn't it?

24                MR. RUSSELLO:  The defendants

1    themselves refer to the investigation as an

2    investigation, and they do refer to the SEC's ability

3    to conduct formal investigations and informal

4    investigations.  At the very least, it should be an

5    informal investigation.

6                THE COURT:  You make a point also that

7    the letters that they have received are in fact

8    identified specifically with reference to MAT, the MAT

9    National, or the other MAT funds, not just to Citi

10   Global hedge funds in general?

11               MR. RUSSELLO:  Yes, Your Honor, that's

12   correct.  The subject lines of both of the letters,

13   May 1st and May 5th, specifically identify as the MAT,

14   which includes MAT Five and a separate Falcon Fund.

15   And they were requesting that CAI, the managing agent,

16   provide documents -- that other various affiliates of

17   Citigroup provide documents, including MAT.  And one

18   of the reasons why that's misleading is because it

19   doesn't disclose that the investigation or inquiries

20   targeting the MAT funds, which we believe is highly

21   material to investors.  And in fact, Mr. O'Brien, who

22   has responsibility for oversight of these funds,

23   couldn't tell from that disclosure in his own

24   testimony that MAT was being investigated.  So on that

1  basis alone, it appears to be misleading in fact as

2  testified to by one of their witnesses.

3            And so we believe that just the

4  mincing of the words itself is somewhat misleading.

5  It doesn't give investors the idea that what's

6  happening here is that there is an investigation for

7  violation of federal securities laws; instead what it

8  appears to suggest is that the informal inquiry

9  consists only of the two document requests.  And once

10  those have been complied with, perhaps the inquiry

11  will go away.  That's just not the case.

12            THE COURT:  What is there in the

13  record that describes the scope of this investigation,

14  other than the two document requests?

15            MR. RUSSELLO:  Well, there are two

16  document requests.  There's also an e-mail that was

17  circulated by the general counsel for Global Wealth

18  Management, which is the brokerage arm of Citigroup

19  essentially, and which is kind of the umbrella

20  organization above the Smith Barney organization which

21  sold these investments.  And in that e-mail, which was

22  an internal e-mail, Michael Sharp says the SEC's

23  investigating the MAT funds and the Falcon Funds.

24  Even he took that to mean this is an investigation

1    that's ongoing here.  The letters themselves are

2    really somewhat of the best evidence of that.

3                    THE COURT:  Okay.

4                    MR. RUSSELLO:  Moving on to the next

5    issue, which is the issue of leverage.  In

6    depositions, actually what was revealed is that there

7    is a separate definition of leverage that is used

8    widely and on a daily basis by CAI, the managing agent

9    of this fund, which takes into account unrealized

10   gains and losses.  The leverage that is disclosed in

11   the private placement memorandum -- the PPM -- only

12   deals with realized gains and losses.  And that is the

13   only definition that investors have.  So an investor

14   reading the memorandum, and many references to

15   leverage, will never understand or comprehend the fact

16   that there is this other definition that is widely

17   used on a daily basis by CAI.  That's important for

18   several reasons.  One is that, in connection with the

19   February and March events that resulted in the cash

20   infusion, the leverage ranged between 16 times to 55

21   times.  That's testified to by Mr. O'Brien, who

22   acknowledged that an e-mail that he had sent in

23   response to a Global Wealth Management executive,

24   identified the fact that the leverage had been that

10

1   high.

2             Of course, defendants seem to try to

3   address the fact that, because they're different

4   leverages, perhaps the leverage didn't exceed the PPM

5   leverage.  It's simply information investors don't

6   know.  But that's also important because in the

7   memorandum a target leverage is disclosed.  And it's

8   much lower than the leverage even that was the target

9   leverage in the PPM.  So now investors really can't

10  gauge what the relevance of that leverage is not

11  knowing specifically that it relates to this other

12  definition.  And that particular kind of leverage is

13  also used in the analyses that's enclosed along with

14  the tender offer memorandum.  I believe that's around

15  page B-3.

16            THE COURT:  One is told that the net

17  asset value of the investment has fallen from a dollar

18  a share to something like $.02 a share, and you know

19  it's a leveraged investment.  Doesn't that itself

20  imply information about what the extent of the

21  leverage is?  You have 2 percent equity instead of

22  98 percent debt; right?

23            MR. RUSSELLO:  Well, I believe that

24  the way it works out is that Citigroup, of course, now

CHANCERY COURT REPORTERS

11

1   has its own investment which has substantially diluted

2   the investors' interest.  The reason why the leverage

3   is important is because it's not a concept that

4   investors know.  They understand that their investment

5   is leveraged, but they won't understand the target

6   range within their investment can be managed on a

7   going-forward basis.

8               THE COURT:  I'm probably wrong in what

9   I just said.  It certainly implies there's been large

10  losses.  It doesn't imply that your debt has been paid

11  off.  Whatever the debt was to start off with is still

12  there.

13              MR. RUSSELLO:  It's my understanding

14  that, in as far as the investment is leveraged -- and

15  investors understand of course -- they do understand

16  that their investment is something of a nature that is

17  being degraded to the point that it's around $.23

18  right now.  On a going-forward basis, for investors

19  who may not tender, they don't really have a benchmark

20  to gauge where the leverage would be.  They don't know

21  what this other definition is.

22              In fact, Jeffrey Traum, who is a

23  managing director of CAI, didn't know this leverage

24  existed.  We think that if the defendants are going to

12

1   be using these terms, they certainly have to make full

2   disclosure about them.

3                    THE COURT:  I suppose you're referring

4   to those charts at the end of the offering statement?

5                    MR. RUSSELLO:  Yes, Your Honor.

6                    THE COURT:  What are they talking

7   about?  Four times and six times leverage?

8                    MR. RUSSELLO:  That's right, Your

9   Honor.  Specifically, Jonathan Dorfman testified that,

10  you know, in connection with conversations that he had

11  had with a portfolio manager, that these leverages

12  match up with the undisclosed form of leverage.  So we

13  would like additional disclosure on that issue.

14                    This brings us into the NAV issue

15  itself.  During depositions, O'Brien and Dorfman

16  testified that a reasonably accurate and reliable net

17  asset value could be discerned or generated in less

18  than four business days.  Well, O'Brien testified that

19  it could be generated in as little as one day and that

20  it's a reasonably reliable number they use widely

21  throughout CAI in connection with risk management

22  purposes and some other purposes.

23                    Mr. Dorfman testified that in a few

24  additional days they can get a much more accurate

13

1    number.  We would like the disclosure of a much more

2    accurate net asset value.

3                Now, because this hearing is taking

4    place today, and it appears that defendants will

5    extend the expiration of the tender offer, it also

6    appears that perhaps the June 30th NAV can be produced

7    in connection with this action or customarily, and so

8    we believe that additional information regarding the

9    net asset value needs to be disclosed so that

10   investors can determine whether their investments are

11   increasing in value or decreasing in value.  Currently

12   they have a NAV for the end of May, which is outdated

13   by a month and a half today.  And so the additional

14   information we're seeking is not anything that

15   necessarily would put defendants out.  It certainly is

16   not speculative as the cases that defendants have

17   cited for that proposition sort of indicate.

18                In fact, in a recent case

19   Chancellor Chandler ruled that the general range of

20   values for the financial advisor's interest in that

21   particular case had to be disclosed, even if it was a

22   range of values, because it could be calculated.  And

23   in that particular instance, as here, the defendants

24   claim that there are so many different components that

14

1    it couldn't possibly be done.  That's just really not

2    the case, and we believe that the defense witnesses

3    have testified to that.

4                This now brings us to facts giving

5    rise to -- or to claims that may be covered by the

6    release.  The first issue is the cash infusion.  Not

7    until their answering papers did defendants at least

8    disclose the fact that the cash infusion was made

9    pursuant to a provision of the LLC agreement that

10   permits investors to receive NAV -- to receive shares

11   at the clean NAV -- the clean net asset value.  That

12   certainly does apply to investors who come into the

13   fund after the initial issuance.

14                However, an ordinary investor would

15   certainly not be able to come into the fund and demand

16   a cost of capital and some of the other provisions

17   that Citigroup has arranged for itself.

18                THE COURT:  Well, presumably that

19   provision is there to protect the existing investors

20   from people acquiring shares at an unfairly low price.

21                MR. RUSSELLO:  That is most likely

22   accurate, Your Honor.  But of course, the issue is

23   that an ordinary investor coming in at the same price,

24   or perhaps a lower price as a result of the clean NAV,

15

1  would not be able to demand these other sort of

2  amenities that Citigroup has provided itself with in

3  connection with the cash infusion.

4            THE COURT:  Well, I got that point.

5  But I was trying to get you to move one step in a

6  different direction and suggest that the provision

7  in -- I guess it's the MOF LLC agreement -- it would

8  be very hard to understand how it could have prevented

9  the managers of MOF from selling Citibank interests at

10 a higher price.

11            MR. RUSSELLO:  Yes, Your Honor.

12 That's correct.  To that extent, it's amenable that

13 they did issue themselves shares at the clean NAV.

14 They did not issue shares necessarily at a lower NAV.

15            THE COURT:  Is there evidence showing

16 that -- at the day that the cash was invested -- that

17 there was, in fact, an issuance of sales at a clean

18 NAV?

19            MR. RUSSELLO:  In actuality, I

20 certainly haven't seen a document that goes to that

21 issue.  I've seen documents internally in Citigroup

22 and between O'Brien and some of the other major

23 players talking about preferred shares.  It actually

24 appears that they were discussing the terms of this

16

1  investment far after the time that they made it.  And

2  Dorfman testified --

3                    THE COURT:  I understand that.  But is

4  there evidence that the shares were at least

5  technically or officially issued on the day or near

6  the day of the investment at the clean NAV?

7                    MR. RUSSELLO:  If there is, Your

8  Honor, we certainly haven't seen it.

9                    THE COURT:  All right.

10                   MR. RUSSELLO:  That also brings us to

11 some of the other issues that were discussed in

12 connection with the tender offer.

13                   Now, for some time after the cash

14 infusion -- and this is sort of linked to the terms of

15 the cash infusion itself -- but for some time there

16 were discussions of these alternative transactions.

17 Each one would have permitted the investors to come in

18 perhaps at the level that Citigroup made its own

19 investment, which was a much lower level than the

20 investors came in at, and would have also had the

21 opportunity to perhaps participate in a follow-on

22 offering: put more money in, buy Citigroup out.  Take

23 away the dilution, really, that is currently affecting

24 these funds.

1                   Those ideas and those alternatives

2     were taken off the table in one meeting that took

3     place with the Citigroup CEO at the very, very end of

4     March.  That sort of dictated what the actual terms

5     would be, because now the defendants could see that

6     there was a rise in the NAV in March.  That also

7     dictated the terms of the tender offer because the

8     release was then agreed to.  All these other

9     alternatives were taken off the table.

10                  The issue with that is that investors

11    don't really have enough information to determine

12    whether any of these things that were considered were

13    viable options, or whether Citigroup did indeed engage

14    in self-dealing, something that would give rise to a

15    requirement that Citigroup established the entire

16    fairness of the infusion.  And so investors will be

17    releasing that, without knowing all of the facts

18    underlying this infusion and the events leading up to

19    the tender offer.

20                  THE COURT:  Well, is there any reason

21    to even entertain the idea that this wasn't

22    self-dealing on the part of Citigroup?

23                  MR. RUSSELLO:  If there is any reason

24    out there that would indicate that this is not

18

1    self-dealing, we don't know of it.  And also, further

2    evidence of the self-dealing are e-mails that were

3    exchanged, and testimony we have from O'Brien and

4    Dorfman, the two most knowledgeable Citigroup

5    witnesses who say this was an excellent investment

6    opportunity.  Of course, it was.  The NAV was so low

7    that they were able to get in and entirely dilute, to

8    the extent of perhaps 98 percent investors' interests.

9    So really they were looking at this as a way to

10   profit.  And the CAI CFO said in an e-mail

11   initially -- which we've attached in our papers --

12   that Citigroup considered the fact that it may lose

13   some money initially with its investment, but that

14   within a longer period of time, identified at about 18

15   months, it could receive returns of about 100 percent.

16   So this is really also just an excellent investment

17   opportunity for the defendants.  So these are some of

18   the facts that we think need to be disclosed.

19              This also brings us to Citigroup's

20   conflict of interest.

21              THE COURT:  Can we just go back for a

22   minute to the subject you were just discussing.

23              What would the disclosure look like?

24   Just a narrative disclosure of what the process was

19

1    that these players went through, beginning at the end

2    of March and ending some time in May, when the terms

3    of the transaction were finally structured?

4                    MR. RUSSELLO:  Somewhat.  Perhaps, of

5    course, it needn't be pejorative or needn't require

6    the defendants to engage in self-flagellation, things

7    like that.  Perhaps just a statement of the facts,

8    what was considered, what prompted them.  That also

9    brings us -- later I was going to address the purpose

10   of the tender offer.  But that brings us to the fact

11   that the defendants believe that this was an

12   investment opportunity.  That should be disclosed,

13   certainly.  There's no reason not to.  And just some

14   of the alternatives that were considered.  Was this

15   considered to be a loan?  Why didn't they choose to

16   consider a loan?  And the answers may be very

17   straightforward.  But that certainly should be

18   something that investors know.  They're asking the

19   questions themselves.

20                    THE COURT:  I have to say, I found the

21   answer is anything but straightforward.  Why wasn't at

22   least in part a loan.  I've read it, but I don't

23   understand it.

24                    MR. RUSSELLO:  Yes, Your Honor.  This

20

1   also brings us to the conflicts of interest.  There

2   were some conflicts of interest disclosed in the

3   initial private placement memoranda for both MAT Five

4   and MOF Five.  The defendants suggest that they

5   disclose a conflict of interest in the memorandum, and

6   that sort of vitiates any issue with regard to this

7   conflict of interest.  In fact, investors could never,

8   ever perceive that Citigroup would come in and dilute

9   their interests to the extent that they have at the

10  initial issuance of the shares.  However, it appears

11  that it was always perhaps an option.  It was

12  certainly something that Citigroup considered on a

13  whim and was able to implement.

14          So we believe that potentially some

15  additional disclosure must be made that the PPM did

16  not specifically address this conflict of interest,

17  that the conflict of interest was something that was

18  foreseeable, and that investors should at least know

19  all the other facts that gave rise to this conflict of

20  interest, including the cash infusion element, so that

21  investors can kind of ascertain the fact that there

22  potentially is a conflict of interest that was

23  existing prior to the time that that disclosure was

24  made in the memorandum.

1          THE COURT:  The memorandum you're

2   referring to -- the offering circular?

3          MR. RUSSELLO:  Yes, Your Honor.

4          This brings me to some other facts

5   that could give rise to claims covered by the release.

6   As we discussed initially, it was the fact that

7   leverage had reached 55 times.  To the extent that

8   defendants say that that's not really a material

9   issue, certainly the way that that particular leverage

10  was explained to us by O'Brien and others, including

11  Dorfman, is that, when the leverage reaches that

12  point, there's so little equity underlying it that

13  there's literally nothing left.  So the fact that the

14  leverage reached 55 times would be something that's

15  material to investors to understand how far out the

16  leverage went from the target numbers that were

17  produced in the PPM.  To the extent that defendants

18  say it's not comparable, then certainly they need to

19  disclose the meaning of that particular leverage and

20  why it reached that high.

21          That also brings us to the fact that

22  numerous complaints were made and received by

23  Citigroup regarding the fact that the MAT funds and

24  the MOF Five funds were marketed as safe and

22

1    conservative investments.  Whether the risk

2    disclosures say that or not, the fact is that

3    Citigroup has received numerous complaints from

4    investors and from financial advisors regarding that

5    very issue.

6              Now, again, they needn't make a

7    pejorative type of disclosure.  They simply need to

8    say that we received numerous complaints that the fund

9    was not marketed in connection, or on the same terms

10   as the risk disclosures stated in the private

11   placement memorandum.  That would be a simple

12   disclosure, but certainly something material to

13   investors who simply don't know if they are in the

14   same boat as somebody else.  They simply don't know if

15   this is something that was done, or a viable, perhaps,

16   course of action eminently important in connection

17   with the release.

18             This brings us into the background of

19   the tender offer.  As we've discussed, there are

20   numerous alternative transactions that were considered

21   that would have perhaps permitted investors to invest

22   at a more favorable NAV, and permitted them to either

23   partake in a follow-in offering or invest at the

24   specific entry point that Citigroup invested.  That's

CHANCERY COURT REPORTERS

1    information we think needs to be disclosed, because

2    there's simply no background of the transaction other

3    than the fact that there was a cash infusion made.

4                    THE COURT:  Do you know, Mr. Russello,

5    in any of the other MAT partnerships that are X'd in

6    MAT One, Two, Three and, I guess, Four -- I haven't

7    seen anyone mention Four -- are there -- did any of

8    them encounter the same trouble?

9                    MR. RUSSELLO:  I believe that the

10   investment in MOF Five was made for the benefit of all

11   of those MAT's.  For the most part, they did.

12   Although MAT Three, for instance, is an older fund, so

13   the bonds had a different kind of level of maturity.

14   I don't know that the situation was as dire with

15   MAT Three, because MAT Three is still a going concern.

16   It's still running, but they will partake --

17   investors, rather, will partake in some of the

18   allocations that were made for March and April gains.

19   They are still running and they also did receive cash

20   infusions, as far as I know.

21                   THE COURT:  But it wasn't in the

22   MOF Five.  They must have been invested in something

23   else.  Maybe it was --

24                   MR. RUSSELLO:  Right.  I believe that

24

1   the MATs themselves are sort of feeders for the

2   underlying MOF fund that actually invests.  So

3   MAT Three --

4                THE COURT:  MOF One, Two and Three

5   were all formed years before Five was formed.  Isn't

6   that right?

7                MR. RUSSELLO:  Yes, Your Honor.

8                THE COURT:  I suppose what I really

9   want to know is: who else is being presented with this

10  tender offer opportunity?

11               MR. RUSSELLO:  Well, as far as I

12  understand, just MAT Five at this point.  There were

13  some Falcon Funds that encountered trouble as well.

14  In that situation, defendants established some sort of

15  a lending facility to the Falcon Funds and there were

16  tender offers made in those situations as well.  In

17  fact, that was one of the cases that defendants had

18  brought to Your Honor's attention.  In the Falcon

19  case, which was brought in the federal southern

20  district court, there was a tender offer in connection

21  with that fund.  There was a tender offer in

22  connection with Falcon Two B.

23               THE COURT:  In any of these cases,

24  were there rights offerings made?

25

 1                  MR. RUSSELLO:  As far as I understand,

 2    it was simply a similar tender offer to this, although

 3    the amount of the consideration offered to investors

 4    in, say, Falcon Strategies Two was $.45.  So it was

 5    approximately 20 above the NAV at that given time.

 6                  THE COURT:  It was above what?

 7                  MR. RUSSELLO:  It was above the NAV --

 8    approximately 20 above the NAV of the Falcon Fund at

 9    the time they made the tender offer.  So they offered

10    more money of their premium, if you will, in

11    connection with the Falcon Fund.  That same offer is

12    not on the table here.

13                  THE COURT:  You say the NAV on that

14    fund was $.25 at the time they offered to buy it for

15    45?

16                  MR. RUSSELLO:  That's right, Your

17    Honor.  So we believe that just on that basis the

18    additional information about alternative

19    transactions --

20                  THE COURT:  Was there any situation in

21    which Citi chose to permit existing investors to

22    invest, take it out of the position, or give it the

23    opportunity to take out its investment at the terms in

24    which it invested, which is one of the options that

26

1    seems to be considered here?

2                    MR. RUSSELLO:  Not as far as we know.

3    In fact, that brings us to this May 6th, 2008 document

4    regarding the restructuring, where it appeared that at

5    that point in time there was a consideration of

6    permitting investors to invest in a new fund or some

7    other sort of situation.

8                    THE COURT:  Was that document

9    distributed to the investors?

10                    MR. RUSSELLO:  I understand -- I

11    believe that it was, Your Honor.  At that time, as

12    well, there was a mention of redemptions.  And that's

13    a major issue here as well.

14                    In that document the defendants

15    disclose that they would open up redemptions, when

16    market conditions permitted, and waive the two-year

17    lockup period that would be subject to the shares.

18    And so what that would mean is that, when market

19    conditions permitted, investors could get out at the

20    NAV.  They would also waive the redemption fees.  That

21    was something disclosed in that document.  That is not

22    something that's disclosed in the tender offer.

23                    In fact, defendants have made

24    disclosure -- I believe it's on page four of the

CHANCERY COURT REPORTERS

1    memorandum -- the tender offer memorandum regarding

2    the distribution of income -- that it will begin again

3    potentially -- although it's unclear if it would --

4    before liquidation.  James O'Brien definitively

5    testified in response to three questions that

6    redemptions will open before liquidation, provided

7    that market conditions permit.  There is no disclosure

8    in the tender offer document about that whatsoever,

9    and certainly no affirmative disclosure to reinforce

10   that issue from May 6th.

11                  And as we see, certain of the terms

12   that were disclosed to investors on May 6th have

13   changed and are not on the table anymore.  The need

14   for disclosure in the tender offer memorandum, which

15   is the main document pursuant to investors electing a

16   tender or not, should contain a disclosure regarding

17   that.  It simply doesn't.

18                  THE COURT:  Now, which exhibit is the

19   May 6th document?

20                  MR. RUSSELLO:  That is Exhibit 3 on

21   the reply that we've submitted.

22                  THE COURT:  Okay.  Go ahead.

23                  MR. RUSSELLO:  And so certainly there

24   must be additional information regarding the

28

1  redemptions, particularly because investors could

2  potentially redeem their shares at the NAV, retain all

3  of their claims and get out of this fund, and assert

4  whatever claims they want after that fact.

5              Really what you're getting out of this

6  is a participation share that will pay out at the

7  liquidation of a company.  And who knows what that

8  will be.  At this point it certainly seems the claims

9  themselves may be more valuable and the redemption

10  right is even more important here.  That's not

11  disclosed anywhere in the memorandum.

12              This also brings us to the purpose of

13  the tender offer, which I was discussing before

14  briefly.  But there's an exhibit, Exhibit 20 and

15  Exhibit 21, which is a draft that we've attached to

16  the opening brief.  And in there there are actually

17  three specific reasons that are disclosed with regard

18  to this particular tender offer and the restructuring

19  plan regarding the MOF funds in particular, and one is

20  to retain -- preserve relationships with GWM financial

21  advisors and their clients -- that's the brokerage

22  arm, of course, that sold these investments -- to

23  minimize the potential damage to the relationship

24  between Citi Alternative Investments, the managing

1    agent, and Global Wealth Management, the brokerage arm
2    and the managing agent, and to minimize potential
3    litigation from fund investments.  Of course, nowhere
4    here is it mentioned that the purpose of the tender
5    offer or the restructuring is to create immediate
6    liquidity, which is the only purpose disclosed in the
7    tender offer.
8                    There's also Exhibit 21 to our opening
9    brief, which was an exact copy of this document but a
10   draft in which there's a little bullet -- a little
11   balloon on the right-hand side of the page which
12   indicates that CAI management's own view -- and that
13   would be Global Fixed Income, Jim O'Brien
14   presumably -- that the goal there was also aligned
15   with these particular motivations but was not
16   particularly geared toward creating immediate
17   liquidity for investors.
18                    So having made a disclosure regarding
19   the purpose of the tender offer, we believe they have
20   to make full and adequate and accurate even disclosure
21   about those issues.  So we've cited some cases in our
22   brief that we believe stand for that proposition.
23                    That gets us to a further issue
24   regarding the fact that currently there are

30

1   negotiations that are taking place with regard to

2   financing structures.  So, liquidity providers,

3   really.  There are conversations taking place where

4   CAI's trying to set the terms of the manner in which

5   it will be able to borrow funds and use funds to

6   invest.  Dorfman testified that, if successful

7   arrangements are not achieved, then that would impact

8   redemptions and that would also impact achieving

9   target leverage.  And so those are two material issues

10  that we've discussed before.  But certainly the fact

11  that those financing facilities are not disclosed

12  anywhere in the memorandum, or the fact that

13  negotiations are taking place, or the import of those

14  negotiations, we believe that that renders also the

15  memorandum misleading on that basis.

16           And lastly, the defense witnesses

17  testify that there's an error essentially.  O'Brien

18  called it an error -- possibly a spreadsheet error,

19  possibly some other sort of error in the analysis at

20  B-2 of the memorandum.  There the document reflects

21  that the market value of total capital, with a March

22  portion of the April Citi allocation as of March 31st,

23  2008, for MAF Five's MOF Five shares, will be

24  $86 million.  The next month, without the April

31

1    portion of the allocation, the shares are reduced to

2    $85 million.

3              Now, defendants claim that that's not

4    a material difference.  But looking at the numerical

5    figure alone is not sufficient because investors may

6    believe that, for some reason, if they did not accept

7    the terms of the tender offer and did not receive the

8    April portion of the Citi allocation, their shares for

9    some reason would decrease in value.  That's just not

10   the case.  So that's why that particular issue is

11   materially misleading, because investors may be led to

12   believe that some sort of relationship between their

13   shares and Citi's shares is different than it actually

14   is.

15             As Dorfman testified, when all shares

16   rise -- when Citi's shares rise, all shares rise, in

17   essence.  To that effect Dorfman confirmed.  O'Brien

18   simply had no explanation.

19             Of course, Traum says that in fact

20   that little footnote at the bottom that the figures

21   are net of management fees charged at the company

22   level and proportional share of any professional fees

23   charged at the MOF level sort of solves the issue.  In

24   fact, it doesn't, because management fees were waived

32

1   after February 29, 2008.  Defendants have not come up

2   with any reason as to why management fees would be

3   assessed two months later, nor have they produced one

4   shred of evidence that in fact those management fees

5   were ever generated.  And that, of course, is leaving

6   aside the fact that that footnote specifically refers

7   to company level existing shares Series 2007, one

8   which is on the right-hand side of the document.  So

9   it's unclear whether that even modifies or qualifies

10  the information that we're addressing here.  So

11  certainly we believe that that's something that is

12  misleading.

13            Unless Your Honor has any questions, I

14  believe that I'm finished here.

15            THE COURT:  That seems like enough to

16  chew on for a while.

17            I am curious.  What does the record

18  show about when Mr. Islam was removed from his

19  responsibilities and what his role was at the time --

20  during the last week in February?

21            MR. RUSSELLO:  Well, defendants

22  themselves say that Mr. Islam was not removed from his

23  position until February 24th, I believe, which is five

24  days prior to the March call.  So he was certainly

33

1  involved in managing the fund up until that point.

2              The specific scope of his

3  responsibility is actually so muddled in the record.

4  It appears that there was at some point -- I believe

5  it was Craig Henig who was managing the fund at some

6  point.  So it appeared that they were diminishing

7  Mr. Islam's role.  It does appear that he was

8  specifically charged with running the fund at the time

9  that it was put into kind of these dire circumstances.

10             THE COURT:  I know you haven't gotten

11 much of a record yet on this subject.  There was at

12 least one fairly provocative document in your reply

13 papers.  Was it Mr. Henig's analysis, or someone's

14 analysis of the state of affairs at the fund?

15             MR. RUSSELLO:  There was a response

16 about the state of affairs to O'Brien, I believe it

17 was.  I think that that was the CFO at the time who

18 said that sort of the company was in a shambles.  It

19 was put together with duct tape and glue, I think is

20 what he had said.

21             THE COURT:  What was the date of that?

22             MR. RUSSELLO:  I can get that

23 information for you in one moment, Your Honor.  I

24 think this is it.  Yes.  It's a March 19th, 2008

CHANCERY COURT REPORTERS

34

1   e-mail between Michael Williams to James O'Brien.  I'm

2   sorry.  He was a managing director.  Michael Williams

3   was a managing director of CAI and chief financial

4   officer, apparently.  And he did say that he was

5   holding meetings daily with the MOF teams to review

6   the status, but essentially that operations were a

7   mess at that time.

8               THE COURT:  All right.  Do you take

9   that referring to operations being a mess after --

10  that that situation coming into existence after the

11  29th of February, or is that something you understand

12  him saying was a condition before the 29th of

13  February?

14              MR. RUSSELLO:  I would have to think

15  that it was ongoing, Your Honor, specifically for the

16  reason that it appeared that these problems with the

17  funds were developing as of the end of February or

18  perhaps before then.  In fact, there was some issues

19  with reconciling margin calls that resulted in the

20  dire financial condition of the company at the end of

21  February.

22              THE COURT:  All right.

23              That gets me to my last question.  At

24  least one of the plaintiffs here, this Raymond

1   Revocable Trust, is a plaintiff in the New York

2   federal action?

3                   MR. RUSSELLO:  The plaintiff had

4   commenced that action but is no longer involved in

5   that action.  I believe a lead plaintiff has been

6   appointed and it is not our client.

7                   THE COURT:  It's not your client.  Has

8   your client discontinued its involvement?

9                   MR. RUSSELLO:  I think that what

10  happened in that situation is that they presumably

11  consolidated the cases and that the lead plaintiff

12  that's been appointed there formally will be running

13  that case.  And I think that Your Honor received some

14  correspondence about that case regarding that other

15  lead plaintiff.  It is not the trust here, though.

16                  THE COURT:  I did.  Well, it's sort of

17  just not really a coincidence.  I guess you regard it

18  as somewhat unfortunate that that case in New York is

19  captioned Marie Raymond Revocable Trust.

20                  MR. RUSSELLO:  Under these

21  circumstances, yes, considering the fact that Marie

22  Raymond Revocable Trust doesn't have any input

23  anymore, as we understand it to be anyway.

24                  THE COURT:  As you know, and I think

36

1   as defense counsel knows, because this letter appeared

2   on the File & Serve at least for a while yesterday, I

3   received a letter from the lead counsel,

4   Laurence Rosen, lead counsel in that action, raising

5   questions about the sort of interplay between the

6   pendency of that action, which is brought as a class

7   action on behalf of the holders of MAT Five LLC

8   Securities, and this provision in the tender offer

9   which requires anyone who chooses to participate in

10  the offer to give a release which, at least as I

11  understand, the copy that's proposed in the tender

12  offer materials is broad enough to encompass the

13  claims that are pending in New York.  Have you got any

14  dog in this fight?

15              MR. RUSSELLO:  In connection with the

16  other action, Your Honor?  Well, specifically --

17  potentially, of course, anyone who tenders will

18  release claims that relate to that other action.  I

19  believe defendants have disclosed that.

20              But with respect to the other

21  counsel --

22              THE COURT:  They will if --

23              MR. RUSSELLO:  Right.  They will if

24  they tender and release.

37

1                    THE COURT:   And if I permit it and if

2    the judge in New York permits it.

3                    MR. RUSSELLO:  Yes, Your Honor.  But

4    we haven't had direct communications with the attorney

5    who is representing the lead plaintiff in that

6    action -- in the federal action.

7                    THE COURT:  All right.  But he sent

8    you copies of the correspondence he sent me?

9                    MR. RUSSELLO:  I haven't seen that

10   letter, Your Honor.

11                   THE COURT:  It was sent to

12   Joe Rosenthal.

13                   MR. MONHAIT:  It did show up on

14   File & Serve, Your Honor.

15                   MR. RUSSELLO:  Excuse me, Your Honor.

16                   THE COURT:  The first letter from

17   Mr. Rosen was not put on File & Serve.  I got it by

18   fax, I believe.

19                   MR. RUSSELLO:  Right.

20                   THE COURT:  Mr. Rosenthal was shown as

21   a carbon copy along with Mr. Rudman.

22                   MR. MONHAIT:  Was the letter from

23   Mr. Rigrodsky, Your Honor, that I think --

24                   THE COURT:  Mr. Rigrodsky's letter

CHANCERY COURT REPORTERS

38

1    appeared later and put this document on File & Serve.

2                    MR. MONHAIT:  Yes.  That's how I

3    became aware of it.

4                    MR. RUSSELLO:  That's the letter that

5    we're aware of as well, Your Honor.

6                    THE COURT:  It was faxed to me

7    directly and shows carbon copies to Mr. Joe Rosenthal.

8                    MR. MONHAIT:  You're right, Your

9    Honor.  On my way out last night, I looked at the fax

10   machine and I think there was something in the fax

11   machine.  But it came to my attention through

12   Mr. Rigrodsky's letter on File & Serve.

13                   THE COURT:  All right.

14                   It shows also a copy to Mr. Rudman.

15                   MR. RUSSELLO:  Well, Your Honor --

16                   THE COURT:  He's your partner, is he

17   not, Mr. Russello?

18                   MR. RUSSELLO:  Presumably we have

19   received the letter.  Simply, at this point, we don't

20   necessarily have kind of a dog in this fight, in as

21   far as it may relate to issues that are raised in this

22   case or issues raised in that case.

23                   THE COURT:  I think it was sent to

24   you, really, as just to alert you to the fact that, if

1    there was movement to settle this case on terms that

2    would require a release or permit the release, it's in

3    the tender offer to get some sort of court blessing.

4    I guess they were taking exception to that fact.

5                    MR. RUSSELLO:  That's understandable,

6    Your Honor.  At this point obviously we're here for

7    the injunction motion.  So, we don't believe that

8    there have been any grumblings toward us at this

9    juncture.

10                    THE COURT:  All right.

11                    Mr. Davidow?

12                    MR. DAVIDOW:  Thank you, Your Honor.

13   May it please the Court.  Charles Davidow for the

14   Citigroup related defendants.

15                    First, perhaps, I should start with

16   respect to the housekeeping matter Your Honor has

17   raised about the other action.  The New York Federal

18   Court action was filed by Marie Raymond Trust and

19   Mr. Russello.  Subsequently, when this tender offer

20   was initiated, they abandoned that action and

21   commenced the action before this Court that brings us

22   here today.  Somewhat in the fashion of a hermit crab

23   inhabiting a vacant shell, the other lawyers have

24   stepped into the role of lead plaintiff and counsel in

40

1  that action in the Southern District of New York.  And

2  their purpose with respect to the letter is -- which

3  we received -- we read much as Your Honor does -- they

4  want to stake out a position that, in the event

5  there's a settlement here, they may wish to be heard.

6  Since there is no settlement being proposed here, we

7  don't think the Court needs to address that issue at

8  this time.

9             THE COURT:  There is none at the

10  moment.  I thought the objection was a little bit

11  broader than that.  There was an objection to you in

12  some sense having included this proposed release in

13  your tender offer as well.

14             MR. DAVIDOW:  They sent us a letter

15  raising that concern under Rule 23 of the Federal

16  Rules of Civil Procedure.  We've relayed that concern

17  to the judge in the Southern District of New York, so

18  that if at some time they raise that issue in that

19  court, then that court can decide whether, for its

20  purposes under Rule 23, the release is or isn't valid.

21  We don't believe that to be an issue before this

22  Court.

23             Indeed, since this Court will be

24  addressing the issue of the adequacy of disclosure

41

1    underlying the release, this Court's ruling may have

2    some impact on what ultimately happens there on the

3    substance.   We don't believe it's an issue that this

4    Court need address.

5                   As Mr. Russello noted and as we

6    informed the Court, we've extended this tender offer

7    to the end of July to avoid the situation where we

8    have a hearing today and the Court's forced to act

9    today as well, because previously the tender offer

10   would have closed today.

11                  As Mr. Russello also observes, one

12   byproduct of that will be that the June 30 NAVs will

13   be distributed in the normal course, which would

14   likely be either later this week or at the beginning

15   of next week.  And investors will therefore have that

16   information automatically and without regard to what

17   happens in this proceeding.

18                  THE COURT:  You're distributing it in

19   the ordinary course, not as a supplement to the tender

20   offer document?

21                  MR. DAVIDOW:  That's correct, just as

22   the May 31 NAVs were distributed the same way in June.

23   And so all investors received them by mail.  They also

24   receive them electronically, if they choose to get

1    them that way.  So they will have that information.

2    And amending the tender offer for that reason wouldn't

3    alter the total mix of information available to

4    investors.

5              There are a number of individual

6    issues Mr. Russello has raised, and I'll address each

7    of them.  I want to address, though, first, what I see

8    as the bigger more policy-oriented issue that I think

9    this case presents, as Your Honor identified it in our

10   telephone conference, and, that is, what sort of

11   disclosure is required where a release is part of an

12   offer.

13             While we haven't seen prior cases that

14   involve quite these circumstances, in effect, releases

15   occur in a variety of merger situations.  Derivative

16   claims are automatically extinguished when a merger

17   occurs.  The Delaware courts have the doctrine of

18   acquiescence.

19             THE COURT:  The claim isn't released.

20   The derivative claim is not released.  Someone may

21   lose standing to prosecute it.

22             MR. DAVIDOW:  Indeed, the plaintiff,

23   who would otherwise have brought the claim, can no

24   longer bring it.  It passes to the corporation that

43

1   now survives.  Under the doctrine of acquiescence,

2   individuals who tender or who submit and obtain merger

3   consideration are deemed to have acquiesced and

4   release claims, other than disclosure related claims.

5                  THE COURT:  Well, that's not exactly a

6   perfect analogy.  It all depends on the adequacy of

7   disclosure.

8                  MR. DAVIDOW:  Indeed.  My point here

9   is that this isn't an entirely novel issue.  Although,

10  as I indicated, it's presented in a somewhat different

11  setting.  It's an issue that may recur in the courts,

12  because this is not the only hedge fund to have done

13  poorly in the recent environment; and indeed, watching

14  the developments in the markets these days, it's not

15  likely to be the only one that runs into difficulties.

16  It is one of few where the companies have actually

17  made offers to the investors as a result of the

18  failure of the hedge fund.

19                  The plaintiffs are asking you for a

20  rule that would in effect prevent the seeking of

21  releases.  Indeed, in their brief, they say explicitly

22  that there is no amount of disclosure that could be

23  sufficient.  Going that far would be bad policy.  The

24  Delaware courts should not discourage offers to

44

1  sophisticated investors that will bring them benefits

2  above the current value of their investments.  This is

3  different from the class action paradigm where there

4  is a different sort of regulation involved.  In these

5  cases there is often no underlying litigation.  And if

6  plaintiffs choose to take advantage of this kind of

7  offer, they get the full benefit of it themselves.

8  They don't have to pay fees of a quarter to a third of

9  whatever they're receiving.

10            THE COURT:  Mr. Davidow, I don't think

11  I'm in a position where I would consider a rule or a

12  ruling that said you can't seek release.  The question

13  is what do you have to disclose.  And I must say that

14  the document that I've read over and over and over

15  again strikes me as one of the least informative

16  documents I've ever seen.

17            MR. DAVIDOW:  Well, with respect, Your

18  Honor, let me then take you through the various issues

19  on which plaintiffs claim there is inadequate

20  disclosure, because I believe the document does

21  disclose the underlying events that gave rise to this.

22  It discloses -- the investors are aware of the most

23  recent audited values and will have received their

24  June 30th values.  The existence of the claims they

1  may have is known to them.  Indeed the document

2  disclosed the existence of the litigation that has

3  raised -- that Mr. Russello filed and that raises the

4  underlying claims that he's now asserting.  And it

5  discloses what they may expect under a variety of

6  scenarios going forward, where they choose to accept

7  this tender offer or whether they choose not to accept

8  this tender offer.

9              In the event this tender offer is not

10 permitted to go forward, or disclosures are required

11 of a nature that would make it impossible or

12 undesirable to go forward --

13             THE COURT:  How would that be true?

14 What would -- what is it you would be required to

15 disclose that would make it either -- let's start with

16 impossible to go forward.

17             MR. DAVIDOW:  Impossible would be only

18 if Your Honor went to the full extent of what

19 plaintiffs asked, and said that it's not possible to

20 give enough information.

21             THE COURT:  So let's go to

22 undesirable.

23             MR. DAVIDOW:  In particular, a number

24 of the things that plaintiffs have said that they

46

1    believe we should disclose are things we believe are

2    simply untrue.

3                    THE COURT:  I'm not going to make you

4    disclose things that are untrue.

5                    Let's start with sort of the narrative

6    of what happened, how the investment was made, what

7    the circumstances were, really, that led to the

8    investment in somewhat more detail than you've given.

9    How the investment was made; what the terms of the

10   investment were at the time it was made.  What process

11   was filed -- was followed by the people involved over

12   the next weeks in determining what the terms of the

13   investment were going to be?  How was that

14   decision-making handled?  What negotiation was there?

15                   I know you try to suggest in your

16   brief that one side of the house was negotiating on

17   behalf of the investors and the other was playing some

18   other role.  If you think of this as sort of an entire

19   fairness issue, and there's a question of value and

20   there's a question of process, and answers I'm not

21   sure are going to be very satisfying to me, and to say

22   it had to be at the -- whatever you call it.

23                   MR. DAVIDOW:  The naked NAV.

24                   THE COURT:  The naked NAV or whatever

1   it is.  It could have been at a higher price,

2   certainly.  In fact, what you've done is make it a

3   higher price.  Effectively you've said, "Whether you

4   tender or not, the terms of our investment are the

5   following."  And that certainly isn't -- doesn't

6   correlate to -- I forget what you call it -- the NAV.

7                    MR. DAVIDOW:  The clean NAV.

8                    THE COURT:  So you have chosen to make

9   an investment on a different -- at a different price.

10  But why aren't the investors entitled to know what the

11  process was that drove that decision making -- what

12  the process was, No. 1 -- and essentially when it

13  happened, what price was arrived at, and what the

14  considerations were?

15                   MR. DAVIDOW:  Well, let me describe

16  the record, and let me also break down the transaction

17  a bit, because I think it's important to do that.  The

18  plaintiffs' roll a variety of things together into one

19  big ball.

20                   Let's talk about the initial infusion

21  for a moment, and then let's talk about the givebacks

22  that were resolved over the months of March and April.

23                   THE COURT:  So you're calling them

24  givebacks.  Why can't you -- one might call them just

48

1   setting the terms of the investment.  Were the terms

2   of the investment set at the time the cash was infused

3   in either February 29th or March 2nd?  It's a yes or

4   no question.

5               MR. DAVIDOW:  Not on the specific

6   date, because the clean NAV couldn't be known on the

7   specific date.

8               THE COURT:  But no one ever -- is

9   there a record some place of the issuance of the

10  interest at the clean NAV?  And when was that

11  prepared?

12              MR. DAVIDOW:  The records that I've

13  seen in discovery reflect a variety of calculations.

14  What happened on February 29th and the beginning of

15  March was that Citigroup put in the money to cover the

16  margin calls.

17              THE COURT:  I understand that.  They

18  put in the money.

19              Now, I mean, there was some discussion

20  up to that point whether it would be equity, whether

21  it would be part equity and part loan, whether it

22  would be all loan.  I also understand that it couldn't

23  have been all loan because there was no equity to

24  support a loan.

1                    What's the record about why it had to

2    be all equity?

3                    MR. DAVIDOW:  The testimony here is

4    that that was, in essence -- well, I don't see any

5    record of discussion of whether Citigroup could have,

6    for example, invested 100 million of equity and then

7    done a loan on top of that.

8                    THE COURT:  I have seen that.  I've

9    read it in people's testimony.

10                    MR. DAVIDOW:  There is then discussion

11    as to --

12                    THE COURT:  I read that, before

13    February 29th, in the discussions leading up to the

14    infusion, there was discussion about that.  Was there

15    not?

16                    MR. DAVIDOW:  Before the event, I

17    believe there was.  Indeed in the case --

18                    THE COURT:  Why would you just have

19    said you've never seen anything about that?

20                    MR. DAVIDOW:  Because, in the period

21    when the terms were actually being discussed for this

22    infusion that occurred in light of these facts, the

23    discussions that I've seen --

24                    THE COURT:  Let's be clear.  The

50

1  period leading up to involved the period of two days

2  before the infusion was made, didn't it?  And it

3  referred to this particular infusion.  Now, am I

4  reading something else?

5              MR. DAVIDOW:  I'm not sure --

6              THE COURT:  There was people

7  working -- Dorfman and O'Brien, I guess -- working

8  over the weekend trying to get this money on the table

9  by Monday morning?

10             MR. DAVIDOW:  Yes.

11             THE COURT:  And there were various

12 proposals made during that period of time, were there

13 not?

14             MR. DAVIDOW:  There were.

15             THE COURT:  And it led directly to the

16 decision to infuse money on February 29th, did it not?

17             MR. DAVIDOW:  February 29th was Friday

18 before the weekend.  The discussions were over the

19 weekend.

20             THE COURT:  When was the first cash

21 infusion?

22             MR. DAVIDOW:  I believe the cash was

23 put up on Monday, March 3rd, during the day, and

24 therefore was at the February 29th closing price.

51

1                    THE COURT:  So during the period

2       between February 29th -- I thought there were two

3       different infusions.  I read that someplace, perhaps

4       even in your offering material.

5                    MR. DAVIDOW:  That's correct.

6                    THE COURT:  Is that wrong?

7                    MR. DAVIDOW:  No.  It's correct.  They

8       were both in the first week or so of March.

9                    THE COURT:  But it was not done

10      February 29th?

11                   MR. DAVIDOW:  It was done as of

12      February 29th.

13                   THE COURT:  As of?

14                   MR. DAVIDOW:  Yes, Your Honor.  It

15      used the closing price on February 29th because it was

16      done during the day on March 3rd, I believe.

17                   THE COURT:  So there was a discussion

18      between February 29th and the period when this

19      infusion was actually made.  It was made as of an

20      earlier date, at which consideration was given to

21      whether it would be equity or a loan, or part equity

22      or part loan, or even equity in a standby equity

23      position; correct?

24                   MR. DAVIDOW:  Equity in a standby

CHANCERY COURT REPORTERS

1    equity I do recall seeing discussed.

2                    THE COURT:  If you look at the

3    testimony, you'll see there's reference in the

4    documents -- you'll see reference potentially of some

5    of it being loans, too.  There were reasons given as

6    to why it wasn't treated as a loan?

7                    MR. DAVIDOW:  I don't recall a

8    reference to discussions.  I do recall both

9    Mr. Dorfman and O'Brien discussing their mental

10   process as to why it could not be a loan.

11                   It was done as a loan in the Falcon

12   case.  That was Citi's preferred approach.  It avoided

13   the downside risk.  It was not done at a loan here

14   because, in their view, as they described in their

15   testimony, it could not be done as a loan.  This was

16   an insolvent entity.

17                   THE COURT:  I understand why you

18   couldn't do it all as a loan.  I have difficulty

19   understanding why you couldn't -- maybe the truth is

20   you couldn't.  But why you couldn't have done some

21   part of it as equity and the rest of it as a loan, and

22   then there's some other explanation about how you

23   can't do that for tax reasons.  I find that one hard

24   to understand as well.

53

1                    MR. DAVIDOW:  I can explain that, if

2     Your Honor would like.

3                    THE COURT:  Please do.

4                    MR. DAVIDOW:  When you have an

5     investment in municipal securities, which are tax

6     exempt, the Internal Revenue --

7                    THE COURT:  I understand that

8     principle.  So you raised $500 million but then you

9     borrowed six or eight times that much, didn't you?

10                    MR. DAVIDOW:  No, Your Honor.  The

11    leverage was done by virtue of the derivatives that

12    the entity acquired, not by virtue of bank borrowing.

13    The leverage is referring to the effective leverage

14    obtained through the transactions that the entity

15    engaged in.

16                    THE COURT:  What was the amount of the

17    borrowings?

18                    All right.  This is very complicated.

19    It's more complicated than I probably could

20    understand.  It's certainly much more complicated than

21    has been explained in either your offering material or

22    your briefs.

23                    The leverage that you're achieving is

24    partly -- is partly derived by designing derivative

54

1   securities -- is that what you're saying? --that

2   recreate leverage?

3                   MR. DAVIDOW:  By purchasing

4   derivatives.

5                   THE COURT:  By negotiating derivatives

6   with counterparties that have some factor, and then it

7   creates leverage?

8                   MR. DAVIDOW:  Yes, Your Honor.

9                   THE COURT:  All right.  That's not

10  regarded as borrowing for purposes of the IRS

11  regulation?

12                  MR. DAVIDOW:  Again, I'm not an

13  authority on this, but that's my understanding.

14                  THE COURT:  It's hard to understand.

15                  Would you mind if we take a short

16  recess?

17                  (Recess taken.)

18                  (Reconvened.)

19                  THE COURT:  Mr. Davidow.

20                  MR. DAVIDOW:  Thank you, Your Honor.

21                  Perhaps it would be most useful for me

22  to go through the various points plaintiffs have

23  raised, although I'd be happy to address further, if

24  Your Honor would like, the actual underlying

CHANCERY COURT REPORTERS

55

1   circumstances of the investment.

2              THE COURT:  Why don't you go ahead and

3   proceed as you suggest.

4              MR. DAVIDOW:  First, with respect to

5   the SEC investigation, the only documents coming from

6   the SEC are the two documents Your Honor has seen --

7   the two requests.  As Your Honor pointed out, these

8   are -- I shouldn't say "as Your Honor pointed out."

9   In fact, these are not subpoenas.  They are letters

10  requesting information.  Whether we describe it as an

11  inquiry or investigation, I believe not to be a

12  material issue.  Indeed the letters themselves use

13  both terms.  Whether it is formal or informal would be

14  of significance if it were formal.  But as far as we

15  know, it is not.  We have only those two letters.  We

16  have no subpoenas.  From what one can glean from the

17  two letters, these are very broad requests.

18             The caption of the letters refers to

19  Falcon -- to three different groups of hedge funds:

20  The Falcon funds of which there are several, the ASTA

21  funds of which there are several, and the MAT funds of

22  which there are several.

23             The text of the request is broader

24  still.  It refers to any hedge funds -- any Citi hedge

1    funds and requires a broad group of documents being

2    produced regarding any or all of those hedge funds.

3                    For plaintiffs to suggest that this is

4    an investigation focused lazer like on MAT Five is

5    unsupported by the evidence, or by any of the facts of

6    which we are aware.

7                    The disclose which has been made in

8    the exchange offer captures quite well what has been

9    sought by the SEC.  They have sought information about

10   Citi's hedge funds.  The fact that we've included it

11   in this exchange offer memorandum certainly indicates

12   to investors that, as one would expect, since they

13   knew they were investing in a hedge fund managed by

14   Citi, this is one of the hedge funds that comes within

15   that broad request.  And it does.

16                   THE COURT:  Are you telling me that

17   the Falcon funds and ASTA/MAT comprise all of the Citi

18   hedge funds?

19                   MR. DAVIDOW:  In fact they do, Your

20   Honor.

21                   THE COURT:  They're defined that way

22   in this letter.  Is that it?  That's everything that

23   CAI does that would be called a hedge fund?

24                   MR. DAVIDOW:  Yes.  It has a number of

57

1    registered investment companies, but we don't view

2    those as hedge funds or as covered by this request.

3              THE COURT:  They are not covered by

4    the request because of the way the phrase Citigroup

5    hedge funds is defined in the request; correct?

6              MR. DAVIDOW:  The way -- indeed the

7    way it's defined covers Citigroup itself and not

8    merely these hedge funds.  It's a somewhat unusual and

9    very broad definition.

10             THE COURT:  The only question is

11   whether you have any reason to believe from the

12   letter, or from any other -- frankly, any other

13   communication you had with members of the SEC staff

14   that there is interest on the part of the staff in

15   investigating this particular fund.  It's certainly

16   broad enough to cover this fund.  The MAT funds are

17   identified by name in the reference line.

18             MR. DAVIDOW:  Yes, as among the

19   various funds as to which they're questioning

20   documents.  That is the case.  Although it's outside

21   the record, I'm the counsel representing Citigroup in

22   connection with that investigation.  And I can

23   certainly represent to the Court that we are not aware

24   of the investigation having focused on any one fund at

1   this point.

2                  And as the record reflects, there have

3   been no requests for testimony or anything of the

4   sort.  There have been these two document requests.

5   Document production has begun.  We've produced the

6   plaintiffs everything that we've produced to the SEC.

7   And that's the state of the affair at this point.

8                  It's hard for us to see how there is

9   more than we can accurately say to investors, and

10  certainly not more that would materially alter their

11  investment decision.  Indeed, to go as far as what

12  plaintiffs would have us say would be, in our view,

13  simply untrue.

14                 THE COURT:  You could go -- where

15  exactly in the disclosure document is this -- is the

16  reference made to the SEC inquiry?

17                 You can come back to that.  Why don't

18  you move ahead, Mr. Davidow.

19                 MR. DAVIDOW:  Yes.  One of my

20  colleagues can provide me with the precise page.

21                 Let me turn to the issue of leverage,

22  which is the second of the issues that plaintiffs

23  focused on.  First, I'll address it at a simple level

24  and then at a more complicated level.

59

1          The private placement memorandum

2    defines the term leverage.  It's a definition that is

3    essentially static in nature.  Normally one thinks

4    about leverage as involving the total amount of the

5    assets divided by the amount of money invested.  And

6    that's how the private placement memorandum defines

7    it.  But it defines it as a static number -- that is,

8    neither numerator or denominator is market-to-market.

9    Mr. Islam explained the reason for that.  He said the

10   private placement memorandum was intended to affect

11   how they trade.  How the markets move thereafter is

12   not within their control, to the same extent, and the

13   focus here is in effecting what kinds of trades one

14   can put on.  For better or worse, that's the

15   definition in the PPM.

16          There is no evidence that MAT Five

17   ever violated the leverage guidelines as defined

18   there.  Indeed Mr. Traum, who testified that he

19   reviewed the regular compliance materials that tested

20   for guideline compliance, never saw one indicating

21   that there was a violation.  And again, that's much as

22   one would expect because, even in the period when the

23   fund was failing, when you're dealing with a fraction

24   that is not being market-to-market, one would not

60

1    expect it to respond violently.  That's the basic PPM

2    version of leverage.

3                      Internally, among the people who were

4    managing this fund and overseeing it, they thought

5    about leverage in a different and additional

6    respect -- that is, what's happening on a

7    market-to-market basis.  As the markets change, are we

8    increasing our risk?  Are we decreasing our risk?

9    That's not a matter as to which representations have

10   been made to investors in the PPM, but it was

11   certainly a relevant matter as to them.  As the value

12   of MAT Five declined and the denominator of the

13   market-to-market version declined, as investors' value

14   had decreased, that became quite large.  Not a

15   guideline violation, because there was no guideline

16   with respect to that, but clearly an issue of great

17   interest to them internally.  There are a variety of

18   documents that the plaintiffs have seen discussing

19   that and the increase in that level.

20                     With respect to the tender offer

21   memorandum, there is the chart at page B2 that refers

22   to leverage.  And again, if this is -- not B2.  B3.

23   What plaintiffs argue here is that the term "leverage"

24   isn't defined in this document.  And there is

61

1    testimony to the effect that at least some of the

2    people who were involved understand leverage, as used

3    in this document, to be referring to the

4    market-to-market version of leverage and not the

5    private placement memorandum version of leverage.  And

6    therefore plaintiffs say, "Aha, investors looking at

7    this won't understand what they're seeing."

8                    Now, first of all, I think actually,

9    if one looks at this very carefully, including the

10   footnotes, one can see that there is a change of

11   valuation being used in this leverage calculation.

12   Indeed, if one looks at footnote three on the

13   following page, it talks about assuming leverage on

14   4/30/08, which is different from the initial leverage

15   numbers.  But even apart from that, Mr. Traum, who was

16   the one person they deposed, who actually worked on

17   these materials and reviewed them at the time, said it

18   doesn't matter, to the effect -- to the point that

19   this chart is making.

20                   What this chart is saying is not here

21   are leverage guidelines going forward.  What it is

22   saying, in effect, is we intend to manage the fund so

23   that its leverage is in the range of four to six

24   times.  If we manage it in a way that has leverage of

1    four to six times, and if we make some assumptions as

2    to what interest rates do, here's what your expected

3    returns will be.

4                    And if one looks, for example, in the

5    tender scenario, under the column Estimate of Capital

6    Value Participation, the spread is fairly small

7    between -- depending on -- in any one group.

8                    What Mr. Traum said is that, if we're

9    using leverage at these levels, it doesn't really

10   matter what definition -- which of the two definitions

11   we use.  We're going to get about the same numbers.

12   Plaintiffs did not cross-examine on that point and

13   have introduced no evidence to the contrary.  So the

14   state of the record is that, at the particular levels

15   being discussed here, the ultimate outcome that

16   investors will be interested in -- that is, what

17   return might I expect -- is not substantially affected

18   by that difference.

19                   And there's a second reason why it

20   doesn't matter.  The 4X and 6X numbers reflect how the

21   management, using the definition of leverage they're

22   using here, intends to manage the fund.  If we

23   restated this chart, and say we're going to use the

24   PPM definition -- that doesn't change -- our

63

1  management intends to manage the fund -- that will

2  simply mean, instead of 4X and 6X, we will have

3  different numbers -- probably a somewhat smaller

4  spread -- that reflects the conversion of how

5  management intends to manage the fund.  But it's the

6  same underlying substance that's going on, and

7  therefore the same ultimate numbers that will result.

8  It's akin, as we say in our brief, to arguing over

9  whether temperature assumptions are being done in

10 degrees centigrade or degrees Fahrenheit, where the

11 question being addressed is how many weeks in March

12 will I have to wear an overcoat.  It doesn't matter.

13          The point is, all the underlying

14 factors will shift if you choose to change the

15 definition but the answer will still be the same.  For

16 that reason, we don't believe this leverage issue is

17 an issue at all.

18          The next issue they raise is this

19 updated NAV availability.  By indicating, as we have

20 already said, that we intend to extend to the end of

21 July, I hope we have addressed the issue of the

22 June 30 NAVs.

23          With respect to the question of should

24 we be releasing desk NAVs -- that is, the informal

64

1   NAVs calculated internally -- there we believe that

2   plaintiffs are wrong; and that not only are we under

3   an obligation to release those, but it would be

4   misleading under the circumstances.

5                   The record reflects that the month-end

6   NAVs are calculated by an independent third-party

7   using a very complicated process, as one would expect,

8   where derivatives are being traded as they are here.

9   The desk NAV is, in a sense, a back-of-the-envelope

10  calculation.  It's still quite complex because there

11  are many, many securities involved.  But it leaves out

12  about ten of the dozen factors.  And what's more, I

13  believe the record shows it involves internal marking

14  of derivatives based on models.

15                  That is not what we do with respect to

16  our month-end audited financials.  The month-end

17  audited financials are done based on quotes obtained

18  by the third-party administrator from pricing

19  services, or quotes obtained from dealers in these

20  derivatives.

21                  THE COURT:  Which are based on models

22  they used -- they call you up to price their

23  derivatives and you call them up to price yours;

24  right?

1              MR. DAVIDOW:  First, there's an issue

2    of who the "they" and the "you" is.  The desks that

3    trade derivatives, which are a different part of the

4    organization, do give prices out.  The desks of other

5    banks --

6              THE COURT:  No doubt they do, based on

7    the same models, probably, that you're using

8    internally to do your informal estimates.

9              MR. DAVIDOW:  I can't speak to the

10   ultimate accuracy.  What I can say is that they have

11   no incentive to exaggerate or understate the values

12   that they're giving us, and they are the best

13   available.  And by virtue of the fact that they're not

14   ours, that they at least withstand the self-interest

15   allegation.

16             THE COURT:  You said something before,

17   Mr. Davidow.  I'm sorry.  I'm flipping through the

18   book trying to understand it.  When you were

19   describing the charts on B3, you said that the

20   assumptions -- the scenarios of the 4X leverage and 6X

21   leverage somehow reflected the plan -- the

22   going-forward plan for managing the fund.  Is that

23   disclosed in the document someplace, or did I

24   misunderstand you?

66

1            MR. DAVIDOW:  Well, what it says in

2    footnote three is the managing agent believes that a

3    4X to 6X leverage range is an approximate -- is a

4    reasonable approximation of future leverage, based on

5    current market conditions which are subject to change.

6    I'm paraphrasing that.  Since it's a matter within the

7    managing agent's control --

8            THE COURT:  Is there anything in the

9    document that actually discloses, without looking in

10   footnotes, what the managing agent's expectations or

11   plans are for managing this fund on a going-forward

12   basis?

13           MR. DAVIDOW:  I don't -- I'm not aware

14   of specific statements as to its plans.

15           THE COURT:  Any statement at all about

16   what their plan is?

17           MR. DAVIDOW:  Not that I recall.

18           THE COURT:  All right.

19           MR. DAVIDOW:  I mean --

20           THE COURT:  We're arguing that this

21   chart reflects how they claim to manage it going

22   forward.  You're extrapolating that statement from

23   this footnote three?

24           MR. DAVIDOW:  Yes, Your Honor.

1              THE COURT:  You think that was a fair

2    thing to do?

3              MR. DAVIDOW:  I do, Your Honor.

4              THE COURT:  Why?

5              MR. DAVIDOW:  Because, when a company

6    decides what assumptions to use with respect to

7    matters under its control in its materials that it

8    circulates, what it is saying is, "We think these are

9    reasonable numbers going forward."  And when it's a

10   matter --

11             THE COURT:  If that is what their plan

12   is going forward to get into that range, that also

13   should be disclosed to people who are being asked to

14   make a choice between either selling or staying in?

15             MR. DAVIDOW:  Well, I think it is fair

16   to disclose.  And I think that by doing this in the

17   one part of the document, where they're actually

18   talking about what results one might expect going

19   forward, they're disclosing it in a part of the

20   document where it's most meaningful to investors.

21             THE COURT:  That there shouldn't be a

22   part of the document that talks about the plans to

23   manage the business going forward and it should just

24   be in some annex chart?  Anyway, I'm just arguing with

1    you.

2                    MR. DAVIDOW:   The location of --

3                    THE COURT:   Yes.   Locating something

4    in a footnote -- in an annex -- I don't think is the

5    same thing as having some forthright disclosure in the

6    document about what your plans are for managing the

7    business going forward, which would include not only

8    what you're expected leverage is, and, frankly,

9    described in some sensible way what you mean by that,

10   as opposed to other definitions of it, but what

11   arrangements you're making with respect to borrow --

12   having liquidity facilities, what the status of those

13   negotiations is, how they will affect the ability of

14   the fund in the future to pay dividends or pay

15   interest -- whatever it is -- and also to permit

16   redemptions.   Is there any disclosure in the document

17   about that?

18                    MR. DAVIDOW:   With respect to

19   developing a liquidity facility, no, there is not

20   disclosure regarding that.

21                    THE COURT:   Is that something that's

22   going on?

23                    MR. DAVIDOW:   That's one of the number

24   of things they're doing to try and get into a position

1    to permit redemptions and permit distributions in the

2    future.

3                    THE COURT:  Do they still plan to, or

4    is it still under consideration to waive the two-year

5    lockup and permit redemptions sooner than February of

6    2009?

7                    MR. DAVIDOW:  It's under

8    consideration, as the document that plaintiffs have

9    identified before indicates.

10                   THE COURT:  It's not disclosed in this

11   document, is it?

12                   MR. DAVIDOW:  It is not in this

13   document.

14                   THE COURT:  The fact that it was

15   disclosed in an earlier document and not in this

16   document might actually lead people to believe that

17   it's no longer under consideration, might it not?

18                   MR. DAVIDOW:  I would think that had

19   the decision been made not to do it, as opposed to

20   being silent on it, that would have been disclosed.

21   And people would expect it to have been disclosed,

22   Your Honor.

23                   THE COURT:  I'm being asked -- if I

24   own this, I'm being asked to make a decision and one

1  of them is to hold.  One of the things you're not

2  telling me is, if I hold it, will I be able to offer

3  it for redemption at any time starting with before

4  February of 2009 -- the lockup -- what was the

5  lockup -- and then, more generally, ever before the

6  fund is liquidated.  Why isn't -- isn't that really a

7  key fact for me to understand, if I have to make that

8  decision?

9                    MR. DAVIDOW:  It is a key fact.

10                   THE COURT:  Why is it not in this

11  document?

12                   MR. DAVIDOW:  It's also a fact as to

13  which we don't know.

14                   THE COURT:  You have to say that.

15  Don't you have to say that?  "We're trying to do it,

16  we're trying to make arrangements.  We can't give you

17  any guarantees.  It is our expectation, if we are

18  successful in arranging a liquidity facility, that we

19  will.  It is our plan, and you can count on it."

20                   MR. DAVIDOW:  The "you can count on

21  it" would go --

22                   THE COURT:  A liquidity facility, it

23  is our plan, barring some unforeseen development to do

24  that.  I don't know how you can't tell people that.

1             MR. DAVIDOW:  Very well, Your Honor.

2             Let me move on, then, to some of the

3    other issues here.  With respect to the conflict of

4    interest issue, as we've noted, the tender offer memo

5    does disclose the existence of conflicts of interest

6    presented by the fact that Citigroup now owns shares.

7             Plaintiffs argue that you should also

8    disclose that there was a conflict of interest from

9    the inception, based on the possibility that Citigroup

10   might purchase shares.  I think it's fair to say that

11   there was no -- there is no evidence in the record

12   that that possibility was contemplated indeed, or the

13   circumstances that would give rise to it was

14   contemplated.

15            THE COURT:  Right.  I understand your

16   point on that.

17            MR. DAVIDOW:  With respect to investor

18   complaints -- then that's the next point that

19   plaintiffs had raised -- they argue that it would

20   significantly alter the mix of information for

21   investors to know that some other investors have sent

22   in complaint letters.  Here, we actually have a class

23   action that was filed, of which the investors have

24   been made aware, raising these allegations.  What's

1   more, to the extent investors believe that improper

2   representations were made to them by their brokers,

3   they know that.  They know better than we, or anyone

4   else, what their broker said to them and whether, in

5   light of what's happened, it's accurate or not

6   accurate.  Putting in a disclosure that says we've

7   gotten X number of complaints from other investors who

8   think that their brokers didn't --

9              THE COURT:  That disclosure might

10   actually just be part of the disclosure of the process

11   that was pursued after the cash infusion to establish

12   the terms of the investment, might it not?  It

13   certainly was something that was considered by

14   Citibank, and it was discussed by those who were

15   setting the terms, or negotiating or discussing

16   setting the terms.

17              MR. DAVIDOW:  Yes.  The feedback from

18   the Global Wealth Management brokers and investors was

19   very definitely considered.

20              THE COURT:  So why shouldn't that be

21   part of -- this is to -- you'll have to help me, if

22   you think I'm wrong.  I look at this investment as

23   presenting a situation very similar to an entire

24   fairness analysis: that you made this large investment

1    and then you went about and set the terms yourself, in

2    a case where you controlled all of the actors who were

3    involved in that process and, as a consequence -- at

4    least certainly, when you start with the clean NAV,

5    the other investors were reduced from owning

6    100 percent of the equity to owning 2 percent of the

7    equity, if I have my numbers about right.

8                    MR. DAVIDOW:  You do have the numbers

9    about right.

10                    THE COURT:  You sort of have to carry

11    the burden of persuasion in this that you followed a

12    fair process and you arrived at a fair price.  I don't

13    know how you can do that without describing the

14    process.

15                    MR. DAVIDOW:  To my mind, Your Honor,

16    the issue is this.  First, we're dealing with an

17    entity that's a basket of assets -- a basket of

18    securities that have a value.  So it's somewhat

19    different from the model of an operating company

20    that's being taken over.

21                    THE COURT:  Okay.  So what?

22                    MR. DAVIDOW:  Well, because what that

23    means is that what happened to the value of their

24    investment, when it declined from 100 on the dollar to

1    $.02 on the dollar, is a matter of calculation.  And

2    plaintiffs do not dispute the accuracy of that

3    calculation.  The markets moved against it.  It went

4    from 100 cents down to $.02.  Margin calls came in in

5    the hundreds of million dollars that it lacked the

6    cash to pay.

7                    THE COURT:  Margin calls, which are

8    never specified in your disclosure document.  The

9    amount of that is not disclosed?

10                   MR. DAVIDOW:  I don't believe it's

11   disclosed.

12                   THE COURT:  These are margin calls

13   being made against these derivative securities?

14                   MR. DAVIDOW:  Yes, Your Honor.

15                   THE COURT:  All right.  So it's not

16   some lending facility.  It's a derivative security

17   that Merrill Lynch or J.P. Morgan, or somebody else --

18   was Citibank also a counterparty to one of these

19   derivatives?

20                   MR. DAVIDOW:  It was one of the

21   counterparties.

22                   THE COURT:  Was Citibank making margin

23   calls?

24                   MR. DAVIDOW:  I believe, yes.

1   Absolutely.  The margin calls are specified by

2   contract -- that is, variation of margin is required

3   by a derivatives contract.  All of the counterparties

4   made margin calls, as the markets moved.  Again,

5   there's no issue in this case, as far as I'm aware, as

6   to the accuracy of those margin calls.

7                   THE COURT:  The only reason this is

8   interesting is that -- and as some of your own

9   documents describe -- the opportunity to invest

10  several hundred million dollars at that moment in this

11  entity presented a uniquely attractive or

12  extraordinarily attractive opportunity.

13                  MR. DAVIDOW:  Well, yes.

14                  THE COURT:  There is a confluence of

15  events, there's no doubt about it, and the entity

16  itself couldn't come up with the money.  Now, whether

17  the investors in the entity could have come up with

18  the money, if they had been asked, I don't know.

19  Maybe not quickly enough.

20                  MR. DAVIDOW:  We're talking about

21  something that had to be funded within a day or two.

22                  THE COURT:  That may be the result of

23  the way the fund was managed over time that the

24  problems weren't foreseen.  Although I think one of

1  your witnesses did foresee this as a potential risk,

2  a serious risk, and he foresaw it some time before

3  this happened.  And there's no evidence that anything

4  was done about it.  But the fact that you get into

5  extremists is itself potentially the result of poor

6  management.  Of course, the market's moving against

7  you.  If you have investors that are willing to

8  invest -- and I think you did -- and they aren't given

9  the opportunity, who are already investors and who

10  could invest to avoid dilution, to go to your

11  controlling entity and take the money presents a

12  highly conflicted situation, which I think you're

13  going to have to tell people what the process was that

14  led to it and then what the process was that followed

15  it that led to setting the terms.

16                    MR. DAVIDOW:  I understand, Your

17  Honor.

18                    THE COURT:  And part of that is going

19  to be discussions you had with Global Wealth

20  Management and with the Smith Barney people --

21  complaints that were received.  I guess that's part of

22  it.

23                    You may not view that as a material

24  part of the discussion.  It seems to be part of the

1    story.

2              MR. DAVIDOW:  Let me just say one more

3    word on this issue, as we have gone back to the

4    underlying substance and the nature of the disclosure

5    of it.  I don't think there's anything in the record

6    to suggest that the amount that was needed to meet the

7    margin calls, which was the amount -- which was the

8    amount invested -- the minimum amount necessary to

9    meet the margin calls -- was an amount that could be

10   raised in the day -- by Monday.

11             THE COURT:  I'm not saying it could

12   have been.  But he might have been able to raise a

13   good part of it from the existing investors over the

14   next week or two, had they been offered the

15   opportunity then, or you might have been able to raise

16   it before this calamity occurred, if the funds'

17   affairs had been managed differently.  I don't know.

18             MR. DAVIDOW:  The evidence with

19   respect to ability to raise for investors is that the

20   folks at CAI did speak with Global Wealth Management

21   on the issue.  And as the time period evolved, the

22   feedback that they got was, first of all, investors

23   having lost their shirt on this aren't very keen on

24   investing more.

1                    THE COURT:  At $.02 a share?

2                    MR. DAVIDOW:  That was the market

3    value.  And the market value can be down to zero cents

4    a share, Your Honor.

5                    THE COURT:  It can.  Of course it can.

6    Citi regarded it as an extraordinary opportunity, or

7    at least people in Citi did, and perhaps the investors

8    would have as well.

9                    MR. DAVIDOW:  It was also -- the

10   documents also reflect that it was an investment that

11   Citi did not want to make.  The reason it was viewed

12   as an investment opportunity is because people had the

13   belief, as they had for many months, that these

14   markets would right themselves and, when they did,

15   there would be great value there.

16                    THE COURT:  Mr. Davidow, this is all

17   while having made the investment.  It wasn't made at a

18   clean net asset value.  I don't know whether it was at

19   any point in time, but it certainly wasn't in the end.

20   That's not the deal you made.  You made this very,

21   very different deal.

22                    I'm not suggesting to you that the

23   deal that you structured isn't fair.  I'm not

24   suggesting that at all.  But I don't know how

1   somebody, who's presented with this material, can form

2   a judgment about it unless there's much more

3   disclosure of the process and views as to why -- how

4   the fairness is determined by the people participating

5   in the process.

6              MR. DAVIDOW:   I understand Your

7   Honor's views on that point.   Perhaps I should then

8   address just a handful of other issues that may be

9   important, if and when we have to go forward in

10  fashioning additional disclosure on the other issues

11  as well.

12              THE COURT:   Yes, I think you should.

13  Frankly, it's July 15th.   You want to close this

14  July 31st.   There's a couple of choices.   You can wait

15  ten days for me to issue an opinion, or you can figure

16  out what a new disclosure document should look like,

17  and get it worked out and present it to me and to the

18  plaintiffs, or work it out with them.   I don't know.

19  Maybe we can get -- you can move forward on a much

20  more timely basis.

21              If you wait until the end of the

22  month, I can promise you, there's going to be an

23  injunction.

24              MR. DAVIDOW:   I understand, Your

80

1    Honor.

2              The last of the points they haven't

3    addressed, that I have not yet addressed, is what they

4    claim is a calculation error -- the 86 million versus

5    85 million.  Rather than burden the Court with an

6    explanation as to why in fact it's not an error, I

7    would suggest that, if we need to go back, we can

8    include a better explanation of what that number is

9    and why it is what it is.

10              THE COURT:  How could it have gone

11   down, when the bigger number didn't go down?

12   Citibank's number doesn't go down at all and it's

13   many, many times bigger.

14              MR. DAVIDOW:  That's correct.  You're

15   working from a base -- the investor value of

16   $10 million of shares or what remained.  Citi had

17   allocated additional of its money to investors, but

18   that didn't change their number of shares.  They still

19   had $10 million of shares worth.  In that month, the

20   value went up by about 10 percent, which is why the

21   overall number went up by about 10 percent.  That's an

22   additional million or so dollars.

23              Fees that were charged in accordance

24   with the PPM were charged in arrears quarterly.  There

CHANCERY COURT REPORTERS

81

1   was a fee that was due and was taken out in April of a

2   little in excess of a million dollars -- between a

3   million and two million dollars, I believe.  So that

4   offset the million dollars in gains that the investors

5   would have had.

6                    The footnote to which Mr. Russello --

7                    THE COURT:  This is fees for

8   what?  --the first quarter of the year?

9                    MR. DAVIDOW:  It's the period prior to

10  February 29th.  Beginning February 29th Citigroup

11  waived fees.  There was, I understand it, professional

12  fees.  There was the base management fee.  I don't

13  believe there was any incentive fee payable.  And it

14  was those fees that affected the -- what would

15  otherwise be --

16                   THE COURT:  That were paid in arrears?

17                   MR. DAVIDOW:  Yes, Your Honor.

18                   THE COURT:  And they -- since Citi

19  wasn't an investor at the time, it wasn't socked with

20  any of them?  That's what you're saying?

21                   MR. DAVIDOW:  Not for that period.

22  No, Your Honor.

23                   THE COURT:  All right.

24                   MR. DAVIDOW:  I believe I've now

82

1   addressed each of the issues.  I understand I haven't

2   addressed each of them to Your Honor's satisfaction.

3   We've heard what Your Honor said and we will go back

4   and consider.

5                    THE COURT:  You didn't talk about the

6   purpose of the tender offer.

7                    MR. DAVIDOW:  Very well, Your Honor.

8   The disclosure says that the purpose of the tender

9   offer was to provide liquidity to investors.  It

10  doesn't go the step further that plaintiffs would ask

11  us to and say, "And the reason you want to do that is

12  to mollify your customers."  It discloses that we're

13  requiring a release.  It doesn't go a step further,

14  they say, and say, "You want a release because you

15  want to avoid litigation."  That's obvious.  As in any

16  case where a release is sought, there's only one

17  purpose for a release.  The issue is, does this

18  significantly alter the total mix of information to

19  investors.  I believe it does not.

20                   Indeed in the Skeen case, there was a

21  similar issue raised because there --

22                   THE COURT:  Mr. Davidow, I think when

23  you sit down and write a much more complete sort of

24  background of the offer section and talk about the

CHANCERY COURT REPORTERS

1    negotiation of how the terms were set and the reasons

2    and the various considerations, somehow it seems to me

3    this is just all going to fall into it anyway.  You're

4    going to be disclosing the complaints -- the desire on

5    the part of Citi to mollify investors and to meet the

6    complaints of its customers.  It's just going to be

7    there.  I'm not sure what the point is of fighting it.

8    I wouldn't fight it at this point.  I think I'd go

9    with it.

10                   MR. DAVIDOW:  Very well, Your Honor.

11                   Unless Your Honor --

12                   THE COURT:  There is another question

13   about the scope of -- about the release and the scope

14   of the release.  I suppose not.  Maybe it's not for me

15   to address.  The release also is going to be asking

16   people to release claims relating to the management of

17   the fund.  And there isn't any disclosure in this

18   document about that.  Is there any source of

19   information from people to reach any judgments about

20   how the fund was managed?  I'm only raising this

21   because I've seen a couple of snippets of testimony

22   and a couple of internal Citi documents that could

23   themselves raise questions about the management of the

24   fund.  I guess I'm referring to the glue and --

 1                    MR. DAVIDOW:  Let me comment on that

 2    document.

 3                    THE COURT:  -- the duct tape and glue.

 4                    MR. DAVIDOW:  Yes, Your Honor.  Let me

 5    comment on that document.  There is no testimony about

 6    it, even though the --

 7                    THE COURT:  When was it produced?

 8                    MR. DAVIDOW:  I'm sorry?

 9                    THE COURT:  When was it produced?

10                    MR. DAVIDOW:  As part of our normal

11    production that occurred in the normal time frame in

12    this case.  Plaintiffs didn't ask any of the

13    witnesses, including Mr. O'Brien, about it; didn't

14    include it, or the claim that it suggests in their

15    opening brief and launched it on us in the reply

16    brief.  So there is a very limited record beyond it.

17                    I can tell you some facts that I think

18    are germane to interpreting the document, based on

19    what is in the record.

20                    As Your Honor asked before, the date

21    of this is March 19th, which is after Mr. Islam had

22    been relieved of his duties with respect to this fund,

23    and as it reports a number of his people had just

24    left.  Indeed three of the six people had just left.

1          While Mr. Russello asserts that this

2     must have been about prior events, there's nothing in

3     the document to suggest that.  And by virtue of no

4     witnesses having been asked about it, that's purely a

5     matter of supposition.

6               THE COURT:  Well, it's an inference I

7     draw.  Maybe I'm just being in a very suppositionary

8     mood today.  But it's an inference I draw from the

9     document.  It's not talking about systems and analyses

10    and resources, and all that would have been only there

11    the last couple of weeks.  It's talking about

12    structural inadequacies.

13              MR. DAVIDOW:  It's describing it in a

14    context where the people have left and new people are

15    coming in, and therefore they're trying to put in

16    place systems for the new people.

17              THE COURT:  I understand that.  Don't

18    expect that I or anyone else is going to read a

19    document from the middle of March that is giving

20    someone's assessment of the way a business was run

21    with some very negative comments and think that it is

22    referring to a period of time from the end of February

23    until the middle of March.  It clearly is not.

24              MR. DAVIDOW:  Indeed the next question

1    then would be how one incorporates, one takes a single

2    e-mail from one individual --

3                    THE COURT:  I appreciate the fact they

4    didn't ask any questions about it, and they put it in

5    their reply brief, and it had exactly the intended

6    effect of drawing my attention in a way that leaves

7    you basically unable to respond to it in a reasonable

8    way.  And I point to, I think, also Mr. Dorfman's

9    testimony where he talks about reviewing -- shortly

10   after he arrived, or some time before February,

11   certainly -- reviewing this and other funds and come

12   to realize that they incorporated a risk that he

13   describes as the end of the world risk, in that it's

14   embedded in their investment strategy.  It raises

15   more questions in their answer certainly, but -- he

16   recognized that.  There's no record.  He wasn't asked

17   any more questions about that, for obvious reasons.

18   No litigator would ever ask another question on that

19   subject in that deposition.

20                    The scope of the release you're asking

21   people to give would include claims that would refer

22   to that as well; right?

23                    MR. DAVIDOW:  Indeed it would.  And I

24   think it's fair to say that the tender offer would not

1    have occurred without the release because there is an

2    enormous amount of value and potential value being

3    conveyed.

4                    THE COURT:  You say that.  I thought

5    the record was that everyone was all set on the tender

6    offer, and it was just Mr. Klayman at the last minute

7    that said, "Wait a minute.  Let's get a release if

8    we're doing this."

9                    MR. DAVIDOW:  Yes.  The senior most

10   management said, "Why are we paying potentially

11   hundreds of millions of dollars to people if they're

12   still going to be suing us?"

13                   THE COURT:  But you're giving away a

14   lot of money to people in the same way, without

15   getting a release from them.  A good deal of the money

16   is being transferred without any consideration back.

17                   MR. DAVIDOW:  The first part of this,

18   what I described as the reallocation, was done without

19   requiring anything back.

20                   THE COURT:  Which is $100 million.

21                   MR. DAVIDOW:  That's correct.

22                   THE COURT:  So tell me, again, why is

23   the release a crucial element of this deal?

24                   MR. DAVIDOW:  In the view of the

88

```
 1   senior most management of the company, that having
 2   already paid 100, $115 million, if we are going to
 3   spend more than $100 million on -- potentially on the
 4   shares that people own, therefore taking the risk
 5   associated with those shares and give away 75 percent
 6   of our long-term upside on -- with respect to the
 7   shares we already bought, we're talking about very
 8   large potential amounts of money, if this succeeds
 9   going forward.  And therefore doing that, and at the
10   same time being sued by these people, with the risks
11   that we have to make yet additional payments, is an
12   unattractive --
13               THE COURT:  I understand that.  Which
14   are your damages, too.  I'm raising these issues,
15   Mr. Davidow, only because, by asking for the release,
16   you really do bring into -- you make germane
17   disclosure about everything that the release is
18   releasing.  There isn't anything in this document that
19   even begins to talk about the way that the fund was
20   managed from the period of its inception up until
21   February 29th of 2008.
22               MR. DAVIDOW:  I understand, Your
23   Honor.
24               THE COURT:  All right.
```

CHANCERY COURT REPORTERS

89

1              Well, I'm going to ask you to do this.
2   I think this is a very unusual situation -- certainly
3   for me it is.  I've never done this before.  But I
4   can't imagine that I wouldn't issue an injunction in
5   this situation because I think your disclosure
6   document is just completely inadequate.  That's an
7   exaggeration.  It's inadequate in the ways that we've
8   discussed.
9              I can go write an opinion, but you're
10  not going to get it for ten days or two weeks.  Or
11  I'll ask you to communicate with me and the plaintiffs
12  about this later today, if you can.  I will await a
13  further submission by you that contains additional
14  disclosures and the plaintiffs can look at it.  If
15  they have any complaints about it, they can address
16  them to me.  I'll ask you to give some thought to that
17  and let me know how you wish to proceed.
18              If I write an opinion, I'll tell you
19  exactly what I think is wrong with it, in words and on
20  paper that you can work from.
21              MR. DAVIDOW:  I understand.  Perhaps,
22  Your Honor, what I would request is that we have until
23  the close of the day tomorrow to consult with our
24  client and report back to you as to what we propose to

CHANCERY COURT REPORTERS

90

1   do.

2              THE COURT:  That's fine with me.

3   You'll have until tomorrow, and you'll report to me

4   and the plaintiffs and then we'll proceed.

5              MR. DAVIDOW:  Thank you, Your Honor.

6              MR. WRIGHT:  Your Honor --

7              THE COURT:  Don't worry.  I'm not

8   going to enjoin Mr. Islam.

9              MR. WRIGHT:  Thank you, Your Honor.

10             THE COURT:  We'll stand in recess

11             (Court adjourned at 12:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

91

```
 1                          CERTIFICATE

 2                 I, DIANE G. McGRELLIS, Official Court

 3    Reporter of the Chancery Court, State of Delaware, do

 4    hereby certify that the foregoing pages numbered 3

 5    through 90 contain a true and correct transcription of

 6    the proceedings as stenographically reported by me at

 7    the hearing in the above cause before the Vice

 8    Chancellor of the State of Delaware, on the date

 9    therein indicated.

10                 IN WITNESS WHEREOF I have hereunto set

11    my hand at Wilmington, this 16th day of July, 2008.

12

13                 /s/ Diane G. McGrellis
                   ----------------------------
14                 Official Court Reporter
                    of the Chancery Court
15                    State of Delaware

16

17    Certification Number: 108-PS
      Expiration:  Permanent
18

19

20

21

22

23

24
```

# EXHIBIT 2

# (part 1 of 2)

CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM

# MAT FIVE LLC California Portfolio

**Offers Existing Holders that are Accredited Investors
a Cash Payment and Newly Created Participation Shares
in Exchange for any and all
Existing Shares of Limited Liability Company Interest**

The California Portfolio ("we," "us" or the "Company") of MAT Five LLC ("MAT Five") is offering to exchange for each share of limited liability company interest of the Company (the "Existing Shares" and the holders of Existing Shares, the "Existing Holders") of any series held by Accredited Investors (as defined herein), one (1) share of limited liability company participation interest as described herein (a "Participation Share") together with a cash payment of $0.206, which equals the net asset value ("NAV") per Existing Share as of April 30, 2008 (the "Exchange Payment") and, together with the Participation Share, the "Exchange Consideration"), as described in this confidential tender and exchange offer memorandum (this "Confidential Memorandum"). The foregoing transactions are collectively referred to herein as the "Exchange Offer." For each Existing Share tendered, we will sell one share of a new class of limited liability company interest to Citi (as defined below) (the "New Citi Shares") for a purchase price per New Citi Share equal to the Exchange Payment, the proceeds of which will be used to pay the aggregate Exchange Payment.

Substantially all of the assets of the Company are invested in shares of Municipal Opportunity Fund Five LLC – California Portfolio ("MOF Five"). On February 29, 2008 and March 3, 2008, Citi made investments in MOF Five (the "Citi MOF Investments" and the corresponding shares, the "Citi MOF Shares"). The New Citi Shares together with Citi MOF Shares are referred to herein as the "2008 Citi Shares," and the investments made by Citi corresponding to the 2008 Citi Shares are referred to herein as the "2008 Citi Investment."

All Existing Holders, whether or not participating in the Exchange Offer, (i) have been allocated 75% of the gains as of April 30, 2008 (the "April Citi Allocation") otherwise allocable to the Citi MOF Shares and (ii) will be allocated a pro rata portion of the Company's future interest income on the same basis as prior to the Exchange Offer, including the increased portion of interest income (the "Special Interest Allocation") allocable to all Existing Holders as described herein. In addition, Existing Holders that elect to exchange their Existing Shares for Participation Shares will be distributed, upon the liquidation of the Company or a redemption of any of the 2008 Citi Shares (all such events, "Participation Events"), a cash payment per share (the "Future Gain Distribution") equal to a pro rata portion of 75% of the cumulative gains allocable to the 2008 Citi Shares redeemed (excluding accrued interest income) in excess of the original purchase price of such redeemed 2008 Citi Shares plus the Cost of Capital (as defined herein) thereon.

Holders of Existing Shares who are not eligible or choose not to participate in the Exchange Offer will continue to be allocated interest income (including the Special Interest Allocation) and capital gains and losses of the Company on their Existing Shares. By tendering your Existing Shares in the Exchange Offer, you will not be allocated any further losses of the Company with respect to the Existing Shares, but your continued investment in the Company through ownership of Participation Shares may not result in any appreciation or otherwise in a recoupment of your initial investment. We can make no assurance that, upon the occurrence of a Participation Event, Existing Holders who participate in the Exchange Offer will be in a better position than Existing Holders who choose not to participate.

In order to tender your Existing Shares, you will be required to unconditionally release and discharge (the "Release") any and all claims against us, MAT Five, MOF Five, Citigroup Alternative Investments LLC (the "Managing Agent"), the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), and a number of other individuals and entities described herein relating to or arising from the acquisition, disposition or ownership of Existing Shares, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange (See "Release" on page 28 of this Confidential Memorandum).

**None of the Participation Shares have been registered under the Securities Act of 1933, as amended (the "Securities Act") or any state securities law and, unless so registered, may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. The offer of Participation Shares is being made in reliance upon the exemption from registration provided by Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws. Accordingly, this Exchange Offer is being made only to Accredited Investors as that term is defined herein. The Participation Shares will be subject to significant restrictions on transfer. See "Acknowledgements and Consents" on page 31.**

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and other information described in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. Existing Holders that are not Accredited Investors may not participate in the Exchange Offer. In order for holders of Participation Shares to receive any Future Gain Distribution upon the occurrence of a Participation Event, there will need to be an increase in MOF Five's NAV (and therefore the Company's) as compared to its NAV as of April 30, 2008 such that the NAV of the 2008 Citi Shares exceeds the amount of the 2008 Citi Investment plus the Cost of Capital thereon. As a result, we cannot give any assurance that there will be any Future Gain Distribution to holders of Participation Shares or that, upon liquidation of the Company, holders of Participation Shares will be in a better position than holders of Existing Shares. The Company expects to complete its liquidation and Citi expects its 2008 Citi Shares to be redeemed by March 31, 2011, although, subject to the limitations set forth in this Confidential Memorandum, such period may be shorter, based on such factors as when the ratio of 20-year AAA municipal yields to LIBOR swap rates normalizes.*

**THE PARTICIPATION SHARES ARE NOT DEPOSITS IN, OBLIGATIONS OF OR GUARANTEED BY CITIBANK, N.A. OR ANY OF ITS AFFILIATES, DO NOT HAVE THE BENEFIT OF DEPOSIT INSURANCE, AND ARE NOT GUARANTEED BY ANY GOVERNMENTAL ENTITY.**

**DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS CONFIDENTIAL MEMORANDUM, OR DIVULGING ITS CONTENTS OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED.**

**THE EXCHANGE OFFER WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON JULY 15, 2008, UNLESS EXTENDED BY THE COMPANY WITH RESPECT TO ANY SERIES OF EXISTING SHARES (THE "EXPIRATION DATE"). EXISTING HOLDERS WHO PROPERLY SUBMIT THEIR EXCHANGE OFFER SUBSCRIPTION AGREEMENTS PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2008 OR SUBSEQUENT TO JUNE 13, 2008 BUT PRIOR TO 5:00 P.M., NEW YORK CITY TIME,**

ON JUNE 30, 2008 MAY ELECT TO RECEIVE THE EXCHANGE CONSIDERATION WITH RESPECT TO SUCH SHARES BY JUNE 20, 2008 OR JULY 7, 2008 (IN EACH CASE, "EARLY SETTLEMENT"), BUT WILL RETAIN THE RIGHT TO REVOKE SUCH TENDERS PRIOR TO THE EXPIRATION DATE BY RETURN TO THE COMPANY OF ANY SUCH EXCHANGE PAYMENT AND AUTOMATIC FORFEITURE OF ANY PARTICIPATION SHARES DELIVERED PURSUANT TO SUCH EARLY SETTLEMENT IN ADDITION TO COMPLIANCE WITH THE OTHER REVOCATION PROCEDURES DESCRIBED IN THIS CONFIDENTIAL MEMORANDUM.

The date of this Confidential Memorandum is May 29, 2008.

## SUMMARY TERMS OF THE OFFER

- The Expiration Date is 5:00 p.m., New York City time, on July 15, 2008, unless extended by us at our sole discretion with respect to any series of Existing Shares. The Company reserves the right to amend or terminate the terms of this Exchange Offer in its sole discretion, as more fully described under "The Exchange Offer" on page 23. Any action described herein to be taken by the Company may be made by the Managing Agent.

- Except as set forth in this Confidential Memorandum, we will accept outstanding Existing Shares held by "accredited investors," as defined in Rule 501(a) of Regulation D under the Securities Act ("Accredited Investors") that are properly tendered and not revoked prior to the Expiration Date. Holders of Existing Shares who wish to tender such shares will be required to tender all Existing Shares held by them in order to participate in the Exchange Offer, as more fully described under "The Exchange Offer" on page 23. Notwithstanding anything to the contrary contained herein, certain persons who are affiliates of Citi ("Citi Affiliated Persons") that are also Existing Holders are expected to be excluded from participating in the Exchange Offer. Such exclusion should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, MAT Five, MOF Five, the Managing Agent, Citi or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer; accordingly, you must make your own determination whether to tender your Existing Shares.

- The offer of the Participation Shares pursuant to the Exchange Offer is being extended in reliance on the exemption from registration provided by Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws and has not been registered with the Securities and Exchange Commission (the "SEC"). In order to preserve certain private offering exemptions under the Securities Act, only Accredited Investors may participate in the Exchange Offer. All Existing Holders were required to be Accredited Investors and "qualified purchasers" within the meaning of Section 2(a)(57)(A) of the Investment Company Act of 1940 at the time they acquired their Existing Shares pursuant to the original offering memorandum of the Company (the "Original PPM") and make representations to that effect and to the effect that they had such knowledge and experience in financial and business matters that they were capable of both evaluating the merits and risks of the prospective investment and withstanding losses with respect to such investment. Information contained in the Original PPM does not constitute part of this Confidential Memorandum.

- We will pay, on the terms and subject to the conditions set forth herein and in the related Exchange Offer Subscription Agreement, the Exchange Payment (equal to the NAV per Existing Share as of April 30, 2008, which includes the April Citi Allocation) for each Existing Share properly tendered and not properly revoked. The NAV of the Existing Shares as of April 30, 2008 is set forth in Annex A. The NAV of the Existing Shares as of May 31, 2008 will be provided to all Existing Holders prior to the Expiration Date.

- In addition to the Exchange Payment, we will issue Participation Shares to those holders who have properly tendered and not properly revoked their election to tender their Existing Shares prior to the Expiration Date. Other than with respect to Existing Shares tendered for Early Settlement, we will issue the Participation Shares and pay the Exchange Payment promptly following the Expiration Date upon our determination that the conditions to the Exchange Offer have been satisfied or waived, as more fully described under "The Exchange Offer" on page 23.

- Prior to the commencement of the Exchange Offer, Citi agreed to special provisions related to the sharing of investment income and gains with respect to its Citi MOF Investments, which provisions apply to all Existing Holders equally whether or not they elect to participate in the Exchange Offer. As described more fully below, these provisions include (i) the April Citi Allocation, which allocated to Existing Holders 75% of the gains otherwise allocable to the Citi MOF Shares for the months of March and April 2008, during which there were increases in the NAV of MOF Five; and (ii) the Special Interest Allocation, which will allocate to Existing Holders a larger portion of the interest income of MOF Five (such additional portion generally equal to a pro rata portion of the first 2% of interest income otherwise allocable to the Citi MOF Shares as well as half of the remaining interest income otherwise allocable to the Citi MOF Shares) for the period from May 1, 2008 for as long as Citi remains invested in the Company, based on the number of Existing Shares outstanding as of February 29, 2008 (the "Baseline Share Count"), as more fully described under "Citi Concessions as to Allocations on its Investments" beginning on page 5.

- Following the Exchange Offer, each Participation Share will be entitled to (i) allocations of a portion of the Company's net interest, on the same basis as the Existing Shares (including the Special Interest Allocation), and periodic distributions corresponding to such allocations (when distributions are resumed); and (ii) the Future Gain Distribution, which entitles the holders of such Participation Shares, upon a Participation Event, to distributions equal to a pro rata portion of 75% of the gains otherwise allocable to the 2008 Citi Shares redeemed, based on the Baseline Share Count, net of Citi's cost of capital (3-month LIBOR plus a variable spread determined by Citi, compounded annually, which will initially be equal to 9% but may increase or decrease based on various market, economic and other factors, the "Cost of Capital"). In order for there to be any Future Gain Distribution, there will need to be an increase in the NAV of MOF Five (and therefore of the Company) as compared to its NAV as of April 30, 2008, such that the NAV of the 2008 Citi Shares exceeds the amount of the 2008 Citi Investment plus the Cost of Capital thereon. As a result, we cannot give any assurance that there will be any Future Gain Distribution.

- Existing Holders who are not eligible or choose not to participate in the Exchange Offer will continue to be allocated interest income and gains of the Company on their Existing Shares, and should therefore benefit from the April Citi Allocation and the Special Interest Allocation, but remain exposed to any future losses allocated to their Existing Shares, as more fully described under "Citi Concessions as to Allocations on its Investments" beginning on page 5.

- There is no obligation on any Existing Holder to tender Existing Shares for the Exchange Payment and Participation Shares and, as a result, to grant the Release. Participation in the Exchange Offer is entirely voluntary. There is no minimum number of participating Existing Holders upon which the Exchange Offer is conditioned and no drag along rights, exit consents or other majority action being taken that affects the rights of the Existing Shares, should an Existing Holder choose not to participate in the Exchange Offer. You are not being asked to make an investment decision regarding the assets and strategies of MOF Five (since holders of both Existing Shares and Participation Shares will remain invested in MOF Five via such shares following the Exchange Offer), but rather the comparative value to you of: (A) tendering your Existing Shares for the Exchange Payment and Participation Shares, as well as releasing and discharging the Releasees (as defined below) from any liability in connection with your investment in the Company; or (B) retaining your Existing Shares and thus your share of the Company's profits, losses and net interest income (subject to the ongoing suspension of redemptions and distributions), as well as retaining the right to join or bring legal action against the Releasees, including against the Company, the Investment Manager or Citi. See "Comparison of Existing Shares and Participation Shares Following the Exchange Offer" beginning on page 15, as well as Annex B to this Confidential Memorandum.

- If the Exchange Offer is not consummated, all tendered Existing Shares will be returned, regardless of when they were tendered, no Participation Shares or New Citi Shares will be issued and no Exchange Payment will be paid (other than with respect to Early Settlement, which settlements, if any, will be rescinded), but all Existing Holders will have been allocated the April Citi Allocation and will continue to be entitled to the Special Interest Allocation. The Company has not set a minimum tender amount as a condition for the consummation of the Exchange Offer. Without exception, tendering holders will retain revocation rights until the expiration of the Exchange Offer, including any extension. In the event that you elect to revoke your tender and you follow all the procedures for revocation described under the caption "The Exchange Offer—Revocation Rights" on page 26, you shall continue to be a holder of the Existing Shares and will have been allocated the April Citi Allocation and will continue to be entitled to the Special Interest Allocation, as more fully described under "Comparison of Participation Shares and Existing Shares Following the Exchange Offer" beginning on page 15.

- The Participation Shares are subject to significant restrictions on transfer, as described under the caption "Acknowledgements and Consents" on page 31. Participation Shares (similar to the Existing Shares) may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Managing Agent (which may grant or withhold such consent in its sole discretion) and in compliance with applicable securities laws.

- No Existing or Participation Shares are listed for trading on any national securities exchange or for quotation on any automated quotation system and we do not intend to list the Existing Shares or the Participation Shares for trading or quotation and do not expect any other market to develop.

- For a discussion of certain of the tax consequences of participating in the Exchange Offer, see "Certain United States Federal Income Tax Consequences" beginning on page 28.

- We will not receive any cash proceeds from the Exchange Offer other than from the concurrent sale of the New Citi Shares, as described herein, the proceeds of which will be used to pay the Exchange Payment, as more fully described under "The Exchange Offer" on page 23. Any Existing Shares that are properly tendered by Accredited Investors and accepted pursuant to the Exchange Offer will be considered redeemed.

- By tendering your Existing Shares in the Exchange Offer and executing the Exchange Offer Subscription Agreement and accompanying Release you will unconditionally release and discharge any and all claims against the Company, MOF Five, MAT Five, the Managing Agent, the selling broker for the Existing Shares, Citi, any of the Company's past or present sub-advisors, the Company's auditors and tax preparers, U.S. Bank National Association (the "Administrator") and past and present counsel to such parties (such parties, and their respective affiliates, including but not limited to any other portfolio of MAT Five, and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to herein as the "Releasees") relating to or arising from the acquisition, disposition or ownership of Existing Shares, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of such exchange.

- In connection with this Exchange Offer, the Company's and MOF Five's respective limited liability company agreements (the "LLC Agreements") are being amended to revise the terms of the Existing Shares and Citi MOF Shares as set forth herein and to set forth the terms of the Participation Shares and the New Citi Shares and related matters. Such amendments do not require the consent of the Existing Holders.

- Existing Holders may elect Early Settlement and receive the Exchange Consideration by June 20, 2008 with respect to such Existing Shares tendered prior to 5:00 p.m. on June 13, 2008, or by July 7, 2008 with respect to such Existing Shares tendered prior to 5:00 p.m. on June 30, 2008, as more fully described under "The Exchange Offer—Early Settlement" on page 24. Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of the applicable Exchange Payment and automatic forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein. See "The Exchange Offer—Revocation Rights" beginning on page 26. You should consult your tax advisor regarding the tax consequences to you with respect to the revocation of any Existing Shares tendered and accepted for Early Settlement. If you elect Early Settlement, you will receive the benefit of any increase to the Exchange Consideration.

**This Confidential Memorandum is for the exclusive use of Existing Holders (other than certain Citi Affiliated Persons that are expected to be excluded from the Exchange Offer) in connection with this Exchange Offer and their legal, tax, financial and other advisers on a confidential basis, and may not be used by any other person or for any other purpose. In consideration for the receipt of this Confidential Memorandum, the recipient agrees that, in the absence of the express prior written consent of the Managing Agent, it will not reproduce, copy, use or transmit this document or the information contained herein, in whole or in part or permit such action by others for any purpose (except that an Existing Holder may provide copies of this Confidential Memorandum or portions hereof to its legal, tax, financial and other advisers for the purpose described above). Except as set forth below, the recipient further agrees to keep strictly confidential the information contained herein or made available in connection with any further investigation of the Company.**

**This Confidential Memorandum summarizes various documents and other information. Those summaries are qualified in their entirety by reference to the documents and information to which they relate. IN MAKING AN INVESTMENT DECISION, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE COMPANY, THE MANAGING AGENT, THE PARTICIPATION SHARES, THE RELEASE, THE VALUE OF THE EXCHANGE PAYMENT AND THE TERMS OF THE EXCHANGE OFFER, INCLUDING THE MERITS AND RISKS INVOLVED IN THE EXCHANGE OFFER. No representation is made to you or any other Existing Holder regarding the legality of an investment in the Participation Shares under any applicable legal investment or similar laws or regulations or the adequacy of the Exchange Consideration. The contents of this Confidential Memorandum are not to be construed as legal, business, tax or other advice. You should consult your own advisors as needed to assist you in making your decision whether to participate in the Exchange Offer.**

**No dealer, salesperson or other person has been authorized to give any information or to make any representations not contained in this Confidential Memorandum, and, if given or made, such information or representation must not be relied upon as having been authorized by the Company, MAT Five, MOF Five, the Managing Agent, Citi or any of our or their respective affiliates.**

This Confidential Memorandum does not constitute an offer to sell or a solicitation of an offer to buy Participation Shares offered hereby to any person in any jurisdiction where it is unlawful to make such an offer or solicitation. The information contained in this Confidential Memorandum is current only as of the date hereof and neither the delivery of this Confidential Memorandum nor the offering, sale or delivery of the Participation Shares pursuant to the Exchange Offer made hereunder shall, under any circumstances, create any implication that the information contained herein is accurate as of any time other than the date hereof.

None of the Participation Shares described in this Confidential Memorandum has been registered or qualified under the Securities Act, the securities laws of any state or the securities laws of any other jurisdiction. This is a private offering of Participation Shares pursuant to exemptions provided by Section 4(2) of the Securities Act, Rule 506 of Regulation D thereunder and applicable state securities laws. Neither the SEC, the securities regulatory authority of any state nor the securities regulatory authority of any other jurisdiction has passed upon the value of the Participation Shares or Exchange Payment, or the Release, made any recommendations as to their purchase, approved or disapproved this Exchange Offer, or passed upon the adequacy or accuracy of this Confidential Memorandum. Any representation to the contrary is a criminal offense.

Participation Shares are subject to restrictions on transferability and resale and may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Managing Agent (which may grant or withhold such consent in its sole discretion), and in compliance with applicable securities laws.

During the course of this Exchange Offer and prior to the Expiration Date, each Existing Holder and its representative(s), if any, is invited to question the Company and the Managing Agent concerning the terms and conditions of the Exchange Offer and to obtain additional information. Subject to the foregoing, any representation or information not contained herein must not be relied upon as having been authorized by the Company, the Managing Agent or any of our or its respective affiliates because no person has been authorized to make any such representations or to provide any such information. Questions for the Company and the Managing Agent may be directed to the Managing Agent, attention Investing Services, as set forth herein.

Notwithstanding anything to the contrary set forth herein, each Existing Holder (and each employee, representative or other agent of such Existing Holder) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials of any kind (including any options or other tax analyses) that are provided to such Existing Holder relating to such tax treatment and tax structure. This authorization of tax disclosure is retroactively effective to the commencement of the first discussions between such Existing Holder and the Managing Agent or the Company regarding the transactions contemplated herein.

The Managing Agent is exempt from registration with the U.S. Commodity Futures Trading Commission ("CFTC") as a commodity pool operator because this pool is operated pursuant to the following criteria: (i) shares in this pool are exempt from registration under the Securities Act, and such shares are not offered and sold through a public offering in the United States; and (ii) (a) each natural person participant (including such person's self-directed employee benefit plan, if any), is a "qualified eligible person," as that term is defined in CFTC Regulation Section 4.7(a)(2); and (b) each non-natural person participant is a "qualified eligible person," as that term is defined in CFTC Regulation Section 4.7, or an "accredited investor," as that term is defined in Sections 501(a)(1)-(3), (7), and (8) of Regulation D under the Securities Act. Unlike a registered commodity pool operator, the Managing Agent is not required to deliver a disclosure document and a certified annual report to participants in the Company. The Managing Agent will, however, deliver audited annual reports described herein.

## NOTICE TO FLORIDA RESIDENTS

Where sales are made to five or more persons in Florida, any such sale made pursuant to section 517.061(11) of the Florida Securities Act shall be voidable by the purchaser either within three days after the first tender of consideration is made by such purchaser to the issuer, or an agent of the issuer, or an escrow agent or within three days after the availability of that privilege is communicated to such purchaser, whichever occurs later.

## NOTICE TO GEORGIA RESIDENTS

These securities have been issued or sold in reliance on paragraph (13) of Code Section 10-5-9 of the Georgia Securities Act of 1973, and may not be sold or transferred except in a transaction which is exempt under such act or pursuant to an effective registration under such act.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-b of the New Hampshire Revised Statutes with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State that any document filed under Chapter 421-b of the New Hampshire Revised Statutes is true, complete and not misleading.  Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the Secretary of State has passed in any way upon the merits or qualifications or, or recommended or given approval to, any person, security or transaction.  It is unlawful to make, or cause to be made, to any prospective purchaser, customer or client any representation inconsistent with the provisions of this paragraph.

## NOTICE TO MISSOURI RESIDENTS

The Participation Shares will not be registered under the Missouri uniform securities act (the "Missouri Act").  If a share is offered or sold pursuant to the exemption under section 409.402(b)(10) of the Missouri Act, then that share may not be resold, hypothecated, transferred or assigned or otherwise disposed of in the state of Missouri, except in a transaction exempt from the registration requirements of the Missouri Act.  If a Participation Share is offered or sold pursuant to the exemption under section 409.402(c) of the Missouri Act and section 30-54.215 of the Missouri code of state regulations, as amended, then that share may only be disposed of through a licensed broker-dealer.  It is a felony to sell securities in violation of the Missouri Act.

**TABLE OF CONTENTS**

**Page**

Summary ........................................................................................................................................... 2
Risk Factors .................................................................................................................................... 17
The Exchange Offer ........................................................................................................................ 23
Release ............................................................................................................................................ 28
Certain United States Federal Income Tax Consequences.............................................................. 28
Acknowledgements and Consents................................................................................................... 31
Counsel............................................................................................................................................ 32


ANNEX A – April 30, 2008 Net Asset Value of Existing Shares
ANNEX B – Additional Offering Information

## FORWARD-LOOKING STATEMENTS

This Confidential Memorandum includes forward-looking statements. Forward-looking statements may be identified by the presence in such statements of the words "may," "will," "expect," "intend," "anticipate," "believe," "attempt," "seek," or "project" or the negatives, derivatives, and variations of such words or comparable terminology. The Company has based these forward-looking statements on the Company's current expectations and projections about future events. These forward-looking statements are subject to risks, uncertainties and assumptions about the Company and its investments. Additionally, some forward-looking statements are based on the assumption that the volatility of market conditions in the future will generally not deviate materially from the volatility of market conditions seen over the past decade. Such assumptions would be invalidated in the event of an extended market disruption.

Neither the Company, MAT Five, MOF Five nor the Managing Agent or their respective affiliates undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks, uncertainties and assumptions, the prospective events discussed in this Confidential Memorandum may not occur.

**BEFORE DETERMINING TO PARTICIPATE IN THE EXCHANGE OFFER, EXISTING HOLDERS SHOULD READ THIS ENTIRE CONFIDENTIAL MEMORANDUM AND THE COMPANY'S AUDITED FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2007. EXISTING HOLDERS WILL RECEIVE A STATEMENT SETTING FORTH THE NAV OF THEIR EXISTING SHARES AS OF MAY 31, 2008 PRIOR TO THE EXPIRATION DATE. FOR THE NAV OF THE EXISTING SHARES AS OF APRIL 30, 2008, PLEASE REFER TO ANNEX A TO THIS CONFIDENTIAL MEMORANDUM. ANNEX B TO THIS CONFIDENTIAL MEMORANDUM ALSO SETS FORTH SAMPLE CALCULATIONS COMPARING THE POTENTIAL OUTCOMES FOR EXISTING HOLDERS WHO DO OR DO NOT PARTICIPATE IN THE EXCHANGE OFFER, GIVEN DIFFERENT ASSUMPTIONS OF THE FUTURE PERFORMANCE OF THE COMPANY AND SUBJECT TO THE QUALIFICATIONS AND LIMITATIONS DISCLOSED THEREIN, BUT WE CAN GIVE NO ASSURANCE NOR DO WE EXPRESS ANY VIEW THAT ANY OF THESE OUTCOMES WILL ULTIMATELY HAPPEN. ADDITIONALLY, EXISTING HOLDERS SHOULD CONSULT THEIR INDEPENDENT LEGAL, TAX, FINANCIAL AND OTHER ADVISORS, AND MAKE THEIR OWN INVESTIGATION OF THE COMPANY, THE RELEASE AND THE EXCHANGE OFFER. CITI, ITS AFFILIATES AND ITS EMPLOYEES ARE NOT IN THE BUSINESS OF PROVIDING TAX AND LEGAL ADVICE TO INVESTORS. THE CONTENTS OF THIS CONFIDENTIAL MEMORANDUM ARE NOT TO BE CONSIDERED AS LEGAL, TAX, BUSINESS OR OTHER ADVICE. YOU SHOULD CONSULT YOUR OWN ADVISORS, INCLUDING INDEPENDENT LEGAL AND TAX ADVISORS, AS NEEDED TO ASSIST YOU IN MAKING YOUR DECISION WHETHER TO PARTICIPATE IN THE EXCHANGE OFFER.**

# SUMMARY

*This summary highlights selected information from this Confidential Memorandum and may not contain all the information that is important to you. As used in this Confidential Memorandum, the terms "we," "us," "our," and "the Company" refer to the California Portfolio of MAT Five LLC, "MAT Five" refers to MAT Five LLC and "MOF Five" refers to the California Portfolio of Municipal Opportunity Fund Five LLC. Any action described herein to be taken by the Company may be made by the Managing Agent.*

## The Company

The Company's sole activity is its investment in MOF Five, which was established to acquire and manage a portfolio of securities consisting primarily of residual certificates ("Residual Certificates") issued in tender option bond programs by a trust or other special-purpose entity (in each case, a "TOB Issuer") organized by a dealer (the "TOB Dealer"). In addition to the interest income earned on its portfolio of Residual Certificates, MOF Five earns interest income on the cash collateral required to be posted to TOB Dealers and on unencumbered cash. MOF Five seeks to mitigate the interest rate risks of investments in Residual Certificates through hedging strategies ("Hedge Agreements") or swap agreements or other agreements which seek to replicate certain economic facets of the Hedge Agreements ("Synthetic Positions"). As of April 30, 2008, the Company and MOF Five had $30.0 million and $80.0 million of net assets, respectively. For the net asset value ("NAV") per Existing Share as of April 30, 2008 please refer to Annex A of this Confidential Memorandum. Existing Holders will receive a statement setting forth the NAV of their Existing Shares as of May 31, 2008 prior to the Expiration Date.

Recently, a number of events have significantly impacted the U.S. municipal bond markets and driven municipal yields higher relative to swaps and U.S. treasury securities ("Treasuries"). These factors, which include increased Treasury demand in a period of flight to quality, bond insurer uncertainty and downgrades, declining market liquidity, auction rate securities' failures and the impact on pricing caused by pending municipal bond supply, led to rapid bond fund and institutional investor selloff. These secondary sales overwhelmed market demand and pushed yields on municipal bonds to record highs relative to swaps and Treasuries. For example, on February 29, 2008, 20-year AAA insured municipal bonds were yielding 51 basis points more than LIBOR swaps, with a ratio of 110.8% (5.27% AAA insured 20-year municipal bond versus 4.76% 20-yr LIBOR swaps), which were the highest levels ever recorded and up from 96.6% only three days earlier. The historical average of this ratio is approximately 83% since 1994. Similarly, on February 29, 2008, 20-year AAA insured municipal bonds were yielding 130 basis points more than Treasuries, with a ratio of 133% (5.27% AAA insured 20-year municipal bond versus 3.97% interpolated 20-year Treasury), which were the highest levels ever recorded and up from 115% only three days earlier. The historical average of this ratio is 94% since 1994. The rapid increase in municipal yields without an offsetting movement in the value of Treasury hedges triggered a significant decline in MOF Five's (and therefore the Company's) NAV.

As noted above, MOF Five remains a single-strategy municipal rate arbitrage fund. As of May 23, 2008, 100% of MOF Five's investments were rated Aaa by Moody's Investors Services, Inc. The investment strategies and objectives of MOF Five (and of the Company) have not changed since the date of the Original PPM. Other than maintaining a lower target leverage, such strategies and objectives are not expected to change going forward. In large part, MOF Five's profits and losses are driven by the relationship between the municipal bond and Treasury yield curves. The charts set forth below show this historical relationship.





**The charts above are for illustrative purposes only and are not a prediction of future results.**

**Sources:** The AAA-Insured municipal bond yields are sourced from Thomson Financial's Municipal Market Data. 20-yr LIBOR Swap Rates are sourced from Citi's Yield Book. The data presented is as of May 21, 2008.

On February 29, 2008 and March 3, 2008, Citi made investments totaling approximately $45.0 million into MOF Five (the "Citi MOF Investments") during extremely volatile market conditions in order to provide MOF Five with the cash necessary to meet margin calls. On February 29, 2008 MOF Five's liabilities exceeded its capital value, rendering MOF Five insolvent and unable to meet margin calls when due. Had Citi not stepped in to invest, MOF Five would have defaulted and its financing counterparties would likely have seized and liquidated the assets of MOF Five in what the Managing Agent viewed as unfavorable market conditions, leaving little to no capital value for the Existing Holders. The value of MOF Five has appreciated since that time, and all Existing Holders (whether or not participating in the Exchange Offer) are being allocated the April Citi Allocation and, going forward, the Special Interest Allocation in respect of amounts otherwise allocable to these investments.

On March 20, 2008, the Managing Agent announced that because of the Company's and MOF Five's low cash position and the ongoing dislocation in the municipal bond markets, it believed that it was advisable and in the best overall interests of the holders of equity of the Company to suspend both redemptions (and payments of related redemption proceeds) and quarterly income distributions from MOF Five and the Company in an effort to preserve liquidity.

The distribution of income is expected to re-commence, subject to the Managing Agent's view of market conditions, cash balances and leverage in MOF Five, although we can give no assurance when or if distributions will resume prior to liquidation of the Company. Until such time, interest income generated by MOF Five will accrue to MOF Five's capital value and will be allocated to the Company's shares of MOF Five and to the Citi MOF Shares. Although the Managing Agent intends to complete the liquidation of the Company by March 31, 2011, in the course of such orderly liquidation, the Managing Agent may acquire additional positions and use leverage for such acquisitions, and MOF Five's leverage may as a result increase, causing additional risk to the Company's investment in MOF Five and therefore to the Existing Holders. See "Risk Factors" in this Confidential Memorandum.

### Background and Purpose of the Offer

In connection with the Managing Agent's review of the developments identified above and their impact on Existing Holders, we are undertaking the Exchange Offer to create immediate liquidity for Existing Holders. Currently, due to the Managing Agent's suspension of redemptions and distributions, Existing Holders have no ability to realize liquidity on their Existing Shares outside of the Exchange Offer. Existing Holders who participate in the Exchange Offer will thus receive cash, recognize a portion of the built-in tax loss in their Existing Shares (i.e., the excess of their tax basis over the current fair market value of their Existing Shares), and retain an interest in the Company that includes a continuing share of interest income and a right to a portion of any gains otherwise allocable to the 2008 Citi Shares in excess of the Cost of Capital thereon upon a Participation Event. However, there can be no assurance that there will be any additional gains and, in order for holders of Participation Shares to receive any Future Gain Distribution, there will need to be an increase in MOF Five's NAV as compared to its NAV as of April 30, 2008, such that the NAV of the 2008 Citi Shares exceeds the amount of the 2008 Citi Investment plus the Cost of Capital thereon. As a result, we can give no assurance that there will be any Future Gain Distribution.

To participate in the Exchange Offer, an Existing Holder must grant the Release. Concurrently with the Exchange Offer, the Company will sell to Citi a number of New Citi Shares equal to the number of Existing Shares tendered at a purchase price per share equal to the Exchange Payment.

Existing Holders that do not participate in the Exchange Offer will continue to hold their Existing Shares and be allocated interest income, gains and losses with respect to such Existing Shares and will have been allocated the April Citi Allocation and continue to be entitled to the Special Interest Allocation. Such holders will not be required to grant a Release. There can be no assurance that those Existing Holders who participate in the Exchange Offer will ultimately realize more than those who are not eligible or choose not to participate. Such holders may realize a greater amount than those Existing Holders that participate in the Exchange Offer, but if the Company experiences further losses, such holders, but not tendering Existing Holders, are at risk for those losses for the entire NAV of their Existing Shares.

### Citi Concessions as to Allocations on its Investments

Citi has agreed that the 2008 Citi Shares will have a reduced share in the March and April 2008 income and gains as well as future net income and gains. These concessions are reflected in the amendments to the Company's

and MOF Five's respective limited liability company agreements (the "LLC Agreements") summarized below. Existing Holders are entitled to these concessions, whether or not they participate in the Exchange Offer.

*Allocation of Increases in NAV in March and April 2008*

Under the LLC Agreements, net income and gains for each period are allocated among all MOF Five shares owned by the Company and Citi MOF Shares in proportion to the total number of MOF Five shares outstanding (the Citi MOF Shares were issued at "Clean NAV," as such term is used in the LLC Agreement of MOF Five). In the months following the Citi MOF Investment, there were increases in MOF Five's NAV. If the general allocation rules under the LLC Agreements, prior to amendment, were followed for March and April 2008, approximately 78.5% of the net income and gains of MOF Five for that period would have been allocated to the Citi MOF Shares.

Instead, Citi has agreed that for the calendar months of March and April 2008, 75% of the amounts that would otherwise be allocated to the Citi MOF Shares were instead allocated to the MOF Five shares owned by the Company (the "April Citi Allocation") and thereafter allocated to all Existing Shares based on the Baseline Share Count. This adjustment to the allocations resulted in an increase in the NAV of the Existing Shares. The NAV of the Existing Shares as of April 30, 2008, which includes the April Citi Allocation, is set forth in Annex A hereto. Existing Holders will receive a statement setting forth the NAV of their Existing Shares as of May 31, 2008 prior to the Expiration Date.

This change in allocations represented by the April Citi Allocation has increased the NAV of all Existing Shares, and therefore benefits all Existing Holders, whether or not such Existing Holders participate in the Exchange Offer. For those who do so participate, the increase in NAV will result in increased cash by way of the Exchange Payment for each Existing Share tendered. For those who do not participate, the increase in NAV could increase the amounts received by such holders upon liquidation of the Company, but may be offset by potential future losses allocated to their Existing Shares, whereas such increase in NAV will have already been realized in cash (and therefore not be at risk) by participating holders. This increase in NAV does not, however, correspondingly change the basis on which subsequent allocations are made to the Existing Shares. The Exchange Offer will not affect the methodology by which income, gains and losses are allocated to the Existing Shares, other than the Special Interest Allocation.

As a result of the April Citi Allocation, the NAV of the MOF Five shares owned by the Company increased in greater proportion than did the Citi MOF Shares, as 75% the March and April 2008 gains on such Citi MOF Shares were allocated to the shares of MOF Five owned by the Company and thereafter to the Existing Shares.

*Allocation of Interest Income*

For periods after April 30, 2008, Existing Holders will receive an enhanced share of interest income of MOF Five corresponding to Citi's reduced share of interest income with respect to its Citi MOF Shares (the "Special Interest Allocation"). The Special Interest Allocation for each Existing Holder for any period will be the product of (i) the number of the holder's Existing Shares (or Participation Shares, as applicable) divided by the Baseline Share Count; and (ii) the sum of (A) 99% of the net interest income that would otherwise be allocable to the Citi MOF Shares from MOF Five's net interest income up to an amount corresponding to an interest income yield on the NAV of the Citi MOF Investment of two percent per annum (without compounding); and (B) 50% of the net interest income that would otherwise be allocable to the Citi MOF Shares from MOF Five's net interest income in excess of that amount. For these purposes, interest income is computed net of certain costs of earning such interest income (e.g., certain fees incurred at the TOB Issuer level and allocable to Residual Certificates, and certain operating expenses and fees), but without regard to gains and losses on or costs of hedging activities. New Citi Shares will not be allocated any interest income because such interest income will be allocated to the Participation Shares.

For example, if at the beginning of a calendar quarter the Citi MOF Shares have an NAV of $40,000,000, and the Citi MOF Shares would otherwise (based on the number of such shares) be allocated net interest income of $600,000 for that quarter, $398,000 of that amount (99% of the first $200,000, corresponding to the 2% yield threshold, and half of the remaining $400,000) would be allocated to the Company and thereafter among the Existing Shares and Participation Shares, and the Citi MOF Shares would be allocated only $202,000. The example

above is for illustrative purposes only and we can give no assurance that the actual yield on the Citi MOF Shares will be greater than or less than that set forth above.

These allocations of interest income pursuant to the Special Interest Allocation are for the benefit of all Existing Holders whether or not they participate in the Exchange Offer.

*No Subordinate Allocation*

Prior to its acquisition of the Citi MOF Shares in February and March of 2008, Citi's only equity interest in the Company was through its $500,000 ownership of Class B Shares of the Company ("Class B Shares"). The Class B Shares are not a part of the Exchange Offer and, for the purpose of this Confidential Memorandum, are not included as part of the 2008 Citi Shares, Citi MOF Investments or 2008 Citi Investment. Such Class B Shares generally have a reduced basic share in interest income and gains and losses of the Company, but if the internal rate of return on the Existing Shares had exceeded a 5.75% rate, then up to 20% of net income for a period was to be allocated to the Class B Shares until (on a cumulative basis) such shares had been allocated 20% of the cumulative excess return. This additional allocation to the Class B Shares is referred to as the "Subordinate Allocation," and Citi has agreed to modify its Class B Shares so that they do not receive the Subordinate Allocation for any periods after February 29, 2008.

*Amendment to Reflect Changes in Allocations.*

Under the LLC Agreements, amendments that alter the allocations or other economic benefits of shares of any class require the consent of those holders that would be adversely affected by such amendments. The changes in allocations described above will, in all circumstances, be to the disadvantage of the Citi MOF Shares and Class B Shares (relative to the results if there were no amendment) and to the advantage of the Existing Shares and Participation Shares. Accordingly, consent has been obtained from the holders of the Citi MOF Shares and Class B Shares. Consent is not required from the holders of Existing Shares.

**Additional Information**

MAT Five LLC is a Delaware limited liability company, was formed in 2005 and commenced operations in February 2007. Our mailing address is c/o Citigroup Alternative Investments LLC, Attention: Investing Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022. The telephone number for our office is (212) 783-1330.

**The Exchange Offer**

Existing Shares ........................................ 145,525,000 shares of limited liability company interest (the "Existing Shares") of the California Portfolio of MAT Five LLC (the "Company") which may be of either the Series ASTA Five 2007-1A or Series MAT Five 2007-1A, the terms of which series are identical.

Participation Shares ............................... The number of shares of the Company's series P limited liability company participation interest (the "Participation Shares") equal to the number of Existing Shares validly tendered by Existing Holders with terms as set forth under "The Participation Shares" beginning on page 11.

Citi MOF Shares ..................................... 532,378,103 shares, representing the number of MOF Five LLC's California Portfolio ("MOF Five") series C-1 limited liability company interest (the "Citi MOF Shares") issued in connection with the Citi MOF Investments. Citi has agreed that the Citi MOF Shares will have a reduced share in net interest income and gains, reflected in concessions for the April Citi Allocation, Special Interest Allocation and any Future Gain Distribution.

New Citi Shares ...................................... The number of the Company's series C-1 limited liability company interest (the "New Citi Shares" and together with the Citi MOF Shares, the "2008 Citi Shares") equal to the aggregate number of Existing Shares validly tendered by Existing Holders. Citi has agreed that the New Citi Shares will have a reduced share in net income and gains taking into account concessions for the interest income allocable to the Participation Shares and the Future Gain Distribution. Citi's collective investment in the 2008 Citi Shares is referred to as the "2008 Citi Investment."

Exchange Consideration .......................... The Exchange Consideration is comprised of (i) an amount per Existing Share tendered equal to the NAV of such share as of April 30, 2008 (the "Exchange Payment"), which includes the April Citi Allocation based on the total number of Existing Shares outstanding as of February 29, 2008 (the "Baseline Share Count"), and (ii) one Participation Share for each Existing Share tendered. The NAV per Existing Share as of April 30, 2008, which includes the April Citi Allocation, is set forth in Annex A hereto.

Release ................................................... In order to participate in the Exchange Offer, each tendering Existing Holder, by executing the Exchange Offer Subscription Agreement and granting the Release, will unconditionally release and discharge any and all claims against the Releasees relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange.

**Exchange Offer**........................................ For each Existing Share of any series outstanding and held by an Accredited Investor (other than certain Citi Affiliated Persons) who properly tenders and does not properly revoke the election to tender Existing Shares prior to the Expiration Date, we will pay the Exchange Consideration. Other than in connection with Early Settlement, the Exchange Consideration will be paid only upon consummation of the Exchange Offer. The Company reserves the right to amend the Exchange Consideration in its sole discretion.

By participating in the Exchange Offer you will, with respect to your initial investment in the Existing Shares, not be allocated further losses of the Company, but your continued investment in the Company through your ownership of Participation Shares may not result in any appreciation or otherwise in a recoupment of your initial investment, other than the amount of the Exchange Payment.

**Expiration Date** ........................................ The Expiration Date for the Exchange Offer will be 5:00 p.m., New York City time, on July 15, 2008, unless extended.

**Holders Entitled to Participate in the Exchange Offer**.................................. The right to participate in the Exchange Offer is being offered only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act ("Accredited Investors"). Existing Holders that are not Accredited Investors may not participate in the Exchange Offer. Each Existing Holder that wishes to tender his or her Existing Shares in the Exchange Offer must agree in the manner set forth herein and in the Exchange Offer Subscription Agreement to tender all Existing Shares of any series held by such Existing Holder in order to participate in the Exchange Offer.

**Conditions to the Exchange Offer**........... The Exchange Offer is subject to certain conditions, any or all of which we may waive. The Exchange Offer is not conditioned upon the participation of a minimum number of Existing Holders, nor does it involve any drag-along rights, exit consents or other majority action adverse to those Existing Holders who choose not or are not eligible to participate. Participation in the Exchange Offer is entirely voluntary and at the discretion of eligible Existing Holders. See the discussion below under the caption "The Exchange Offer—Conditions to the Exchange Offer" beginning on page 27.

**Procedures for Tendering Existing Shares** ........................................ See "The Exchange Offer—Procedures for Tendering Existing Shares" on page 25. For further information, please contact the Managing Agent for assistance. No action is required if you decline to participate in the Exchange Offer.

**Revocation of Tendered Existing Shares** ....................................... Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be validly revoked at any time prior to the Expiration Date without consequence to such holders' capital accounts or relative ownership of the Company. See "The Exchange Offer—Revocation Rights" beginning on page 26. A revocation must revoke all Existing Shares of any series previously tendered by such holder. A form of notice of revocation is attached as Annex A to the Exchange Offer Subscription Agreement.

| | |
|---|---|
| **Acceptance of Tenders** ............................. | Subject to certain conditions described herein and other than with respect to Existing Shares tendered for Early Settlement as described below, we will accept any and all Existing Shares which are properly tendered by Accredited Investors (other than certain Citi Affiliated Persons) and which tender is not properly revoked on or prior to the Expiration Date. |
| | We will issue the Participation Shares and pay the Exchange Payment to all properly tendering holders promptly following the Expiration Date, or, in the case of Early Settlement, by June 20, 2008 or July 7, 2008, as the case may be, upon our determination that the conditions to the Exchange Offer have been satisfied. |
| **No Recommendation to Participate by the Company, Managing Agent or Otherwise**............................................ | Notwithstanding anything to the contrary contained herein, certain Citi Affiliated Persons are expected to be excluded from participating in the Exchange Offer. Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, MAT Five, MOF Five LLC, the Managing Agent, Citi or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer; accordingly, you must make your own determination whether to participate in the Exchange Offer. |
| **Consequences of Not Participating in the Exchange Offer** ............................. | Existing Holders who do not participate in the Exchange Offer will continue to hold their Existing Shares and such holders will not execute the Release. Like those holders participating in the Exchange Offer, non-participating holders will have been allocated their pro rata portion of the April Citi Allocation and will be allocated their pro rata portion of the Special Interest Allocation, in each case based on the Baseline Share Count. Those who continue to hold Existing Shares will suffer further losses with respect to such shares if the NAV of the Company declines as the Company's assets are liquidated. However, there can be no assurance that Existing Holders who participate in the Exchange Offer will be in a better position upon liquidation of the Company than those Existing Holders who do participate in the Exchange Offer nor, if the Company continues to experience losses, can there be any assurance that allocations pursuant to the April Citi Allocation or Special Interest Allocation will lead to cash distributions to holders of Existing Shares. See "Comparison of Participation Shares and Existing Shares Following the Exchange Offer" beginning on page 15 and Annex B to this Confidential Memorandum. |
| **Early Settlement**...................................... | Existing Holders may elect Early Settlement and receive the Exchange Consideration by June 20, 2008 with respect to Existing Shares tendered prior to 5:00 p.m., New York City time, on June 13, 2008, or by July 7, 2008 with respect to Existing Shares tendered prior to June 30, 2008 (in each case, "Early Settlement"), as more fully described under "The Exchange Offer—Early Settlement" on page 24. Such holders will retain the right to revoke such tenders prior to the |

|  | Expiration Date by return to the Company of the applicable Exchange Payment and automatic forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein. If you elect Early Settlement, you will receive the benefit of any increase to the Exchange Consideration. |
|---|---|
| **Certain United States Federal Income Tax Consequences** ...................... | For federal income tax purposes, it is expected that Existing Holders who tender their Existing Shares will be treated as having disposed of part of their interest in the Company and retained an interest in the Company, and that such holders will recognize a long term capital loss with respect to the portion disposed of. For a discussion of these and other federal income tax consequences of participating in the Exchange Offer, see "Certain United States Federal Income Tax Consequences" beginning on page 28. |
| **Use of Proceeds**........................................ | The Company will not receive any cash proceeds from the Exchange Offer other than from the concurrent sale of the New Citi Shares, the proceeds of which will be used to pay the aggregate Exchange Payment. Existing Shares of any series that are properly tendered and accepted pursuant to the Exchange Offer will be considered redeemed. |
| **Lack of Dealer Manager, Exchange Agent and Information Agent** ................ | We are not employing the services of any dealer manager, exchange agent or information agent in connection with the Exchange Offer. No broker, dealer, commercial bank or trust company has been authorized to act as our agent for purposes of the Exchange Offer other than the Managing Agent. |
| **Fees and Expenses** ................................... | Citi will bear all expenses directly related to the Exchange Offer, while those expenses serving to benefit all Existing Holders, such as expenses incurred in connection with the amendments to the LLC Agreements, will be borne by the Company. As a result, you are not required to pay any brokerage commissions or any other fees or expenses to the Company or the Managing Agent. |
| **Additional Information** ........................... | You may obtain additional copies of the Original PPM, this Confidential Memorandum or a copy of the LLC Agreements and the amendments thereto, as well as our financial statements for the year ended December 31, 2007 and historical NAV of the Existing Shares by contacting the Managing Agent at the phone number and address set forth on the back cover of this Confidential Memorandum. Annex A to this Confidential Memorandum sets forth the NAV per Existing Share as of April 30, 2008, as well as when Existing Holders can expect to receive a statement containing the May 31, 2008 NAV of their Existing Shares. Annex B to this Confidential Memorandum also sets forth sample calculations comparing the potential outcomes for Existing Holders who do or do not participate in the Exchange Offer, given different assumptions of the future performance of the Company and subject to the qualifications and limitations set forth therein. |

### The Participation Shares

Subject to the terms, conditions and exceptions contained herein, we are offering to pay the Exchange Payment plus issue one (1) Participation Share for each Existing Share of either series validly tendered by any Accredited Investor (other than certain Citi Affiliated Persons) in accordance with this Confidential Memorandum and the accompanying Exchange Offer Subscription Agreement.

**Net Interest Income** ............................. Each Participation Share will be allocated the net interest income that would have been attributable to the corresponding Existing Share tendered, including the Special Interest Allocation. See "Comparison of Participation Shares and Existing Shares Following the Exchange Offer" on page 15 and Annex B to this Confidential Memorandum for a detailed comparison of terms of the Existing Shares and Participation Shares following the Exchange Offer.

The Company expects to continue to generate interest income through its ownership of MOF Five shares and MOF Five's leveraged portfolio of municipal bonds and hedges. Although distributions have been temporarily suspended, interest income generated by MOF Five is accruing to MOF Five's capital value and is being allocated to the Company's Shares of MOF Five and the Citi MOF Shares. Should the Managing Agent determine to re-instate distributions as is currently anticipated, net interest income will be distributed to all Existing Holders through their ownership of Existing Shares or Participation Shares, as the case may be.

If an allocation of interest income is made prior to the resumption of distributions by the Company, such an allocation of interest income will result in an increase to the capital accounts of the holders of Participation Shares, and thus to a claim upon a Participation Event. Because losses will be allocated to Participation Shares only after losses equal the NAV of the Company (excluding accrued but undistributed interest income), such allocations should result eventually in a cash distribution to holders of Participation Shares, but we can give no assurance that significant future losses would not delay, reduce or eliminate such distributions. See "—Losses" below.

**Gains** ..................................................... Upon the liquidation of the Company or a redemption of any of the 2008 Citi Shares (all such events, "Participation Events"), holders of Participation Shares will be entitled to receive the product of (i) the ratio of such holder's Participation Shares to the Baseline Share Count, times (ii) 75% of the excess (if any) of (A) the aggregate proceeds of such Participation Event (other than amounts allocable to the outstanding Existing Shares and any amounts attributable to accumulated interest income not yet distributed), less (B) the purchase price of the 2008 Citi Shares redeemed plus the cost of capital thereon (3-month LIBOR plus a variable spread determined by Citi, compounding annually, which will initially be equal to 9% but may increase or decrease based on various market, economic and other factors, the "Cost of Capital") (such product, the "Future Gain Distribution").

It is not expected that the holders of Participation Shares will receive any distributions of the Company's gains until the completion of the liquidation of the Company except upon a redemption of New Citi Shares concurrently with an equal number of Participation Shares and a proportionate number of Citi MOF Shares. The liquidation of the

Company or any such redemption of 2008 Citi Shares will not occur prior to March 31, 2009, and thereafter not until the earlier of: (i) the "normalization" (i.e., return to an 85% ratio) of the relationship of 20-year AAA municipal yields to LIBOR swap rates or (ii) March 31, 2011.

In order for holders of Participation Shares to receive any Future Gain Distribution, there will need to be an increase in MOF Five's NAV as compared to its NAV as of April 30, 2008, such that the NAV of the 2008 Citi Shares exceeds the amount of the 2008 Citi Investment plus the Cost of Capital thereon. As a result, we cannot give any assurance that there will be any Future Gain Distribution to holders of Participation Shares.

**Losses**.................................... The capital accounts related to the Participation Shares will generally reflect only interest income allocations that have not yet resulted in a distribution. No losses will be allocated with respect to Participation Shares unless and until the capital accounts of the New Citi Shares have been exhausted and the capital accounts of the Existing Shares have been reduced to an amount equal to their share of interest income allocations that have not yet resulted in a distribution. (As of April 30, 2008, such losses would have to exceed $30.0 million in order for any losses to offset interest income allocated to Participation Shares.) In such an event, holders of Participation Shares may receive reduced distributions, or none, of the Company's interest income for a period.

**Redemption**............................ None of the 2008 Citi Shares will be redeemable prior to March 31, 2009. Moreover, Citi has agreed that none of its shares in the Company or MOF Five can be redeemed unless such redemption is part of a pro rata redemption in which equal numbers of New Citi Shares and Participation Shares, and a proportionate number of the Citi MOF Shares, are all redeemed at once. Holders of Participation Shares will participate pro rata in any such compulsory redemption, and, immediately prior to such compulsory redemption, the Future Gain Distribution will be calculated with respect to the Participation Shares to be redeemed and added to the redemption price thereof. Participation Shares are not otherwise redeemable.

**Voting Rights**......................... Participation Shares are non-voting other than with respect to matters directly adversely impacting such Participation Shares. For such matters, Participation Shares will vote as one class with all other classes of limited liability company interest (including in certain circumstances, with holders of Existing Shares and/or holders of 2008 Citi Shares) entitled to vote on such matters.

**Lack of Transferability** ......................... Participation Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the consent of the Managing Agent (which may grant or withhold such consent in its sole discretion) and only to those who meet the same standards as those required to be an Accredited Investor.

**Management Fee** .................................. Participation Shares will not be subject to a management fee.

**Subordinate Allocation**.......................... Neither Participation Shares nor any other shares of the Company will be subject to the Subordinate Allocation.

**2008 Citi Shares**

**Citi MOF Shares** ................................... The Citi MOF Investments were made, and the corresponding Citi MOF Shares were issued, during extremely volatile market conditions and provided MOF Five with the cash necessary to satisfy margin calls. On February 29, 2008, MOF Five's liabilities exceeded its capital value, rendering MOF Five insolvent and unable to meet margin calls when due. Had Citi not stepped in to invest, MOF Five would have defaulted and its financing counterparties would likely have seized and liquidated the assets of MOF Five in what the Managing Agent viewed as unfavorable market conditions, leaving little to no capital value for the Company.

**New Citi Shares** .................................... Concurrently with the consummation of the Exchange Offer, the Company is selling to Citi a number of New Citi Shares equal to the number of Existing Shares accepted for exchange in the Exchange Offer at a purchase price per share equal to the Exchange Payment, the proceeds of such issuance will be used to pay the Exchange Payment to tendering Existing Holders.

**Citi Concessions as to Allocations** ......... As discussed in more detail above, prior to the commencement of the Exchange Offer, Citi agreed to allocations under which its Citi MOF Shares would be entitled to a reduced share in net income and gains of MOF Five. In particular (i) for March and April 2008, 75% of the increased NAV at April 30, 2008 based on the original amount of the Citi MOF Investments that would otherwise have been allocable to the Citi MOF Shares was instead allocated to the shares of MOF Five owned by the Company and thereafter to the Existing Shares based on the Baseline Share Count (the "April Citi Allocation"); and (ii) for periods after April 30, 2008, interest income otherwise allocable to the Citi MOF Shares will be reduced by the aggregate Special Interest Allocation allocable to Existing Shares and Participation Shares. In addition, Citi agreed that its Class B Shares would no longer be entitled to an incentive allocation via the Subordinate Allocation and such shares will not be impacted by, or participate in, the Exchange Offer. These concessions are unaffected by the Exchange Offer, and Existing Holders will benefit from such concessions whether or not they participate in the Exchange Offer.

**Allocation of Profits and Losses** ............ Other than as set forth above, the 2008 Citi Shares will be allocated their pro rata share of the profits or losses of the Company or MOF Five, as the case may be, in the same manner as profits and losses would have been allocated to the Existing Shares prior to the April Citi Allocation.

**Term** ...................................................... Unless earlier redeemed, the 2008 Citi Shares will remain outstanding until liquidation of the Company, which is anticipated to occur, in the sole discretion of the Managing Agent, by March 31, 2011, although such period may be shorter, based on such factors as when the ratio of 20-year AAA municipal yields to LIBOR swap rates normalizes (i.e. returns to 85%). Citi, however, committed to maintain the 2008 Citi Investment in the Company at least until March 31, 2009, and thereafter until the earliest of: (i) such normalization of the relationship of 20-year AAA municipal yields to LIBOR swap rates as determined by the Managing Agent or (ii) March 31, 2011.

| | |
|---|---|
| **Redemption** ........................................... | None of the 2008 Citi Shares may be redeemed prior to March 31, 2009. Subject to the foregoing, if New Citi Shares are redeemed, then an equal number of Participation Shares, and a proportionate fraction of the Citi MOF Shares, will simultaneously be compulsorily redeemed on a pro rata basis.  As a result of any redemption of New Citi Shares or Citi MOF Shares, however, all subsequent Special Interest Allocations or Future Gain Distributions will necessarily be generated from the gains and interest income otherwise allocable to such reduced number of 2008 Citi Shares. |
| **Voting Rights**......................................... | All New Citi Shares will possess the same voting rights as the Existing Shares and will vote as a single class with all other classes of limited liability company interest entitled to vote on any matter brought to a vote of holders (including in certain circumstances, with holders of Existing Shares and/or holders of Participation Shares). |
| **Lack of Transferability** .......................... | No Citi MOF Shares, New Citi Shares, or Class B Shares may be directly or indirectly transferred, resold or otherwise hypothecated without the consent of the Company or Managing Agent (which may grant or withhold such consent in its sole discretion) and only to those who meet the same standards as those required to be an Accredited Investor.  Any such transfer shall not impair the Future Gain Distribution with respect to the Participation Shares or any allocations to the Existing Shares described above. |
| **Management Fee** ................................... | New Citi Shares will not be subject to a management fee. |
| **Subordinate Allocation**........................... | Neither New Citi Shares nor any other shares of the Company will be subject to the Subordinate Allocation. |

# EXHIBIT 2

# (part 2 of 2)

**Comparison of Participation Shares and Existing Shares Following the Exchange Offer**

Set forth below is a comparison of the allocations and distributions to which the Existing Shares and Participation Shares are entitled following the consummation of the Exchange Offer.

| Allocations to Capital Accounts and Distributions | For holders who do not participate in the Exchange Offer (and continue to hold Existing Shares) | For holders who participate in the Exchange Offer (and receive Participation Shares in exchange for their Existing Shares) |
|---|---|---|
| April Citi Allocation | For March and April 2008, 75% of the increased NAV at April 30, 2008 based on the original amount of the Citi MOF Investments that would otherwise have been allocable to the Citi MOF Shares will instead be allocated to the Existing Shares | Same |
| Exchange Payment | None | NAV of the tendered Existing Shares as of April 30, 2008 |
| Basic Interest Allocation | Allocations of a portion of the Company's net interest, based on the Baseline Share Count. | Same |
| Special Interest Allocation | For all periods starting May 1, 2008, the product of (i) the number of the holder's Existing Shares (or Participation Shares, as applicable) divided by the Baseline Share Count; and (ii) the sum of (A) 99% of the net interest income that would otherwise be allocable to the Citi MOF Shares from MOF Five's net interest income up to an amount corresponding to an interest income yield on the NAV of the Citi MOF Investment of two percent per annum (without compounding); and (B) 50% of the net interest income that would otherwise be allocable to the Citi MOF Shares from MOF Five's net interest income in excess of that amount | Same |
| Effect of Future Losses | Existing Shares will continue to be allocated the Company's gains and losses based on the Baseline Share Count, giving effect to the Citi MOF Investments | No losses will be allocated with respect to Participation Shares unless and until the capital accounts of the New Citi Shares have been exhausted and the capital accounts of the Existing Shares have been reduced to an amount equal to their share of interest income allocations that have not yet resulted in a distribution (As of April 30, 2008, such losses would have to exceed $30.0 million in order for any losses to offset interest income allocated to Participation Shares) |

| | | |
|---|---|---|
| Effect of Future Gains | Existing Shares will continue to be allocated the Company's gains and losses based on the Baseline Share Count, giving effect to the Citi MOF Investments | See below |
| Distributions upon Liquidation or Redemption | Upon the liquidation of the Company, Existing Shares are entitled to NAV per share as of such date; redemptions of Existing Shares are currently suspended | Participation Shares are entitled to, upon any Participation Event, the product of (i) the ratio of such holder's Participation Shares to the Baseline Share Count, times (ii) 75% of the excess (if any) of (A) the aggregate proceeds of such Participation Event (other than amounts allocable to the outstanding Existing Shares and any amounts attributable to accumulated interest income not yet distributed), less (B) the original purchase price of the 2008 Citi Shares redeemed plus the Cost of Capital thereon |
| Release of Liability | Holders of Existing Shares following the Exchange Offer will not have executed the Release and may join or bring legal actions against the Releasees, including the Company, the Investment Manager and Citi | Existing Holders who participate in the Exchange Offer will have executed the Release and will have released and discharged the Releasees, including the Company, the Investment Manager and Citi, from any liability arising from such holders' investment in the Company |
| Impact of Class B Shares | None | None |

## RISK FACTORS

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and uncertainties described below as well as the other information appearing elsewhere in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. The risks and uncertainties described below are intended to highlight risks and uncertainties that are specific to us but are not the only risks and uncertainties that we face. The Company's investments in MOF Five involve risks, and there can be no assurance that the Company will achieve its objectives or that holders will receive any distribution on the Participation Shares or Existing Shares or that holders of Existing Shares following the Exchange Offer will not suffer further losses including with respect to amounts allocated as part of the April Citi Allocation or Special Interest Allocation. In considering participating in the Exchange Offer, Existing Holders should consult their independent legal, tax, financial and other advisers, and should be aware of certain considerations and risk factors which include, but are not limited to, the risks described below.*

*The information in this Confidential Memorandum includes forward-looking statements which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of numerous factors, including those described in this section and elsewhere in this Confidential Memorandum and the audited annual financial statements for the year ended December 31, 2007. See "Forward-Looking Statements." See also Annex B to this Confidential Memorandum for sample calculations comparing the potential outcomes for Existing Holders who do or do not participate in the Exchange Offer, given different assumptions of the future performance of the Company and subject to the qualifications and limitations disclosed therein.*

### Risk of Litigation and Release of Liability

On May 1, 2008 an investor in MAT Five filed a class action complaint against MAT Five, Citi and the Managing Agent in the U.S. District Court for the Southern District of New York for breach of fiduciary duties and violations of Section 12(a)(2) of the Securities Act. The complaint alleges that MAT Five, Citi and the Managing Agent misrepresented the level of risk of MOF Five's investment strategy and that the prospectus relating to the Existing Shares contained untrue statements of material fact and concealed and failed to disclose material facts. The complaint further alleges that Citi and the Managing Agent failed to properly preserve the assets of MAT Five and ignored and did not protect against numerous conflicts of interest in connection with Citi's investment in MAT Five. The plaintiff seeks class certification, compensatory damages, reimbursement of legal fees and expenses, rescission or a rescissory measure of damages and additional equitable and/or injunctive relief. There can be no assurance that other similar suits will not be filed or that claims will not be made against MAT Five or any of its affiliates.

In addition to the foregoing, the Managing Agent might become involved in other litigation as a result of investments made in MOF Five. Under such circumstances, MAT Five and/or other affiliated entities could be named as a defendant in a lawsuit or regulatory action. Citi has received two requests for documents concerning Citi-managed hedge funds in connection with an informal inquiry by the SEC. Citi is responding to those requests and cooperating with the SEC. Certain affiliates of the Company are currently the subject of Financial Industry Regulatory Authority arbitration proceedings relating to sales practices relating to securities of the Company or its affiliates. The Release would prevent participating holders from engaging in such proceedings and there can be no assurance as to the ultimate result of such claims or that other similar proceedings will not be brought against MAT Five or any of its affiliates, including the Company.

You are releasing various parties, including without limitation MOF Five, MAT Five, Citi, the Managing Agent and any sub-agent, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other portfolio of MAT Five. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claim described above with respect to MAT Five or similar claims that may be brought against MAT Five or any portfolio thereof, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages or indemnity required to be paid by MOF Five or MAT Five will reduce the funds available, if any, to the Company for distribution on the Participation Shares or Existing Shares upon the occurrence of an applicable Participation Event.

**Limited Assets**

No portfolio of MAT Five, including the Company, has any significant assets other than the corresponding shares of limited liability company interest in the applicable portfolio of MOF Five's leveraged portfolio of municipal bonds and hedges (the "Underlying Assets"). Consequently, the Company must rely solely on distributions on the Underlying Assets in order to provide any return on the Existing Shares or Participation Shares. Accordingly, there can be no assurance that the value of the Underlying Assets associated with the Company will be maintained at the level of April 30, 2008 or will increase such that Existing Holders will be able to receive any distribution on either their Existing Shares or Participation Shares, as applicable, upon the occurrence of an applicable Participation Event or that holders of Existing Shares following the Exchange Offer will realize the April Citi Allocation or that any holders will realize any Special Interest Allocation. As a result, we can not give any assurance that holders of Participation Shares or Existing Shares will be able to recoup any of their initial investment in the Company (except, in the case of holders who participate in the Exchange Offer, to the extent of the Exchange Payment) upon our liquidation, which is expected to occur by March 31, 2011, although such period may be shorter.

**Market Effects**

Over the past nine months, an unprecedented wave of volatility has swept through the global fixed income markets, leading to sharp price declines and pushing risk premiums on many credit instruments to record or near-record highs vis-à-vis U.S. treasury securities. Recently, a number of events have significantly impacted the U.S. municipal bond markets and driven municipal yields higher relative to swaps and Treasuries. These factors, which include increased Treasury demand in a period of flight to quality, bond insurer uncertainty and downgrades, declining market liquidity, auction rate securities' failures and the impact on pricing caused by pending municipal bond supply, led to rapid bond fund and institutional investor selloff. These secondary sales overwhelmed market demand and pushed yields on municipal bonds to record highs relative to swaps and Treasuries. For example, on February 29, 2008, 20-year AAA insured municipal bonds were yielding 51 basis points more than LIBOR swaps, with a ratio of 110.8% (5.27% AAA insured 20-year municipal bond versus 4.76% 20-yr LIBOR swaps), which were the highest levels ever recorded and up from 96.6% only three days earlier. The historical average of this ratio is approximately 83% since 1994. Similarly, on February 29, 2008, 20-year AAA insured municipal bonds were yielding 130 basis points more than Treasuries, with a ratio of 133% (5.27% AAA insured 20-year municipal bond versus 3.97% interpolated 20-year Treasury), which were the highest levels ever recorded and up from 115% only three days earlier. The historical average of this ratio is 94% since 1994. The rapid increase in municipal yields without an offsetting movement in the value of Treasury hedges triggered a significant decline in MOF Five's (and therefore the Company's) NAV. In addition, during the period of liquidation additional declines could occur and continued volatility could result in further losses and impact any future distributions on the Existing Shares or Participation Shares. As a result, we can give no assurance that holders of Existing Shares will recoup any of their initial investment in the Company or that holders of Participation Shares will realize any further distributions upon the occurrence of a Participation Event or receive any amounts (other than to the extent of the Exchange Payment) in respect of their ongoing investment in the Company.

**Loss in Value of Investments**

The market value of municipal bonds, like that of other fixed-income investments, generally declines as prevailing interest rates increase. In addition, their market value is dependent on the credit of the issuer of such bonds. In a tender option bond program such as those in which MOF Five participates, a municipal bond (an "Underlying Municipal Bond") is deposited with the TOB Issuer organized by the TOB Dealer. The TOB Issuer issues two classes of securities: (i) a floating rate security ("Floating Rate Certificate"), entitling the holders to a variable interest rate based on prevailing short-term tax-exempt rates, with a face amount approximately equal to the market value of the Underlying Municipal Bond on its date of acquisition by the TOB Issuer, and (ii) a Residual Certificate. Because the value of Residual Certificates issued in tender option bond programs is directly tied to the value of the Underlying Municipal Bonds, a decrease in the market value of those municipal bonds would cause a decrease in the value of the Residual Certificates. Such decreases have led and could further lead to a decline in MOF Five's NAV and could impair the Company's ability to realize amounts sufficient to make distributions to holders of Participation Shares or Existing Shares upon the occurrence of an applicable Participation Event. Furthermore, there can be no assurance that holders will realize any net interest income on the Participation Shares or Existing Shares, as applicable, if continued declines cause further losses for the Company that exhaust the value of the Company's assets.

**Hedging**

MOF Five continues to seek to hedge against potential losses described above by entering into Hedge Agreements or Synthetic Positions. However, MOF Five's hedging strategy continues to entail risks, including but not limited to those described below.

MOF Five's hedging policies give substantial discretion to the Managing Agent in determining the type of Hedge Agreements and Synthetic Positions to be executed by MOF Five, as well as the tenor, notional amount and other terms of those agreements. The decisions made by the Managing Agent in implementing MOF Five's hedging policies may significantly affect MOF Five's income and NAV, and ineffective hedging could lead to material losses to investors, including the Existing Holders. No assurance can be given that the Managing Agent will be able to implement MOF Five's hedging policies effectively.

The Hedge Agreements and Synthetic Positions expose MOF Five to cash flow risk. Hedge instruments require up-front or ongoing payments of cash, which depend upon the movements of interest rates. Large declines in interest rates or changes in the relationship of 20-year AAA municipal yields to LIBOR swap rates will produce significant short-term cash liabilities under the Hedge Agreements and Synthetic Positions, such that MOF Five may become unable to make payment or that making payment reduces the collateral available for future payments. Conditions such as those in the first quarter of 2008 would have resulted in insolvency of MOF Five if not for the Citi MOF Investments. Future margin calls could lead to a forced liquidation of assets, which could result in further losses to MOF Five, and therefore MAT Five, and reduce the likelihood that holders of either Existing Shares or Participation Shares will receive any distributions upon the occurrence of an applicable Participation Event.

**Reimbursement Obligations**

When the proceeds of the sales of Underlying Municipal Bonds are less than the amount required to redeem the corresponding Floating Rate Certificates, MOF Five is obligated to pay the TOB Dealer the amount of that shortfall. To the extent these obligations are not effectively hedged by the Hedge Agreements, they will result in losses to MOF Five. In addition, in order to meet its obligations under its reimbursement agreements ("Reimbursement Agreements"), MOF Five in certain instances has and in the future may be required to liquidate investments at a loss. MOF Five continues to be subject to certain collateral requirements and asset tests related to the Reimbursement Agreements, the Hedge Agreements and the Synthetic Positions. Failure by MOF Five to meet these collateral requirements or asset tests may constitute a default under the related agreements and could result in substantial payments or losses by MOF Five, depending on market conditions at the time of default. These collateral requirements and asset tests will also limit the assets from which MOF Five can make distributions to the Company and, as such, reduce the chances of there being any distribution to holders of either Existing Shares or Participation Shares upon the occurrence of an applicable Participation Event.

**Residual Certificates**

The Residual Certificates are adversely affected by any increase in prevailing short-term interest rates. The Residual Certificates are entitled to payments based on the difference between the return on the Underlying Municipal Bonds and the rate paid to the holders of Floating Rate Certificates (the "Floating Rate"). While the interest rate on the Underlying Municipal Bonds is fixed, the Floating Rate is reset periodically. The leveraged nature of the Residual Certificates means that an increase in the Floating Rate results in a magnified decrease in yield on the Residual Certificates. Rising short-term interest rates, therefore, substantially reduce the net interest income available to MOF Five and impairs MOF Five's ability to make distributions on the Underlying Assets. If the interest rate required by investors in Floating Rate Certificates approaches or exceeds the fixed interest rate on the Underlying Municipal Bonds, an automatic tender of the Floating Rate Certificates occurs. In the event of such an automatic tender, the Underlying Municipal Bonds are sold, in certain circumstances, into a declining market, and such sale causes the holder of the related Residual Certificate to bear a loss. Such losses are magnified by the use of leverage as the repurchase price for the Floating Rate Certificates exceeds the value of the Underlying Municipal Bonds.

Some of the Residual Certificates are callable by the TOB Issuer upon the occurrence of certain events. These events typically include bankruptcy of the TOB Issuer, non-payment of any of the Underlying Municipal Bonds, a downgrading of the rating of the Underlying Municipal Bonds to below investment grade, and a change in the tax treatment of the Underlying Municipal Bonds. If any Residual Certificates are redeemed, the redemption price may be less than the original cost of the redeemed Residual Certificates. These conditions reduce the amounts distributed to the Company in

respect of the Underlying Assets and, as a result, we can give no assurance that holders will receive any distribution on their Participation Shares or Existing Shares upon the occurrence of an applicable Participation Event.

**Liquidity**

MOF Five must rely for payment under the Hedge Agreements and the Synthetic Positions on the creditworthiness of the counterparties, including the TOB Dealers. The counterparties are expected to be rated at least A by Standard & Poor's Rating Services or A2 by Moody's Investors Service, Inc., and the obligations of the parties under the Hedge Agreements and the Synthetic Positions are expected to be marked to market on a daily basis. There can be no assurance, however, that any counterparty will honor its obligations under a Hedge Agreement or a Synthetic Position. As counterparties become financially unsound or insolvent, MOF Five may be forced to unwind its Hedge Agreements and Synthetic Positions with such counterparty and experience further losses. After unwinding a Hedge Agreement or a Synthetic Position in that manner, MOF Five's hedging strategy will not be fully implemented and MOF Five will be exposed to losses due to unfavorable interest rate movements. MOF Five also continues to be subject to the risk that issuers or insurers of municipal bonds or other instruments in which it invests and trades (including governmental entities as well as non-governmental entities, and including investments rated at least A3 or P-1 by Moody's Investors Service, Inc. or at least A- or A-1 by Standard & Poor's Rating Services) may default on their obligations under such instruments, or that the credit quality of those issuers may decline significantly. These conditions could reduce the likelihood that holders of either Existing Shares or Participation Shares will receive any distributions upon the occurrence of an applicable Participation Event.

**Use of Borrowed Funds; Margin Requirements**

In the course of the orderly liquidation of the Underlying Assets, the Managing Agent may acquire additional positions and use leverage for such acquisitions. MOF Five is authorized to borrow on a secured or unsecured basis for any purpose, including to increase investment capacity, cover operating expenses and make withdrawal or distribution payments or for clearance of transactions. The leverage restrictions applicable to MOF Five do not limit the amount of indebtedness or other obligations that MOF Five may incur. The interest expense and other costs incurred in connection with such borrowing may not be recovered by appreciation in the investments purchased or carried, may not be deductible for tax purposes and may cause U.S. tax-exempt investors to recognize unrelated business taxable income. If investment results fail to cover the cost of borrowings, MOF Five's NAV could also decrease faster than if there had been no borrowings. In addition, unanticipated increases in applicable margin requirements, such as those experienced in the first quarter of 2008, could adversely affect the liquidity of MOF Five and therefore adversely affect its performance and reduce the chances of there being any distribution to holders of either Existing Shares or Participation Shares upon the occurrence of an applicable Participation Event.

Although the Managing Agent intends to complete the liquidation of the Underlying Assets by March 31, 2011, in the course of such orderly liquidation the Managing Agent may acquire additional positions and use leverage for such acquisitions. There can be no assurance that these continued investments will be successful, that MOF Five's investment objectives will be achieved, that MOF Five will enter into effective Hedge Agreements and Synthetic Positions or that the Company will receive any return on its investment in MOF Five. There also can be no assurance that Existing Holders who are not eligible or choose not to participate in the Exchange Offer will recover any portion of their initial investment in the Existing Shares or that holders of Participation Shares will receive any distributions upon the occurrence of a Participation Event.

**Lack of Control**

Pursuant to the provisions of the LLC Agreement for MOF Five, as amended in connection with this Exchange Offer, all authority to manage the day-to-day operations and the assets of MOF Five is vested in the Managing Agent. The holders of Participation Shares, like the holders of Existing Shares, will not be entitled to make decisions with respect to the management, disposition or other realization of any investment made by MOF Five, or regarding MOF Five's business and affairs. In addition, because the Participation Shares are non-voting other than with respect to matters directly and adversely impacting the Participation Shares, their holders will not be able to determine the outcome of matters submitted to a vote of our members for approval.

**Non-Transferability of Shares**

The Participation Shares represent highly illiquid investments. You will not be permitted to directly or indirectly transfer, resell or otherwise hypothecate your Participation Shares (or Existing Shares) without the prior written consent of MAT Five or the Managing Agent, which may be withheld in their sole discretion, and the satisfaction of certain other conditions, including compliance with applicable securities laws. You should not expect MAT Five or the Managing Agent to grant their consent to transfers. Neither MAT Five nor the Managing Agent will consent to any transfer that would cause (i) the Participation Shares to be held of record by 500 or more investors as determined under the Exchange Act or (ii) the assets of the Company or MOF Five to be deemed to be "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

Because of the Company's and MOF Five's low cash position and the ongoing dislocation in the municipal bond markets, the Managing Agent has suspended both redemptions from the Company (and payments of related redemption proceeds) and quarterly income distributions in an effort to preserve liquidity, and we can not be certain when such redemptions and distributions will resume. There is currently no market for Participation Shares or any series of Existing Shares, and it is not contemplated that one will develop. You may not be able to liquidate your investment in the event of an emergency or for any other reason, and your Participation Shares or Existing Shares may not be readily accepted as collateral for a loan.

**Tax Treatment of Exchange**

As discussed below in "Certain United States Federal Income Tax Consequence," the Company intends to treat holders of Existing Shares who participate in the Exchange Offer as disposing of part of their interest in the Company and retaining part of that interest, resulting in the current recognition of a long term capital loss. There can be no assurance, however, that the U.S. Internal Revenue Service ("IRS") will agree that such treatment is appropriate, or that it will agree with the allocation of basis and calculation of loss that a particular holder may adopt. Further, it is possible that the IRS may take the position that a portion of the Exchange Consideration should be treated as a payment for the Release, resulting in the recognition of a long term capital gain together; although this should also result in an increased long term capital loss, the net effect may be to reduce the net loss recognized. See "Certain United States Federal Income Tax Consequences" beginning on page 28. Existing Holders should consult with their own independent tax advisors concerning the tax issues raised by participation in the Exchange Offer and the ownership of Participation Shares.

**Limited Information**

This Confidential Memorandum does not provide specific information with respect to any municipal bond, the issuers thereof, any tender option bond program, any TOB Dealer, any residual dealer, or any Residual Certificates, or with respect to any rights or obligations, legal, financial or otherwise, arising thereunder or related thereto, except information relating to the general characteristics thereof. In addition, this Confidential Memorandum does not purport to disclose current material information concerning any specific municipal bonds or Residual Certificates. The actual terms of the investment securities purchased by MOF Five and the Hedge Agreements and Synthetic Positions entered into MOF Five may vary significantly from the general terms described in this Confidential Memorandum.

**Limited Reliability of Forward-Looking Scenario Analysis**

Annex B to this Confidential Memorandum sets forth certain scenario analyses of the potential future results of MOF Five and the Company (for the purposes of this section, "Analyses") prepared by the Managing Agent using, among other things, assumed fund portfolio characteristics as of April 30, 2008 and assumed variations in 20-year AAA insured municipal yields projected on a forward looking basis. The Analyses, while presented with numerical specificity, are based upon a number of estimates and assumptions, which though considered reasonable by the Company at the time presented, are inherently subject to significant business, economic and market uncertainties and contingencies, many of which are beyond the control of the Company. Among other factors, actual portfolio characteristics and municipal yields for the periods indicated may differ materially from those assumed. Additionally, the assumptions on which the Analyses are based do not account for all variables that could impact future investment returns. While the Company believes that the Analyses are based upon reasonable assumptions and estimates, actual results will vary and such variations may be material, and it is usually the case that one or more of the underlying assumptions will not materialize. EXISTING HOLDERS ARE CAUTIONED NOT TO PLACE ANY RELIANCE ON THE ANALYSES AND SHOULD READ ANNEX B IN CONJUNCTION WITH THE ENTIRE CONFIDENTIAL MEMORANDUM, PARTICULARLY THIS "RISK FACTORS" SECTION. No representation is being made that any Existing Holder, whether or not choosing to participate

in the Exchange Offer, will or is likely to achieve a performance record similar to that shown in the Analyses.  The Company's independent auditors have not compiled or examined the Analyses and, accordingly, do not express any opinion or any other form of assurance with respect thereto.

**Conflicts of Interest**

Citigroup Inc. and its affiliates (collectively, for purposes of this section, "Citigroup") engage in a broad spectrum of activities, including insurance, banking, underwriting, private equity and financial advisory activities, and have extensive investment activities that are independent from, and may from time to time conflict with those of, MOF Five or its shareholders, including the Company.  For example, Citigroup may have participated in advising Existing Holders in the purchase of Existing Shares and now has authority on behalf of the Company in the Exchange Offer relating to such shares. There may also be instances where the interests of Citigroup conflict with the interests of MOF Five or the Company.  Citi currently holds the Citi MOF Shares and is also purchasing the New Citi Shares concurrently with this offering, and may have interests that differ from those of the Existing Holders as a result of the ownership of any of the Citi Shares.  Certain affiliates of the Managing Agent may engage in transactions with, and may provide services to, MOF Five or MAT Five, and will receive compensation from such entities.  The Managing Agent and its affiliates may also provide services to, invest in, advise, sponsor or act as Managing Agent to investment vehicles and other person or entities that may have similar structures and investment objectives and policies to those of MOF Five, that may compete with MOF Five and the Company for investment opportunities and that may co-invest with MOF Five in certain transactions.

The activities of Citigroup may also restrict or preclude the Managing Agent, and therefore MOF Five and MAT Five, from pursuing certain investment or disposition opportunities and from taking certain actions with respect to a particular investment.  In addition to investment management services, affiliates of the Managing Agent may provide services to MOF Five or MAT Five, including, without limitation, brokerage and custodial services and moneys held by MOF Five or MAT Five may be invested in instruments issued by Citigroup and money market funds managed by Citigroup.

Any such activities may create a conflict of interest among MOF Five, MAT Five and Citigroup, including the Managing Agent.  We can give no assurance that, to the extent conflicts arise between the interests of MOF Five and MAT Five and those of Citigroup, such conflicts will be resolved in a manner favorable to MOF Five, MAT Five or the Company.

**Other Clients of Advisors**

In addition to MOF Five, the Managing Agent generally will manage other accounts (including other accounts in which it may have an interest) and may have financial and other incentives to favor such accounts over MOF Five.  In investing on behalf of a number of different clients, the Managing Agent may face limits on its management resources, as well as limited market opportunities.  These limitations and increased competition for the same market opportunities could make it difficult or impossible for MOF Five to liquidate a particular position at a price indicated by the Managing Agent's strategy.

## THE EXCHANGE OFFER

**General**

Upon the terms, conditions and exceptions set forth in this Confidential Memorandum, we are offering Existing Holders that are Accredited Investors the Exchange Payment and one (1) Participation Share for every Existing Share validly tendered and not revoked prior to the Expiration Date. Existing Holders who are not Accredited Investors may not participate in the Exchange Offer. All Existing Holders that wish to tender their Existing Shares in the Exchange Offer will be required to grant the Release, releasing and discharging any and all claims against the Releasees relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of tender pursuant to the Exchange Offer. Each Existing Holder who wishes to tender his or her Existing Shares in the Exchange Offer must agree in the manner set forth herein and in the Exchange Offer Subscription Agreement to tender all Existing Shares of any series held by such Existing Holder in order to participate in the Exchange Offer, regardless of an Early Settlement election. For the NAV of the Existing Shares as of April 30, 2008, which includes the April Citi Allocation, as well as when you can expect to receive the May 31, 2008 NAV of your Existing Shares, please refer to Annex A.

Existing Shares tendered for exchange in the Exchange Offer will be considered redeemed upon acceptance and consummation of the Exchange Offer by the Company, subject to revocation in the case of all Existing Shares tendered, including those tendered for Early Settlement. Concurrently with the consummation of the Exchange Offer (including upon Early Settlement), the Company will sell such number of New Citi Shares to Citi representing a number of shares equal to the number of Existing Shares tendered in the Exchange Offer, for a per share purchase price equal to the Exchange Payment, the proceeds of which will be used to pay the aggregate Exchange Payment. In the case of a validly revoked tender by an Existing Holder participating in Early Settlement, the New Citi Shares corresponding to such revoked Existing Shares will be cancelled and the purchase price for such New Citi Shares will be returned to Citi.

This Confidential Memorandum, together with the Exchange Offer Subscription Agreement, is being sent to all registered holders of Existing Shares as of May 29, 2008. The Company reserves the right to amend the terms of this Exchange Offer in its sole discretion. The Exchange Offer is not conditioned upon the participation of a minimum number of Existing Holders, nor does it involve any drag-along rights, exit consents or other majority action. Participation in the Exchange Offer is entirely voluntary and at the discretion of eligible Existing Holders. In addition, our obligation to accept Existing Shares for exchange in the Exchange Offer is subject to the satisfaction of the conditions set forth hereunder "—Conditions to the Exchange Offer," any or all of which we may waive in our sole discretion.

None of the Company, MAT Five, MOF Five, the Managing Agent, Citi or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer, and, accordingly, you must make your own determination whether to participate in the Exchange Offer. Notwithstanding anything to the contrary contained herein, certain Citi Affiliated Persons are expected to be excluded from participating in the Exchange Offer (and as a result, any Citi Affiliated Person that receives this Confidential Memorandum should not deem such receipt as an invitation to participate in the Exchange Offer). Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer.

Existing Shares of either series will be deemed to have been accepted as validly tendered if, as and when we have given oral or written notice thereof to the Managing Agent. The Managing Agent will act as agent for tendering Existing Holders in delivering the Participation Shares and the Exchange Payment to such Existing Holders.

We and our affiliates reserve the right to purchase or make offers for any Existing Shares of any series that remain outstanding subsequent to the Expiration Date or, as set forth under "—Conditions to the Exchange Offer," to terminate the Exchange Offer or, after the Expiration Date, to redeem any series of the Existing Shares as a whole or in part and from time to time, as permitted by the LLC Agreement for MAT Five, and, to the extent permitted by applicable law, purchase Existing Shares in privately negotiated transactions or otherwise. Following consummation of the Exchange Offer, the terms of any such redemptions, purchases or offers could differ from the terms of the Exchange Offer.

Tendering holders of Existing Shares will not be required to pay brokerage commissions or fees or, subject to the instructions in the Exchange Offer Subscription Agreement, transfer taxes with respect to the receipt of the Participation

Shares in exchange for Existing Shares pursuant to the Exchange Offer. The Company will pay all charges and expenses, other than certain applicable taxes, directly related to the Exchange Offer. See "—Fees and Expenses" below.

**Expiration Date; Extensions; Amendments**

The Expiration Date is 5:00 p.m., New York City time on July 15, 2008, unless the Exchange Offer period is extended, in which case the Expiration Date will be the last date to which the Exchange Offer is extended. We may extend the Exchange Offer from time to time, in our sole discretion, for any purpose including without limitation to permit the satisfaction or waiver of all conditions to the Exchange Offer.

We expressly reserve the right to (i) delay acceptance of any Existing Shares, extend the Exchange Offer, or terminate the Exchange Offer and not accept Existing Shares not previously accepted if any of the conditions set forth herein under "—Conditions to the Exchange Offer" shall not have been waived or satisfied prior to the Expiration Date, and (ii) amend at any time, or from time to time, the terms of the Exchange Offer. To extend the Expiration Date, the Company will so notify the Managing Agent and will make a public announcement thereof, not later than 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration Date. If the Exchange Offer is amended in a manner determined by us to constitute a material change, we will promptly disclose such amendment in a manner reasonably calculated to inform the Existing Holders of such amendment and extend the Expiration Date as appropriate.

The minimum period during which the Exchange Offer will remain open following material changes in the terms of such Exchange Offer or in the information concerning such Exchange Offer (other than a change in Exchange Consideration) will depend upon the facts and circumstances of such change, including the relative materiality of the terms or information changes. With respect to any change in the Exchange Consideration (other than setting forth the Exchange Payment prior to the Expiration Date), a minimum ten business-day extension period will be made to allow for adequate dissemination of such change. If any of the terms of the Exchange Offer, or the terms of the Participation Shares, are amended in a manner we determine to constitute a material change adversely affecting any Existing Holder, we will promptly disclose any such amendment in a manner reasonably calculated to inform such Existing Holders of such amendment and we will extend the Exchange Offer period for a time period which we, in our sole discretion, deem appropriate, depending upon the significance of the amendment and the manner of disclosure to holders of Existing Shares, if the Exchange Offer period would otherwise expire during such time period. Existing Holders who tender their Existing Shares for Early Settlement will receive the benefit of any amendment to the Exchange Offer, including but not limited to any increase in Exchange Payment or change in the terms of Participation Shares, and will retain revocation rights until the Expiration Date, including any extension.

**Early Settlement**

Existing Holders may elect Early Settlement and receive the Exchange Consideration by June 20, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. (New York City time) on June 13, 2008, or by July 7, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. (New York City time) on June 30, 2008. Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of such Exchange Payment and automatic forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein. See "—Revocation Rights" below. You should consult your tax advisor regarding the tax consequences to you with respect to the revocation of any Existing Shares tendered and accepted for Early Settlement.

Existing Holders who desire to participate in Early Settlement should so indicate by marking the appropriate boxes in, and signing and dating, the accompanying Exchange Offer Subscription Agreement.

Existing Holders who have tendered Existing Shares for Early Settlement who wish to revoke such tenders must also return the Exchange Payment received prior to the Expiration Date. Upon acceptance by the Company of a valid notice of revocation and return of the Exchange Payment, the New Citi Shares issued and corresponding to such revoked Existing Shares will be cancelled, any Participation Shares received pursuant to such Early Settlement will be rescinded and an equal number of Existing Shares of the applicable series will be re-credited to such holders' account on the books and records of the Company. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders. Existing Holders who tender their Existing Shares for Early Settlement will receive the benefit of any amendment to the Exchange Offer, including but not limited to any increase in Exchange Payment or change in the terms of Participation Shares, and will retain revocation rights until the Expiration Date, including any extension.

**Procedures for Tendering Existing Shares in the Exchange Offer**

All Exchange Offer Subscription Agreements that are validly delivered and not validly revoked will be given effect in accordance with the specifications therein. Tenders of Existing Shares may only be made with respect to all of the Existing Shares owned by such Existing Holder and such Existing Holder must also grant the Release. Elections with respect to receipt of Participation Shares shall apply to all Existing Shares tendered. In order to change an election after delivering a completed Exchange Offer Subscription Agreement, Existing Holders must properly revoke their prior tender by following the procedures described under "—Revocation Rights" (and, if applicable,"—Early Settlement") and then resubmit a new Exchange Offer Subscription Agreement.

Existing Holders who desire to participate in the Exchange Offer should so indicate by marking the appropriate boxes in, and signing and dating, the accompanying Exchange Offer Subscription Agreement and Release and any other required attachments thereto, and delivering such items in accordance with the instructions contained herein and therein. Unless all of the appropriate boxes in the Exchange Offer Subscription Agreement are checked, the Existing Holder will not be deemed to have tendered his or her Existing Shares in the Exchange Offer or granted the Release.

The Exchange Offer Subscription Agreement must be executed in exactly the same manner as the name of the Existing Holder appears on the books and records of the Company. **If Existing Shares are held of record by two or more joint Existing Holders, all such Existing Holders must sign the Exchange Offer Subscription Agreement and Release.** If a signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other Existing Holder acting in a fiduciary or representative capacity, such person should so indicate when signing. If an Existing Holder has Existing Shares registered in different names, separate Exchange Offer Subscription Agreements and corresponding Releases must be executed covering each form of registration. If an Exchange Offer Subscription Agreement is executed by a person other than the Existing Holder, then such person must have been authorized by proxy or in some other manner acceptable to the Company to execute the Exchange Offer Subscription Agreement with respect to the applicable Existing Shares on behalf of the Existing Holder, but the corresponding Release must be executed by the Existing Holder.

An Existing Holder must complete, sign and date the Exchange Offer Subscription Agreement and Release (or photocopies thereof) and deliver such Exchange Offer Subscription Agreement and Release and any other required documentation by mail, first-class postage prepaid, hand delivery, overnight courier or by facsimile transmission (with an original to be delivered subsequently) to the appropriate address or number set forth in the Exchange Offer Subscription Agreement. Delivery of Exchange Offer Subscription Agreements and other applicable documentation should be made sufficiently in advance of the Expiration Date to assure that the Exchange Offer Subscription Agreements are received prior to the Expiration Date (and, in the case of facsimile transmission, that the original Exchange Offer Subscription Agreements are received by the appropriate party prior to 5:00 p.m., New York City time, promptly following the Expiration Date) or the applicable date of Early Settlement, as applicable.

The Company reserves the right to receive Exchange Offer Subscription Agreements by any other reasonable means or in any form that reasonably evidences the tender of Existing Shares and the granting of the Release.

All questions as to the validity, form, eligibility (including time of receipt), acceptance and revocations of tender of Existing Shares will be resolved by the Company, whose determination will be binding. The Company reserves the absolute right to reject any or all Exchange Offer Subscription Agreements and revocations thereof that are not in proper form or the acceptance of which could, in the opinion of the Company's counsel, be unlawful. The Company also reserves the right to waive any irregularities in connection with deliveries of Exchange Offer Subscription Agreements, which the Company may require to be cured within such time as the Company determines. Neither the Company, MAT Five, MOF Five, the Managing Agent, the Administrator nor any other person shall have any duty to give notification of any such irregularities or waiver, nor shall any of them incur any liability for failure to give such notification. Deliveries of Exchange Offer Subscription Agreements or notices of revocation will not be deemed to have been made until such irregularities have been cured or waived. The Company, in its sole discretion, may waive any irregularities in any deliveries of Exchange Offer Subscription Agreements, which may include irregularities in how or when Exchange Offer Subscription Agreements are delivered. The Company's interpretation of the terms and conditions of the Exchange Offer (including this Confidential Memorandum and the accompanying Exchange Offer Subscription Agreement and the instructions hereto and thereto) will be final and binding on all parties.

**Acceptance of Existing Shares for Exchange; Delivery of Participation Shares and Exchange Payment**

Subject to the limitations set forth herein, upon satisfaction or waiver of all of the conditions to the Exchange Offer, all Existing Shares properly tendered and not revoked will be accepted, and the Participation Shares will be issued and payment of the Exchange Payment will be made promptly after acceptance of the Existing Shares, which, in the case of Existing Holders who elect Early Settlement and do not validly revoke such tenders, will be by June 20, 2008 or July 7, 2008 with respect to shares tendered for Early Settlement prior to 5:00 p.m. on June 13, 2008 or June 30, 2008, respectively, and for other Existing Shares, promptly after the Expiration Date. See "—Conditions to the Exchange Offer." For purposes of the Exchange Offer, Existing Shares shall be deemed to have been accepted as validly tendered for exchange when, as and if we have given oral or written notice thereof to the Managing Agent. For each Existing Share tendered for exchange such holder will receive one Participation Share and the Exchange Payment. The Exchange Payment will be paid by wire transfer to the Smith Barney or Citi Private Bank account(s) in which the Existing Shares to be exchanged are held and Participation Shares will be credited to such account.

In all cases, issuances of Participation Shares for Existing Shares that are accepted for exchange pursuant to the Exchange Offer will be made only after timely receipt of a properly completed and duly executed Exchange Offer Subscription Agreement and all other required documents in accordance with the terms thereof.

If any tendered Existing Shares are not accepted for any reason set forth under "—Conditions to the Exchange Offer," such unaccepted or such unexchanged Existing Shares will be credited to the account of the applicable Existing Holder in the name of the Existing Holder of such Existing Shares on the books and records of the Company as promptly as practicable after the expiration or termination of the Exchange Offer with respect to the applicable series of Existing Shares.

**Revocation Rights**

Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be revoked at any time prior to the Expiration Date.

For a revocation of a tender to be effective, a written notice of revocation (the form of which is attached as Annex A to the Exchange Offer Subscription Agreement) must be received by the appropriate party prior to the Expiration Date in accordance with the instructions set forth in the Exchange Offer Subscription Agreement. Any such notice of revocation must:

- specify the name of the person that tendered the Existing Shares to be revoked;

- state that the tender of all Existing Shares previously made are to be revoked (and to be effective all of such Existing Holder's Existing Shares must be revoked);

- contain a statement that such Existing Holder is revoking its election to tender such Existing Shares;

- be signed by the holder in the same manner as the original signature on the Exchange Offer Subscription Agreement by which such Existing Shares were tendered, or be accompanied by documents of transfer, acceptable to the Managing Agent, to have the Administrator register the transfer of such Existing Shares in the name of the person revoking the tender; and

- specify the name in which such Existing Shares are registered, if different from the person who tendered such shares.

All questions as to the validity, form, eligibility and time of receipt of such notice will be determined by us, and our determination shall be final and binding on all parties. Any Existing Shares so revoked will be deemed not to have been validly tendered for exchange for purposes of the Exchange Offer and the corresponding Release shall be voided. Any Existing Shares that have been tendered for exchange but are not exchanged for any reason will be credited to an account in the name of the Existing Holder of such Existing Shares on the books and records of the Company for the Existing Shares as soon as practicable after revocation, rejection of tender or termination of the Exchange Offer with respect to the Existing Holder. Properly revoked Existing Shares may be retendered by following the procedures described under "—Procedures for Tendering Existing Shares in the Exchange Offer" above at any time prior to the Expiration Date including execution of a new Release.

**Conditions to the Exchange Offer**

Notwithstanding any other provision of the Exchange Offer, or any extension of the Exchange Offer, we shall not be required to accept for exchange any Existing Shares, issue any Participation Shares or make any payment of the Exchange Payment, and we may terminate or amend the Exchange Offer, if at any time prior to the consummation of the Exchange Offer, we determine, in our reasonable judgment, that any of the following conditions has not been satisfied, prior to or concurrently with such consummation of the Exchange Offer:

- the completion of the other components of the related transactions, including the closing of the offer and sale of the New Citi Shares;

- our assets would not be treated as assets of any "employee benefit plan" as defined in and subject to ERISA or of any "plan" subject to Section 4975 of the Code and none of the transactions contemplated under the Exchange Offer constitute or give rise to a non-exempt prohibited transaction as defined in Section 406 of ERISA or Section 4975(c) of the Code for any purpose of ERISA or Section 4975 of the Code.

- there shall not have occurred or be likely to occur any event affecting our business or financial affairs that would or might prohibit, prevent, restrict or delay consummation of the Exchange Offer and related transactions as a whole, or that will, or is reasonably likely to, impair the contemplated benefits to us of the Exchange Offer and related transactions as a whole or that might be material to the Existing Holders of a series of Existing Shares in deciding whether to accept the Exchange Offer; and

- there shall not have been any action taken or threatened, or any statute, rule, regulation, judgment, order, stay, decree or injunction promulgated, enacted, entered, enforced or deemed applicable to the Exchange Offer or related transactions or the exchange of Existing Shares or issuance of Participation Shares or payment of Exchange Payment pursuant to the Exchange Offer, by or before any court or governmental regulatory or administrative agency or authority, tribunal, domestic or foreign, which (1) challenges the making of the Exchange Offer or the related transactions as a whole or might, directly or indirectly, prohibit, prevent, restrict or delay consummation of, or might otherwise adversely affect in any material manner, the Exchange Offer or the related transactions as a whole or (2) could materially adversely affect our business, condition (financial or otherwise), income, operations, properties, assets, liabilities or prospects, or materially impair the contemplated benefits of the Exchange Offer or the related transactions as a whole to us or that might be material to Existing Holders of a series of Existing Shares in deciding whether to accept such Exchange Offer.

The foregoing conditions are for our sole benefit and may be asserted by us regardless of the circumstances giving rise to any such condition (including any action or inaction by us) or may be waived by us, in whole or in part, at any time and from time to time, in our sole discretion. The failure by us at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time by us. If we terminate or revoke the Exchange Offer, Participation Shares issued pursuant to Early Settlement will be rescinded and an equal number of Existing Shares will be re-credited to each applicable Existing Holder's account on the books and records of the Company, and each such Existing Holder will be required to return all Exchange Payment previously received. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders.

**Fees and Expenses**

We will pay the aggregate Exchange Payment and issue Participation Shares to those Existing Holders who validly tender and do not revoke their Existing Shares prior to the Exchange Date with the proceeds of the offer and sale of the Citi Shares.

Additionally, Citi will pay all transfer taxes, if any, applicable to the exchange of Existing Shares pursuant to the Exchange Offer. Existing Holders of Existing Shares of any series will not be required to pay a redemption fee on the exchange of Existing Shares pursuant to the Exchange Offer. If, however, Participation Shares or Existing Shares of either series are to be issued in the name of any person other than the registered holder of the Existing Shares tendered for principal amounts not tendered or accepted for exchange or if tendered Existing Shares are registered in the name of any person other than the person signing the Exchange Offer Subscription Agreement, or if a transfer tax is imposed for any reason other than the exchange of Existing Shares pursuant to the Exchange Offer, then the amount of any such transfer taxes imposed on the registered holder or any other persons will be payable by the tendering holder. If satisfactory

evidence of payment of such taxes or exemption therefrom is not submitted with the Exchange Offer Subscription Agreement, the amount of such transfer taxes will be billed directly to such tendering holder.

### RELEASE

In connection with this Exchange Offer, participants tendering Existing Shares will be required to execute and deliver the Release. The Release releases and discharges all claims against the Company, the Managing Agent and any sub-agent, the selling broker for the Existing Shares, Citi, MAT Five, MOF Five, any of our past or present sub-advisors, our auditors and tax preparers, the Administrator and past and present counsel to such parties (such parties, and their respective affiliates (including but not limited to any other portfolio of MAT Five) and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to herein as the "Releasees") from all actions or claims directly or indirectly arising from, relating to or in any manner connected with (i) any investment by such participant in the Company, including the acquisition or disposition of any securities of the Company, (ii) such participant's acceptance of the terms of this Exchange Offer, (iii) the operation, management, supervision, or investment of any of the assets of the Company by any of the Releasees or (iv) any actions taken or omitted to be taken by any of the Releasees in connection with or otherwise relating to or affecting in any way the Company or the acquisition, ownership or disposition of Existing Shares of either series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of tender pursuant to the Exchange Offer. No Participation Shares will be issued in exchange for Existing Shares, and no Exchange Payment will be paid, unless a properly executed Release has been granted by the tendering Existing Holder in accordance with the Exchange Offer Subscription Agreement.

### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

*To ensure compliance with U.S. Treasury Department Circular 230 (the regulations governing practice before the IRS), you are hereby notified that: (i) any discussions of U.S. federal income tax issues in this document is not intended or written by us to be relied upon, and cannot be relied upon, by any person for the purpose of avoiding penalties that may be imposed under the Code; (ii) such discussion is written in connection with the promotion and marketing of the Participation Shares by the Company and Citi; and (iii) Existing Holders should seek advice based on their particular circumstances from their own independent tax advisors.*

The following is a summary of certain of the federal income tax considerations which are material to an Existing Holder who is a United States citizen or resident individual. No attempt has been made to comment on all federal income tax matters affecting the Company or its members. The following discussion does not purport to deal with federal income or other tax consequences applicable to certain categories of Existing Holders and members, including, without limitation, tax-exempt entities, dealers in securities, members who are not U.S. citizens or resident individuals, or members holding Existing Shares or Participation Shares as a hedge or as a position in a "straddle," "conversion transaction," or "constructive sale" transaction for federal income tax purposes. This summary is not intended as, and should not be construed as, tax advice.

The following discussion is based on the Code, the Treasury regulations thereunder, published rulings and procedures, and court decisions, all as in effect on the date of this Confidential Memorandum. Future legislative or administrative changes or court decisions (which may have retroactive application) could significantly and adversely affect the tax consequences described in this Confidential Memorandum. No ruling on the federal, state or local tax considerations relevant to the exchange offer and other matters described herein has been, or will be, requested from the IRS or from any other tax authority. Accordingly, prospective investors are encouraged to consult their own tax advisors concerning the tax consequences of the exchange offer under U.S. federal income tax law, as well as the tax law of any relevant state, local or foreign jurisdiction.

**Recognition of Taxable Loss Upon Acceptance of the Exchange Offer**

*Generally*

Under the terms of the Exchange Offer, you will have the opportunity to dispose of part of your interest in the Company, while retaining an ongoing interest in the Company's tax-exempt income and in certain profits on liquidation. For federal income tax purposes, if you accept the Exchange Offer, it is expected that you will be treated as selling part (but not all) of your interest in the Company to Citi. (For these purposes, the redemption of Existing Shares and simultaneous

contribution of an equal amount by Citi in exchange for the New Citi Shares should be treated as a "disguised sale" of partnership interests, and thus treated for all federal income tax purposes as a sale of partnership interests to Citi.)

If a partner in a partnership sells part of its interest but also retains an interest in the partnership, the partner's tax basis must be allocated between the portion sold and the portion retained based on the relevant fair market values of the two interests. The partner will then recognize gain or loss to the extent the amount received in the sale is greater than or less than the portion of their tax basis allocable to the portion of the partnership interest sold. That gain or loss will be long term if the interest sold has been held for more than one year, and short term if it has been held for a lesser period. For those who participate in the Exchange Offer, it is expected the result will be a long term capital loss.

It could be argued that a portion of the cash payment made under the Exchange Offer is not payment for the Existing Shares (or a portion of the Existing Shares) being purchased, but is instead consideration paid for the Release being granted. Under longstanding federal income tax principles, a payment for a release or settlement of a claim gives rise to income to the recipient of a character consistent with the "origin of the claim." Since any claims being released here arise from the purchase and sale of a capital asset, such income should be capital gain, which gain would be long term capital gain if the Existing Shares have been held for more than a year. If such an analysis were followed, the participants in the Exchange Offer would also have an increased long term capital loss upon the sale of part of their interest, since the amount deemed received in that sale would be reduced, but the increased loss should be less than the gain from the Release.

The Company, however, will take the position that no portion of the payments is attributable to the Release, since the amount being received for the Existing Shares is equal to the NAV of those Existing Shares, which is the amount that would be expected to be realized upon the liquidation of the Company. There can be no assurance that this position would be upheld if challenged by the Internal Revenue Service. Holders are advised to consult with their own tax advisors about these issues. The remainder of this discussion assumes that no portion of payments received in the Exchange Offer will be treated as payments for a release for federal income tax purposes.

### Allocation of Tax Basis and Calculation of Net Loss

To determine the loss that will be recognized upon acceptance of the Exchange Offer, it is necessary for a holder of Existing Shares to allocate its tax basis in those Existing Shares between the portion being sold and the portion being retained (i.e., the Participation Shares) based on their relative fair market values.

It is expected that the fair market value of the Participation Shares will be a modest portion of the total fair market value of the holder's Existing Shares. While the Participation Shares are expected to generate material amounts of interest income, the receipt of any further amounts upon liquidation of the Company should be considered speculative, since no amounts will be payable unless market conditions improve and MOF Five's NAV increases to an amount such that the NAV of the 2008 Citi Shares exceeds the amount of the 2008 Citi Investment plus the Cost of Capital thereon compounded annually. Each participant in the Exchange Offer is free to take its own position as to the relevant fair market values of the interest disposed of and retained. Annex B to this Confidential Memorandum also sets forth sample calculations comparing the potential outcomes for Existing Holders who do or do not participate in the Exchange Offer, given different assumptions of the future performance of the Company. Existing Holders should consult with their own independent tax advisors concerning the tax issues raised by participation in the Exchange Offer and the ownership of Participation Shares.

Following consummation of the Exchange Offer, each participating Existing Holder should have a tax basis in the Participation Shares equal to the portion of its original tax basis allocable to its retained interest in the Company. Upon final liquidation of the Company, the holder will recognize a capital loss to the extent that its tax basis in the Participation Shares exceeds the amount received on liquidation. This capital loss will be a long term capital loss to the extent the holder has held an interest in the Company (whether the Existing Shares or the Participation Shares) for more than one year.

### Reportable Transactions

The IRS has issued final Regulations that may require the Company or its Existing Holders to report their direct or indirect participation in certain "reportable transactions" by filing IRS Form 8886 (Reportable Transaction Disclosure Statement). A "reportable transaction" includes a transaction that results in a loss claimed under Section 165 of the Code by a taxpayer (computed without taking into account offsetting income or gain items, and without regard to limitations on its deductibility) in excess of certain thresholds, unless the transaction has been exempted from reporting by the IRS. For existing Holders that are individuals, S corporations or trusts, the applicable thresholds are (i) $2 million in any single taxable year and (ii) $4 million for the taxable year the Exchange Offer is entered into and the five succeeding taxable years.

(Higher thresholds would apply to Existing Holders that are corporations.) If you recognize a loss with respect to the Exchange Offer in excess of these thresholds, your participation in the Exchange Offer may be considered participation in such a "reportable transaction" and require you to file a Reportable Transaction Disclosure Statement. None of the current exemptions from reporting appear to apply to such a loss. Potentially affected Existing Holders are encouraged to consult with their own tax advisors concerning the application of these rules to their particular circumstances.

## Taxation of Holders of Participation Shares

As noted above, any Participation Shares received in the Exchange Offer will be treated for federal income tax purposes as a portion of the holder's interest in the Existing Shares that has been retained. Such Participation Shares will succeed to a portion of the tax basis of the holder in the Existing Shares, and will have the same holding period as the Existing Shares surrendered. The holder will initially have a capital account of zero with respect to its Participation Shares.

Because the Company is treated as a partnership for federal income tax purposes, it will generally not pay taxes on its income, but rather its owners will be required to report on their own individual tax returns their allocable shares of the taxable and tax-exempt income, gain or loss and other tax items of the Company.

Holders of Participation Shares will be allocated interest income to the extent of the interest share distributable to those Participation Shares. It is expected that much of this interest income will be tax-exempt income that can be excluded from federal taxable income.

Holders of Participation Shares may also be allocated capital gains in some circumstances. At the end of each taxable year, the Company will adjust the capital accounts of the Existing Holders to reflect both gains and losses that have been realized for federal income tax purposes and gains and losses that are unrealized for such purposes. (In general, losses of the Company will only be allocated to Participation Shares after losses have first been allocated in amounts sufficient to reduce the capital accounts of the New Citi Shares to zero, and to reduce the capital accounts of the Existing Shares to an amount equal to their share of interest income allocated but not yet distributed.) To the extent that amounts would have been distributable with respect to such Participation Shares if the Company had sold all of its assets for NAV and liquidated on the last day of a taxable year, however, gains will be allocated to the holders of Participation Shares. If realized gains are allocated with respect to Participation Shares for a taxable year, but there are subsequent losses in value, holders of Participation Shares could have taxable realized gains in one year, and either receive corresponding amounts of cash only upon liquidation or receive a lesser amount of cash and an allocation of capital losses in a later year or upon liquidation. Prospective holders of Participation Shares are encouraged to consult with their own income tax advisors about possible allocations of gain or loss, and in particular about the effects of gains and losses over multiple taxable years.

**THE FOREGOING DISCUSSION DOES NOT PURPORT TO ADDRESS ALL OF THE FEDERAL INCOME TAX CONSEQUENCES THAT MAY APPLY TO HOLDERS BASED ON THEIR SPECIFIC CIRCUMSTANCES, AND DOES NOT ADDRESS ANY ISSUES THAT MAY ARISE UNDER STATE AND LOCAL INCOME TAXES, FOREIGN TAXES, OR THE FEDERAL ALTERNATIVE MINIMUM TAX. EXISTING HOLDERS SHOULD CONSULT WITH THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE TAX ISSUES RAISED BY PARTICIPATION IN THE EXCHANGE OFFER AND THE OWNERSHIP OF PARTICIPATION SHARES.**

## ACKNOWLEDGEMENTS AND CONSENTS

Because the following restrictions will apply to Participation Shares, holders of Existing Shares who exchange their Existing Shares for Participation Shares in the Exchange Offer are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Participation Shares.

The Participation Shares to be issued in the Exchange Offer have not been registered under the Securities Act or any state or non-U.S. securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state and foreign securities laws. Accordingly, the right to receive Participation Shares, is only for those individuals and entities that are "accredited investors" (as defined in Rule 501(a) under the Securities Act).

**By delivering an Exchange Offer Subscription Agreement and receiving Participation Shares and the Exchange Payment in the Exchange Offer, each such Existing Holder participating in the Exchange Offer will be deemed to:**

1.      Represent that it is acquiring the Participation Shares for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is an Accredited Investor;

2.      Acknowledge that the Participation Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Managing Agent (which may grant or withhold such consent in its sole discretion);

3.      Acknowledge that the Participation Shares issued in the Exchange Offer have not been, nor will they be, registered under the Securities Act or with any securities regulatory authority of any jurisdiction and that such Participation Shares may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except as set forth below;

4.      Agree that it will deliver to each person to whom it transfers any of the Participation Shares notice of any restrictions on transfer of such Participation Shares;

5.      Understand that, unless registered under the Securities Act, any Participation Shares issued in the Exchange Offer in certificated form will bear a legend to the effect that such shares may only be transferred upon prior written consent of the Company or Managing Agent and in compliance with applicable federal and state securities laws. Participation Shares issued in book entry form will be subject to appropriate stop orders limiting transfer;

6.      Represent that it has such knowledge and experience in financial and business matters, that it is capable of evaluating the merits and risks of participating in the Exchange Offer;

7.      Represent that it is tendering all of its Existing Shares and, upon the completion of the Exchange Offer and the exchange of its Existing Shares for Participation Shares, if applicable, the only shares or other equity interests of the Company owned by it will be such Participation Shares and otherwise will own no equity interests of the Company;

8.      Represent that it is a sophisticated investor and understands, fully appreciates and is willing to assume any and all risks associated with and any and all potential negative or adverse consequences of its participation in the Exchange Offer including, but not limited to, the risks described in this Confidential Memorandum;

9.      Grant the Release; and

10.      Acknowledge that the Company, the Managing Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements, and agree that if any of the acknowledgments, representations or warranties deemed to have been made by it by its exchange of Existing Shares are no longer accurate, it shall promptly notify the Company and the Managing Agent. If it is acquiring any Participation Shares as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

## COUNSEL

The Managing Agent has retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to serve as counsel to the Managing Agent with respect to certain matters relating to the Exchange Offer.  Skadden may act as counsel to the Managing Agent in connection with investments made by the Company or the day to day operation of the Company.  Skadden does not represent and has not represented the Company, the Funds or their respective members in organizing the Company or the Funds, negotiating their business terms or in connection with this Exchange Offer.  It is not anticipated that, in connection with the general operation of the Company or the Funds, the Company or the Funds will engage separate counsel.

Skadden's engagement by the Managing Agent in respect of the Company is limited to the specific matters as to which it is consulted by the Managing Agent and, therefore, there may exist facts or circumstances which could have a bearing on the Company's or the Managing Agent's financial condition or operations with respect to which Skadden has not been consulted and for which Skadden expressly disclaims any responsibility.  Skadden is not representing any Existing Holder in connection with the Exchange Offer.  Jones Day also serves as tax counsel to the Managing Agent with respect to certain matters relating to the Exchange Offer and the Company.

The Managing Agent may remove Skadden or Jones Day at any time without the consent of, or notice to, the Existing Holders.

Confidential Tender and Exchange Offer Memorandum

# MAT FIVE LLC California Portfolio

Offers Existing Holders
that are Accredited Investors
a Cash Payment and Newly Created Participation Shares
in Exchange for any and all
Existing Shares of Limited Liability Company Interest

———————————

**Copies of the Exchange Offer Subscription Agreement will be accepted by the Company pursuant to the instructions set forth therein.  Questions or requests regarding the Exchange Offer may be directed to the Managing Agent at the address set forth below:**

## Citigroup Alternative Investments LLC

731 Lexington Avenue
27th Floor
New York, NY  10022
Attention:  Investing Services
Telephone: (212) 783-1330

———————————

May 29, 2008

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF APRIL 30, 2008\***

**MAT FIVE LLC – CALIFORNIA PORTFOLIO – SERIES 2007-1A**

| Net Asset Value | Percentage of Initial Capital Invested\*\* |
|---|---|
| Per Existing Share: $0.206 (includes the April Citi Allocation) | 20.6% |

| Distributions Since Inception as a Percentage of Initial Capital Invested\*\* |
|---|
| 4.5% |

\*    The NAV per Existing Share as of May 31, 2008 will be provided to Existing Holders prior to the Expiration Date as part of such holders' monthly statements, which statements are usually available within four weeks of the date of NAV contained therein.

\*\*    Initial Capital Invested represents purchases from the Company and not any subsequent transfers.

**Net Asset Value**

    The Exchange Offer will not affect the methodology employed to calculate the NAV of the Company or of MOF Five. The NAV of the Existing Shares has been and will continue to be calculated in the same manner as has been calculated since the date of the Original PPM, taking into account the April Citi Allocation and the Special Interest Allocation. The NAV of the Participation Shares will initially be zero, and thereafter will be calculated in the same manner as that of the Existing Shares. The NAV for the Existing Shares and Participation Shares includes the April Citi Allocation and, going forward, will include the Special Interest Allocation, but these increases in NAV do not correspondingly change the basis on which subsequent allocations are made to the Existing Shares. The Exchange Offer will not affect the methodology by which income, gains and losses are allocated to the Existing Shares, other than the Special Interest Allocation.

**ANNEX B TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**ADDITIONAL OFFERING INFORMATION**

BEFORE DETERMINING TO PARTICIPATE IN THE EXCHANGE OFFER, EXISTING HOLDERS SHOULD READ THE ENTIRE CONFIDENTIAL MEMORANDUM OF WHICH THIS ANNEX B FORMS A PART AND THE COMPANY'S AUDITED FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2007. THE SCENARIOS SET FORTH IN THIS ANNEX B INCLUDE SAMPLE CALCULATIONS COMPARING THE POTENTIAL OUTCOMES FOR EXISTING HOLDERS WHO DO OR DO NOT PARTICIPATE IN THE EXCHANGE OFFER, GIVEN DIFFERENT ASSUMPTIONS OF THE FUTURE PERFORMANCE OF THE COMPANY AND SUBJECT TO THE QUALIFICATIONS AND LIMITATIONS DISCLOSED HEREIN AND IN THE ENTIRE CONFIDENTIAL MEMORANDUM, BUT WE CAN GIVE NO ASSURANCE NOR DO WE EXPRESS ANY VIEW THAT ANY OF THESE OUTCOMES WILL ULTIMATELY HAPPEN.

The analysis set out below has been prepared by the Managing Agent using, among other things, assumed fund portfolio characteristics as of April 30, 2008 and assumed variations in 20-year AAA insured municipal yields projected on a forward looking basis. Among other factors, actual portfolio characteristics and municipal yields for the periods indicated may differ materially from those assumed. The scenarios are not intended to provide any assurance, prediction or indication of future results. MOF Five employs leverage, which will cause any negative returns to be increased and, as a result, the NAV of the Company to decline faster. The assumptions on which the below analysis is based do not account for all variables that could impact future investment returns. No representation is being made that any Existing Holder, whether or not choosing to participate in the Exchange Offer, will or is likely to achieve a performance record similar to that shown.

MAT FIVE LLC – California Portfolio

| Source: Citigroup Alternative Investments LLC. All figures shown are unaudited, as of 5/28/08, subject to change | MOF Five Level | Estimated Market Value of MOF Five Shares Owned by the Company (as % of Initial Amount Invested) | Company Level Existing Shares Series 2007-1* |
|---|---|---|---|
| Initial Capital From Existing Holders – Issue Date 2/07 | $146mm | 100% | $146mm |
| Cumulative Distributions of Income (% of Initial Investment) | 4.5% | NA | 4.5% |
| Market Value of Initial Capital - as of 2/29/08 (Pre-Citi MOF Investments) | $14mm | 9.5% (On this day MOF Five's liabilities exceeded its capital value, rendering MOF Five insolvent and unable to meet margin calls when due) | 8.8% |
| Citi MOF Investments - on 2/29/08 & 3/3/08 | $45mm | NA | NA |
| Market Value of Total Capital if March portion of April Citi Allocation was not made – as of 3/31/08 | $72mm ($55mm – Citi MOF Shares) ($17mm – Company's MOF Five shares) | 11.5% | 10.9% |
| Market Value of Total Capital with March portion of April Citi Allocation – as of 3/31/08 | $72mm ($48mm – Citi MOF Shares) ($24mm – Company's MOF Five shares) | 16.8% *Citi agrees to the reallocation of 75% of its gains on the Citi MOF Investments to increase capital value of MOF Five shares owned by the Company from 11.5%* | 16.1% |
| Market Value of Total Capital if April portion of April Citi Allocation was not made – as of 4/30/08 | $80mm ($54mm – Citi MOF Shares) ($26mm – Company's MOF Five shares) | 17.7% | 17.3% |
| Market Value of Total Capital with April portion of April Citi Allocation – as of 4/30/08 | $80mm ($49.5mm – Citi MOF Shares) ($30.5mm – Company's MOF Five shares) | 20.9% *Citi agrees to the reallocation of 75% of its gains on the Citi MOF Investments to increase capital value of MOF Five shares owned by the Company from 17.7%* | 20.6% |

\* Net of management fees charged at the Company level through 2/29/08 (waived thereafter) and proportional share of any professional fees charged at the MOF Five level.

**Scenario Analysis For Existing Holders Assuming 4x & 6x Leverage –** The scenarios set forth below are presented in order to illustrate potential ranges of performance of the Company on a going forward basis.  Although the future range of returns of MOF Five (and therefore of the Company) will depend on many variables, one of the important variables is the relationship between longer term muni yields relative to longer term LIBOR swaps rates as measured by the ratio of 20-year AAA insured municipal bond yields to the 20-year LIBOR swap rate (the "Ratio").  It is for that reason that the scenario analyses herein show movement in this Ratio but we can give no assurance that such scenarios will be indicative of future performance or that other factors will not adversely impact our results.

| Assumes 4x Leverage | Tender Scenario Participates in the Exchange Offer and executes the Release | | Non-Tender Scenario* Does not participate in the Exchange Offer and does not execute the Release | |
|---|---|---|---|---|
| | Estimate Of Capital Value of Participation Shares Over 1-year Period (5/1/08 to 4/30/09) | Estimated % Return of Participation Shares Over 1-year Period (As % of 4/30/08 Capital - Post April Citi Allocation) | Estimate Of Capital Value of Existing Shares Over 1-year Period (5/1/08 to 4/30/09) | Estimated % Return of Existing Shares Over 1-year Period (As % of 4/30/08 Capital - Post April Citi Allocation) |
| Estimated Capital Value as of 4/30/08 (After April Citi Allocation - current Ratio approximately 97) | 20.9% | NA | 20.9% | NA |
| Base Case (Assumes Ratio stays at current level of 97) | 23.9% | 13.9% | 23.9% | 13.9% |
| Best Case (Assumes Ratio declines to 85 – close to its historical average) | 25.7% | 22.5% | 25.8% | 23.0% |
| Stress Case (Assumes Ratio increases to 130) | 23.9% | 13.9% | 17.4% | -18.2% |

| Assumes 6x Leverage | Tender Scenario Participates in the Exchange Offer and executes the Release | | Non-Tender Scenario* Does not participate in the Exchange Offer and does not execute the Release | |
|---|---|---|---|---|
| | Estimate Of Capital Value of Participation Shares Over 1-year Period (5/1/08 to 4/30/09) | Estimated % Return of Participation Shares Over 1-year Period (As % of 4/30/08 Capital - Post April Citi Allocation) | Estimate Of Capital Value of Existing Shares Over 1-year Period (5/1/08 to 4/30/09) | Estimated % Return of Existing Shares Over 1-year Period (As % of 4/30/08 Capital - Post April Citi Allocation) |
| Estimated Capital Value as of 4/30/08 (After April Citi Allocation- current Ratio approximately 97) | 20.9% | NA | 20.9% | NA |
| Base Case (Assumes Ratio stays at current level of 97) | 24.8% | 18.6% | 24.8% | 18.6% |
| Best Case (Assumes Ratio declines to 85 – close to its historical average) | 29.9% | 42.9% | 27.7% | 32.1% |
| Stress Case (Assumes Ratio increases to 130) | 24.8% | 18.6% | 14.8% | -29.6% |

Percentages in the above scenarios may not be exact due to rounding.

*In this scenario, investments in the Existing Shares will remain subject to losses, including the possible loss of the entire amount invested. See "Risk Factors" and "Summary—The Exchange Offer—Consequences of Not Participating in the Exchange Offer" in the Confidential Memorandum.

*The analyses above are illustrative of possible outcomes for the California Portfolio of MAT Five LLC based on the changing relationship between 20-year AAA insured municipal yields and 20-year LIBOR swap rates.* *We made several assumptions to calculate the scenario analyses which are described as follows:*

1. Portfolio – assumes that actual portfolio characteristics (rate, maturity, etc.) as of 4/30/08 remain static for a 1-year time horizon (5/1/08 to 4/30/09). In each scenario, capital includes the 2008 Citi Investment.

2. Ratio – calculated utilizing Municipal Market Data 20-year AAA insured muni yields divided by 20-year LIBOR swap rates. Illustrative case scenarios are calculated by changing the muni/swap ratio assuming that 20-year muni yields increase or decrease while keeping 20-year LIBOR swap rates constant.

3. Leverage – assumes constant leverage on 4/30/08 MOF Five capital value. Going forward actual leverage may be higher or lower from time-to-time at the discretion of the Managing Agent. The Managing Agent believes that a 4x to 6x leverage range is a reasonable approximation of future leverage based on current market conditions, which are subject to change. As of 4/30/08, leverage at the MOF Five level was approximately 3.1x, which was lower than the target range of 4x to 6x due to the selling of assets and inflow of capital pursuant to the Citi MOF Investments.

4. Interest Income On Underlying Assets– each scenario assumes MOF Five earns a spread of 1.5% on the muni bond portfolio (represents the bond yield less the costs of hedging and leverage), which, with leverage of 4x or 6x, yields an estimated return of either 6.0% or 9.0%, respectively, on the 4/30/08 estimated capital value of MOF Five. Assumes interest income is not distributed, but retained in MOF Five to increase capital value (the distribution of interest income is expected to re-commence at the earliest possible date, as described in the Confidential Memorandum). No tax benefit is attributed to the interest income.

5. Interest Income on Cash Collateral – in addition to the estimated interest income earned on the levered muni bond portfolio, each scenario assumes MOF Five also earns a yield of 2% on cash collateral posted to TOB Dealers. Total estimated MOF Five interest income over a one year period on muni bonds and cash collateral is 8% and 11% of 4/30/08 estimated MOF Five capital value depending upon 4x to 6x leverage, respectively.

6. Cost of Capital – initially will equal 9% and is only charged in determining estimated capital values and returns as of 4/30/09 with respect to the Participation Shares. The Cost of Capital is charged beginning 4/30/08 on the capital value of the 2008 Citi Investment (which will include New Citi Shares purchased by Citi in the Exchange Offer).

7. Sharing Interest Income – Starting 5/1/08, all Existing Shares and Participation Shares will be allocated a pro rata portion of the sum of (A) 99% of the net interest income that would otherwise be allocable to the Citi MOF Shares from MOF Five's net interest income up to an amount corresponding to an interest income yield on the NAV of the Citi MOF Investments of two percent per annum; and (B) 50% of the net interest income that would otherwise be allocable to the Citi MOF Shares from MOF Five's net interest income in excess of that amount. (See the definition of the "Special Interest Allocation" in the Confidential Memorandum.) As a result, the estimates of interest income to all Existing Holders over a one year period are 13.9% and 18.6%, depending upon 4x to 6x leverage, respectively.

8. Sharing Profits – a pro rata portion of 75% of the gains on the Citi MOF Investments from 2/29/08 to 4/30/08 based on the original amount of the Citi MOF Investments that would otherwise have been allocable to the Citi MOF Shares was instead allocated to the shares of MOF Five owned by the Company and thereafter to the Existing Shares based on the Baseline Share Count and added to their capital to such extent. Such allocation will not change the basis on which subsequent allocations are made to the Existing Shares. Gains and interest income will continue to be allocated based on the Baseline Share Count. (See the definition of the "April Citi Allocation" in the Confidential Memorandum.)

9. Future Gains – In the case of Existing Holders who tender their Existing Shares for Participation Shares, a pro rata portion of 75% of the net positive returns, based on the 2008 Citi Investments plus the Cost of Capital thereon, will be allocated to such holders based on the Baseline Share Count and distributed upon the occurrence of a Participation Event. (See the definition of the "Future Gain Distribution" in the Confidential Memorandum.)

10. Management fee and Subordinate Allocation – 0%.

# EXHIBIT 3

EFiled:  Jun 19 2008  5:50PM EDT
Transaction ID 20323352
Case No. 3843-

IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE

———————————————————— x
MARIE RAYMOND REVOCABLE TRUST  :
and RICHARD and SHARON BROWER, as  :
Joint Tenants with Right of Survivorship,  :
   :
              Plaintiffs,  :
   :   Civil Action No.
    vs.  :
   :
MAT FIVE LLC, MUNICIPAL  :
OPPORTUNITY FUND FIVE LLC,  :
CITIGROUP INC., CITIGROUP  :
ALTERNATIVE INVESTMENTS LLC,  :
CITIGROUP FIXED INCOME  :
ALTERNATIVES LLC and REAZ ISLAM,  :
   :
             Defendants.  :
———————————————————— x

## VERIFIED CLASS ACTION COMPLAINT

### INTRODUCTION

1.     This is a class action on behalf of all members/investors of MAT Five LLC ("MAT

Five" or the "Company"), a Delaware limited liability company operating as a private hedge fund

that sought to provide absolute returns and fixed-income to the members/investors.  Substantially all

of MAT Five's assets were/are invested in an affiliated fund that implements municipal bond

arbitrage strategies, defendant Municipal Opportunity Fund Five LLC ("MOF Five"), and both of the

funds are managed by defendant Citigroup Inc. and its affiliates that are also named as defendants

herein (collectively "Citigroup," unless otherwise stated).  Under the guise of a self-tender offer

recently commenced by MAT Five (the "Tender Offer"), Citigroup intends to acquire as many

shares of the Company as possible, capitalize on the appreciation of the assets and investments so

acquired, and continue the ongoing liquidation of the Company.  In addition, investors who tender

their shares must accept the terms of an extremely broad general release that covers any conceivable claim that could be brought against any of the defendants or their affiliates.

2.      In this action, plaintiffs charge defendants with breaches of fiduciary duty arising out of their self-dealing and failure to disclose all material facts in the Tender Offer, including information regarding a pending SEC inquiry into Citigroup's hedge funds.  Plaintiffs seek to enjoin the Tender Offer unless defendants comply with their fiduciary duty of candor.  In addition, the action seeks to impose a constructive trust with regard to any profits defendants have obtained (or could obtain) as a result of their wrongful conduct together with an appropriate award of damages to compensate the members/investors for the harm they have sustained as a result of defendants' wrongdoing.

## NATURE OF THE ACTION

3.      This case is yet another in a recent line of cases in which individual investors were induced to invest a substantial amount of money in what was initially represented as a conservative investment that could guarantee reasonable yet absolute returns with minimal risk.  In actuality, risky hedging strategies that were highly dependent upon leveraging municipal bonds exposed investors to massive losses when the nature of the investments departed from this conservative strategy and unprecedented volatility in the financial markets occurred.  Against this backdrop, defendants have suspended redemptions and quarterly income distributions to investors, have begun liquidating the Company (and put in motion its dissolution), and Citigroup now seeks to acquire the Company for itself to capitalize on the sale of its assets.  Importantly, even though Citigroup's management of hedge funds such as MAT Five and MOF Five are the subject of an SEC inquiry about which defendants have made insufficient disclosure, defendants seek to obtain a release from investors of legal claims relating to the Company's management and operations.

4.    Under the guise of a self-tender offer directed to investors, in which MAT Five purportedly seeks to acquire its outstanding shares in exchange for a miniscule cash payment of $0.231 per share[1] and the issuance of a so-called "participation" share, Citigroup, which will fund the transaction, will receive a newly issued share for each share tendered.[2]    In this manner, Citigroup, which exercises sole discretion to manage the Company, will actually acquire the Company, because the issuance of a newly issued share for each tendered share will provide Citigroup with the aggregate ownership interest that those investors once held.    Moreover, because Citigroup previously made a $246 million cash infusion in MOF Five on favorable terms to itself that it later set – characterizing the loan as an "equity investment," and issuing itself shares of MOF Five – Citigroup has also structured a back-end incentive for itself in the Tender Offer:  the terms of the so-called investment entitle Citigroup to reap the benefits of the recent appreciation of MOF Five's and MAT Five's shares, thereby proportionately reducing the interests of those investors who do not tender.

5.    In addition, in order to obtain a release of any investor claims, defendants have expressly conditioned MAT Five's acceptance of any tendered shares on the investors' agreement to an extremely broad general release that would cover any conceivable claim that may exist against any of the defendants, their advisors and numerous third-parties – whether actual, potential, known

---

[1]    MAT Five is offering (and Citigroup is paying) $0.206 per share in connection with the Tender Offer for shares of the Company's California Portfolio.

[2]    Upon the liquidation of the Company or a redemption of any of Citigroup's newly issued shares or the shares associated with Citigroup's alleged cash investment in the Company (described herein), a participation share purportedly entitles its holder to receive a cash payment per share equal to a pro rata portion of 75% of the cumulative gains allocable to the redeemed Citigroup shares (excluding accrued interest income) in excess of the original purchase price of those shares plus the cost of capital.

or unknown – arising out of the management and operations of the Company or the Tender Offer (the "Release"). This Release even conceivably extends to MOF Five, whose shares predominately comprise MAT Five's "investments," precluding investors from seeking any recourse relating to the faulty municipal bond arbitrage strategies MOF Five employed which adversely affected MAT Five. However, defendants have attempted to induce investors to participate in the Tender Offer, and execute the Release, on the basis of inadequate and materially misleading disclosures. These disclosures, which are contained in a Confidential Tender and Exchange Offer Memorandum, dated May 29, 2008 (the "Memorandum"), fail to adequately apprise investors of all material facts regarding the Tender Offer and the Release, including definitive disclosure as to whether the Release covers MOF Five. Moreover, the significance of adequate disclosure here is particularly acute, since public information regarding the Company or its underlying investments is not available because MAT Five is a private entity that is exempt from regulatory reporting requirements, and Citigroup controls the flow of information to investors.

6.      Accordingly, through the Tender Offer Citigroup seeks to take over the Company for minimal consideration while evading liability for mismanaging the Company's investments and operations. Without the equitable relief sought herein, investors will have no choice but to make an uninformed decision about whether to participate in the Tender Offer, thereby releasing any claim they may have against defendants. Moreover, investors who refuse to tender will have no choice but to subject themselves (and their investments) to the ongoing liquidation process that the defendants have put in motion, which defendants have veiled in secrecy.

## PARTIES

7.      Plaintiff Marie Raymond Revocable Trust, formerly known as Carl and Karen Schaefer Revocable Trust, acquired shares in the National Portfolio of the Company pursuant to a Private Placement Memorandum ("PPM"). Other members of the putative class also acquired their

8.      Plaintiffs Richard and Sharon Brower purchased their shares of the California Portfolio of the Company pursuant to the PPM, as joint tenants with the right of survivorship.  Other members of the putative class also acquired their shares in the Company pursuant to the PPM. Investors were required to invest a minimum of $250,000 in order to acquire an interest in the California Portfolio (as were investors who acquired an interest in the New York Portfolio).

9.      MAT Five is a Delaware limited liability company that was formed on June 10, 2005 and commenced operations in 2007.  MAT Five has issued shares of at least three portfolios, the National, California and New York Portfolios, each of which invests in a corresponding portfolio of shares issued by MOF Five.

10.     Defendant MOF Five is a Delaware limited liability company that was formed on June 10, 2005 to engage in municipal bond arbitrage involving fixed-rate, tax-exempt municipal bonds.

11.     Defendant Citigroup is a Delaware corporation that describes itself as a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries.

12.     Defendant Citigroup Alternative Investments LLC ("CAI") is a Delaware limited liability company that manages a wide range of products across five asset classes, including private equity, hedge funds, real estate, fixed income and infrastructure.  CAI is an indirect subsidiary of Citigroup which manages capital on its behalf as well as third-party institutional and high net worth

investors.  CAI acts as the investment manager for MAT Five, and manages the day-to-day operations and assets of the Company, under the supervision and control of its parent, Citigroup.

13.    Defendant Citigroup Fixed Income Alternatives LLC ("CFIA") specializes in the identification, development and management of alternative fixed-income products.  CFIA operates as a business unit of CAI, and assisted in the sale of MAT Five shares and the drafting and dissemination of the PPM and other selling documents.  CFIA also assisted CAI in managing the Company, assisting in portfolio management and risk oversight.

14.    Defendant Reaz Islam ("Islam") served as the Managing Director and Senior Investment Officer of CAI and the Managing Director of CFIA.  Until recently, Islam managed the day-to-day operations of MAT Five on behalf of CAI.  In May 2008, Islam reportedly announced his resignation, but purportedly will continue to manage MAT Five and/or other Citigroup-managed funds during a transition period.

15.    Defendants received substantial fees for their participation in the selling and management of MAT Five.  CAI, as Managing Agent, received a base management fee of 0.35% (0.38% for the New York portfolio and the California portfolio) of the par amount of the underlying municipal bonds plus the notional value of any swaps.  In addition, a 1% placement fee was charged to investors.

**SUBSTANTIVE ALLEGATIONS**

**Citigroup Promotes MAT Five as a Conservative Investment**

16.    The MAT Five fund was formed on June 10, 2005, and commenced operations in 2007.  The PPM, dated June 17, 2005, indicates that the Company is structured to issue separate series of shares, all of which represent units of limited liability company interest whose value is contingent on the value and performance of a series of underlying shares issued by MOF Five fund.  According to the PPM, MOF Five "makes economically leveraged investments in fixed-rate tax-

exempt municipal bonds and seeks to mitigate the interest rate risks through proprietary hedging strategies" – a strategy known as municipal bond arbitrage.[3]  Although each series of MAT Five shares may invest in other assets, substantially all of MAT Five's "assets" were invested in MOF Five (and thus municipal bond arbitrage).  CAI, as the managing agent of MAT Five and MOF Five, is vested with the discretionary authority to manage the investments and operations of both of the funds and continues to manage their day-to-day operations.  The minimum investment in MAT Five's National Portfolio was $500,000, while the minimum investment in each of the Company's California and New York Portfolios was $250,000.[4]

17.    Beginning in late-2006, Citigroup, through CFIA, CAI and other affiliated entities, began soliciting investors who it believed were interested in fixed-income investments that would provide reasonable yields in relation to conservative risks.  From that point onward, the defendants assured investors that investing in MAT Five was safe and would virtually guarantee tax-free returns of between 7% and 8%.  Specifically, MAT Five was promoted as an investment fund that was designed to produce stable cash flows in a tax-advantaged arbitrage opportunity.  Investors were told that the MAT Five fund was the fifth series of four prior funds that employed the same type of investment strategy, each of which purportedly had performed well and either met or exceeded target returns, with net returns of 14% on a tax equivalent basis.  The private placement was so successful that new investors were told that it would be oversubscribed.

---

[3]    Municipal bond arbitrage is an investment strategy that attempts to take advantage of the perceived market inefficiencies between the municipal and taxable bond markets, by leveraging investments in municipal bonds.  The strategy seeks to capitalize on the steeper municipal bond yield curve and the higher after-tax yields offered by longer-term municipal bonds relative to the cost of hedging in the taxable markets.

[4]    The New York and California portfolios invested in the municipal bonds of their respective states.  They also charged investors with a slightly higher percentage of management fees.

18.    In the PPM, defendants represented that MAT Five's "investment objective" was "to generate attractive after-tax returns through investments in limited liability company interests" issued by MOF Five, "a fund that makes economically leveraged investments in fixed-rate, tax-exempt municipal bonds" and which "will seek to mitigate the accompanying interest rate risks through proprietary hedging strategies . . . ." *See* PPM at 11-12.

19.    Moreover, in the risk disclosures contained in the MOF Five Private Placement Memorandum, dated June 17, 2005 ("MPPM"), defendants implied that declining interest rates would cause an increase in the market value of the shares:

> The market value of municipal bonds, like that of other fixed-income investments, generally declines as prevailing interest rates increase.  Similar market value fluctuations may occur with Eligible Investments.  In addition, their market value is dependent on the credit of the issuer of such bonds.  Because the value of Residual Certificates is directly tied to the value of the Underlying Municipal Bonds, a decrease in the market value of those municipal bonds would cause a decrease in the value of the Residual Certificates.  Such decreases could lead to a decline in the Fund's Net Asset Value and could cause material losses to investors in the Fund. [*See* MPPM at Annex I-10.]

20.    The MPPM also emphasized the risk management aspects of the strategy and that capital loss parameters might limit opportunities:

> The Fund expects to achieve its goals through a ***disciplined and experienced approach*** to trading and a ***rigorous risk management strategy*** within the Investment Restriction and Guidelines.  Key components of the Fund's investment approach are the following:
>
> ▪    Relative Value Investing
>
> ▪    Portfolio Monitoring and Hedging Strategies
>
> *        *        *
>
> **Portfolio Monitoring and Hedging Strategy**
>
> The Fund's portfolio will be marked to market on a daily basis.  The Managing Agent or Sub-Agent will evaluate the appropriateness of each Underlying Municipal Bond on an ongoing basis.  ***Any perceived changes in credit quality, yield spread relative to the Municipal Market Data index or an Underlying Municipal Bond's relative value will cause the Managing Agent or Sub-Agent to re-evaluate***

*the position*. The Fund intends to capitalize on opportunities occasionally by selling Underlying Municipal Bonds that have appreciated against the Hedge Agreements and to liquidate positions perceived by the Managing Agent or Sub-Agent to add unreasonable risk to the Fund's portfolio. The Managing Agent or Sub-Agent will evaluate the Hedge Agreements that are in place for each Underlying Municipal Bond and adjust them based on, among other things, the structure of the particular Underlying Municipal bond, the current market environment and the Managing Agent's or Sub-Agent's view of the direction of the market. ***The capital loss parameters established with the Managing Agent, which the Managing Agent and each Sub-Agent intend to follow, may limit the Managing Agent's and each Sub-Agent's choice of new or replacement Hedge Agreements or Synthetic Agreements, and may reduce the economic benefit of a particular hedge by comparison to a hedge not subject to such parameters***. [*See* MPPM at Annex I-36; all emphasis added.]

21.     Largely modeled on the disclosures contained in the PPM, MPPM and associated documents, defendants disseminated additional promotional materials to investors in December 2006, in which they characterized MAT Five as an "indirect" investment in MOF Five and described it as a "[u]nique alpha generating strategy that seeks to deliver absolute returns and tax-advantaged income." Some of the "highlights" that defendants emphasized in those materials, including that they would employ proprietary hedging and leverage strategies and that they had extensive experience in managing alternative investments, reinforced this conservative image and the notion that the defendants could capitalize on inefficiencies in the municipal bond market:

- **Tax-Advantaged Arbitrage Opportunity:** Seeks to exploit inefficiencies between AAA/AA rated long-term municipal bonds relative to hedging interest rate risk in the taxable markets.

- **Proprietary Strategy:** Hedging and leverage strategies designed to produce stable cash flow and manage fluctuations in NAV resulting from changes in interest rates and shares of yield curve.

- **Potential For Attractive Tax-Advantaged Returns:** Seeks attractive tax-advantaged returns, along with quarterly income distributions.

- **Experienced Management:** Citigroup Fixed Income Alternatives ("CFIA") was one of the first to develop and offer this strategy in 2002, and as of 11/30/2006, manages one of the industry's largest, most established programs with $1.2bn of capital ($13.8bn of AUMs) in other unique alternative fixed income strategies.

22.     The defendants also repeatedly emphasized certain "key considerations" that further supported the long-term, conservative outlook that the defendants purported to employ in managing MAT Five, including that they recommended a five year "holding period," that shares would be locked-up for two years, that the funds would employ reasonable leverage, and that the defendants would return capital to investors if they were unable to identify "suitable" investment opportunities:

- **Liquidity:** Recommended 5-yr holding period, shares are subject to a 2-yr lock-up with redemption fees of 3% in yr 3 and 1.5% during yr 4

- **Leverage:** This fund expects to employ 7-9x leverage, with a maximum of 12x.

                    *           *           *

- **Ramp-Up Period:** Fund expects to invest contributed capital over a 14-month period. During this initial ramp-up stage, returns and distributions may be lower and if the fund manager cannot find suitable investments and, [sic] after 14 months the fund may return un-invested capital to investors.

23.     In addition, the defendants touted their consistent approach to managing investments, including CFIA's purportedly "strict management process" that focused on strategy risks, interest rate risk, leverage, diversification, credit risk and spread risk.

24.     Other promotional materials disseminated to investors in connection with the solicitation of investors reiterated these notions. In fact, even after the fund was subscribed, the defendants continued to assure investors that MAT Five was a safe and conservative investment.

25.     For example, in a January 2007 article authored by defendant Islam and published by CAI, entitled "New Horizons in Fixed Income Investing," defendants confirmed that MAT Five was suitable for fixed-income investors who sought absolute returns with minimal downside risk, as a result of the hedging strategies employed by the fund and the investment-grade municipal bonds utilized in implementing those strategies:

- The MAT Five fund would seek attractive tax-advantaged returns, with hedging strategies designed to manage fluctuations in Net Asset Value ("NAV").

- The selected instruments would be AAA/AA-rated municipal bonds, swaps, swaptions and Treasuries.

- Each municipal bond at the time of purchase would be rated at least A3 by Moody's Investors Service ("Moody's") and AA by Standard & Poor's ("S&P").[5]

26.    As detailed herein, these statements reflected a reckless or intentional disregard for the true risks inherent in the municipal arbitrage strategies employed by the MAT Five and MOF Five funds, the realization of which directly resulted in a meltdown of the funds. The defendants' inadequate risk management procedures also facilitated the precipitous decline of the funds.

**MAT Five Deteriorates as MOF Five's Investment Strategies Fail**

27.    In or about April 2007, defendants issued MAT Five's quarterly report as of March 31, 2007, noting that the Company attempted to take advantage of increased municipal bond supply, and decreased investor demand, to capitalize on "buying opportunities" in furtherance of increasing the leverage of the fund to target levels. Defendants indicated that they believed impending interest rate cuts by the Federal Reserve "could cause the yield curve to further steepen and create additional relative value opportunities":

> MAT Five National Portfolio (the ''Fund'') completed its first capital raise and began operations on February 14, 2007. Thus far, the markets have presented rather favorable investment opportunities for the Fund's initial ramp-up of the municipal arbitrage strategy and for purchasing short-term cash collateral. New municipal supply has been running ahead of our initial expectations, with $106 billion issued during the first 3 months of 2007, a 53% increase over last year's near record levels. Given this magnitude of supply, investor demand began to wane near the end of the period. As a result, longer-term municipal yields moved slightly higher (cheaper) vs. Treasuries, which increased Long Ratios* and created buying opportunities for the Fund. We took advantage of these attractive buying opportunities, and as of March 31, 2007, the Fund was approximately 1.8 times leveraged. Subsequent to quarter-end, as of April 27, 2007, the Fund's leverage increased to 2.8 times. Once fully ramped-up, we continue to target a leverage range

---

[5]    Moody's A3: Obligations rated A are considered upper-medium grade and are subject to low credit risk. S&P's AA: Quality borrowers, a bit higher risk than AAA.

of 7-9 times, which we hope to have completed within 12-14 months of the initial closing, possibly sooner if market conditions continue to cooperate.

Looking ahead, we are optimistic about the investment opportunities, and continued ramp-up of the Fund. We believe that municipal bond issuance is likely to remain heavy for the next couple of months, with the possibility that 2007 full year supply may surpass the record $408 billion set in 2005. The heavy issuance volume is likely to keep municipals attractive vs. Treasuries and aide the continued ramp-up of the Fund. In addition, we expect that in mid-to-late 2007, the Fed is likely to cut rates, *which we believe could cause the yield curve to further steepen and create additional relative value opportunities*. In summary, we are satisfied with the Fund's ramp-up thus far, and our outlook for the near term remains quite optimistic. We will provide you a more detailed summary in our next quarter report as of June 30, 2007. Emphasis added; footnote omitted.]

28.    In or about July 2007, defendants disseminated MAT Five's quarterly report as of June 20, 2007, in which they acknowledged the onset of deepening issues relative to the subprime mortgage market. Defendants were optimistic, however, noting that any volatility in the subprime market "could keep bond market volatility elevated, cause the yield curve to steepen further and create relative value and income opportunities for the Fund":

For the quarter ended 6/30/07, the MAT Five National Portfolio (the "Fund") continued to ramp up the initial capital investment while posting a slight negative total return as income generation was offset by a decline in NAV that resulted from municipals generally underperforming relative to taxables, as more fully described below. Under what we believe were relatively attractive market conditions, the Fund continued to deploy capital into the municipal arbitrage strategy and began to generate higher levels of tax-exempt income. On 7/16/07, the Fund made its first distribution to investors equal to approximately 1% of the initial investment. Going forward, the Fund anticipates making regular quarterly distributions with the next distribution expected on 10/15/07.

*            *            *

Looking ahead, we are optimistic that issuance volume could remain heavy and aide in the continued ramp-up of the Fund. In addition, *economic uncertainty and concerns of a potential sub-prime contagion could keep bond market volatility elevated, cause the yield curve to steepen further and create relative value and income opportunities for the Fund. In summary, we are pleased with the Fund's ramp-up thus far, and our outlook for the near term remains optimistic*. Please see below for the details of your specific series. We will provide you a more detailed summary in our next quarterly report as of September 30, 2007. [Emphasis added.]

- 12 -

29.     This rosy outlook changed in the fall of 2007, when CFIA issued MAT Five's quarterly report as of September 30, 2007, which showed how poorly the Company was performing, with a negative year-to-date return of 9.15%.  Nevertheless, defendants continued to represent that the fund had taken advantage of market volatility and would not be adversely affected by it, assuring investors that the fluctuations in the net asset value ("NAV") of the Company would "not materially impact the Fund's ability to generate income":

> Overall during the period, municipals underperformed vs. Treasuries and the Fund posted a total return of −7.85%.  Subsequent to quarter end and through 10/18/07, Fund returns have increased by approximately 3.5%.  Over the next 3-6 months, we believe longer-term muni-to-Treasury yield relationships will continue to decline towards more historical levels as the bond markets revert back towards normal levels.  The Fund looked to benefit from this period of volatility by adding positions at what we believe were very attractive levels, as it continued to ramp up the initial capital investment (leverage increased to 6.8x from 4.7x – with target of approx. 8x).  It is important to note that ***periodic fluctuations in NAV do not materially impact the Fund's ability to generate income, and on 10/15/07, the Fund made its second distribution to investors equal to approximately 1.75% of their initial investments***.  Going forward, the Fund anticipates making regular quarterly distributions with the next distribution expected on 1/15/08.  [Emphasis added.]

30.     Unfortunately for investors, defendants' assurances turned out to be false or seriously misguided, as developing facts of which defendants were aware undermined the effectiveness and increased the volatility associated with the Company's investment strategy.  In MAT Five's quarterly report as of December 31, 2007, defendants described these conditions and the adverse effect that they had on the Company's return to investors:

> From a historical perspective, the quarter ended December 31, 2007 was one of the most volatile quarters ever for the bond markets as the spreading sub-prime contagion, liquidity crunch and economic uncertainty caused a dislocation between tax-exempt and taxable yields, which resulted in the Fund posting a net total return of −17.08%.  As the quarter began, the financial markets appeared to be recovering from the August turmoil, but by late October they took a significant turn for the worse as financial institutions disclosed significantly larger write-downs from sub-prime mortgage, CDO and LBO exposures.  Market concerns about the health of the financial sector ignited a second and more severe flight-to-quality that pushed credit spreads on most fixed income sectors to near or above historically high levels as

- 13 -

investors shunned risk of any type.  Bond market liquidity also declined due to capacity constraints on bank/broker balance sheets that have limited their ability to trade and offer credit.  As investors rushed into the safety of US Treasuries, taxable yields declined steeply and more rapidly than tax-exempts, which along with growing concerns about "AAA" ratings of municipal bond insurers, caused the ratio of 20-year "AAA" insured municipal yields divided by Treasury yields to rise well above 100%, before recovering somewhat in December . . . .

31.    However, even when faced with these adverse conditions, defendants continued to express an optimistic outlook and reassured investors that fluctuations in NAV would not "materially impact the Fund's ability to generate income":

Over the next 3-9 months, we expect continued volatility in the municipal arbitrage strategy due to headline risk regarding bond insurers, financial names and the US economy, but over time we feel the muni/Treasury relationship should gradually revert towards more historical levels as market uncertainty subsides.  Please note that the unrealized fluctuations in NAV do not materially impact the Fund's ability to generate income and that on 1/15/08 the Fund made a quarterly distribution . . . .

32.    In fact, defendants portrayed the disruption in the credit and bond markets as an event that could benefit investors, noting that they had increased the Company's leverage from 6.9x to 8.6x, while acknowledging that "the Fund's NAV declined due to unrealized losses in our taxable hedges (Treasuries) that were not fully offset by limited unrealized gains in our muni bond portfolio."  Once again, defendants also continued to reassure investors that the long-term nature of MAT Five's investment strategy would insulate its investments from losses:

It's important to keep in mind that the inefficiency/volatility of the longer maturity municipal bond market relative to the globally traded Treasury bond market is the premise upon which the municipal arbitrage strategy is based, as *it seeks to benefit from periods of market dislocation to purchase municipal bonds* when the cost of hedging in the taxable markets looks cheap on a historical basis.  *The Fund's investment strategies are long-term in nature and seek to capture an income spread while also attempting to mitigate the longer-term impact of interest rate fluctuation on NAV*; they do not fully eliminate the interim volatility between shorter-term movements in Treasury rates because municipal rates typically lag.  [Emphasis added.]

- 14 -

33.    Contrary to defendants' assurances, the value of MAT Five's shares continued to decline over the next few months, compelling Citigroup to make an equity contribution to MOF Five (described below) as public attention increased regarding the manner in which the risky hedge funds were promoted to conservative investors. [6]  As *The Wall Street Journal* reported in an April 29, 2008 article:

> The losses by the two hedge funds at issue, called Falcon and ASTA/MAT, are the latest examples of the credit crunch hammering retail, or individual, investors who believed they were holding low-risk securities.
>
> *        *        *
>
> Last year, as Citigroup was gearing up to launch new Falcon and ASTA/MAT funds, it encouraged brokers at Smith Barney and in Citigroup's private bank to pitch the funds to their best customers. One reason for the push: Initial market tremors caused the Falcon family to decline by more than 10%, and Citigroup hoped to stabilize it with an infusion of cash.
>
> By September, the new Falcon fund had raised about $71 million. A new ASTA/MAT fund raised about $800 million. Both new funds were heavily comprised of retail investors.
>
> Citigroup brokers and fund managers assured prospective investors that the new hedge funds were low-risk, with Falcon likely to post losses of no more than 5% a year in the worst-case scenario, according to people familiar with the situation.
>
> "That's why they bought it," says a Smith Barney broker whose clients, many of them wealthy retirees, invested in the Falcon fund. "These kinds of clients weren't looking for a home run."
>
> *        *        *
>
> As of March 31, the new Falcon fund was worth just 25% of its initial value, according to internal documents.  The ASTA/MAT fund had shriveled by Feb. 29 to less than 10% of its original value, the documents show.  ***Even as their performances deteriorated, Reaz Islam, the 41-year-old manager of the funds,***

---

[6]    In addition, as disclosed in a note contained in MOF Five's financial statements for the year ended December 31, 2007 (disseminated to investors on or after April 28, 2009), defendants indicated that effective March 2008, CAI had terminated the portfolio management agreement of Bigelow & Hart Capital Management, LLC, to which CAI had delegated a portion of its management responsibilities for MOF Five.

***reassured uncertain brokers and clients that the funds were likely to rebound, according to people familiar with the matter***.  [Emphasis added.]

34.    Then, on May 22, 2008, *The Wall Street Journal*, *Bloomberg, Reuters* and other news outlets reported that defendant Islam had announced his resignation from CAI/CFIA, but would continue his employment during a "transition period."  Islam's resignation was apparently disclosed in an internal memorandum, dated May 20, 2008, circulated within Citigroup.

**Citigroup Makes a Cash Infusion into MOF Five**

35.    As volatility in the financial markets continued to increase, MOF Five's arbitrage and hedging strategies failed and its investments declined precipitously in value.  These conditions allegedly prompted Citigroup to contribute approximately $660 million to MOF Five in order to keep it and its affiliated funds – including MAT Five – afloat.

36.    In a letter to investors dated March 20, 2008, defendants were forced to admit that "the cash positions and net asset values of ASTA/MAT municipal arbitrage fund portfolios, which include MOF Five National, have been severely impacted" by adverse conditions in the credit market that "spread into the municipal bond markets."  As a result, they represented that a cash infusion, which they characterized as an "investment," was necessary to enable MOF Five to cover margin calls and continue to operate (although it is unclear whether any margin calls actually occurred).  As defendants later disclosed in the Memorandum relating to the Tender Offer, as of February 29, 2008, "MOF Five's liabilities exceeded its capital value, rendering MOF Five insolvent and unable to meet margin calls."

37.    In the March 20, 2008 letter, defendants indicated that Citigroup had "committed $1 billion of equity to the ASTA/MAT platform in early March 2008," and that $661 million of the

equity had already been distributed across the funds, including MOF Five.[7]  At that time, however, they conceded that the "terms and conditions" of the cash infusion had "not yet been finalized."

38.    In addition, defendants also announced in the letter that they would indefinitely suspend MOF Five's income distributions until further notice "in an effort to preserve liquidity," delay redemptions of shares for those fund where the lock-up periods have expired, and "continue to look for opportunities to sell assets, increase liquidity and reduce leverage to allow the funds to move toward a more defensive position."

39.    Defendants further claimed that they were "very aware that some investors are interested in adding capital to their existing investments in specific ASTA/MAT funds to reduce the dilutive impact of Citi's equity investment," and indicated that they would "be in contact regarding the specifics of any follow-on ASTA/MAT offering."  Subsequently, the NAV of MOF Five's shares – and thus MAT Five's own shares – increased, although it appears that Citigroup did not announce any follow-on offering.

**Citigroup Sets the Terms of the Cash Infusion**

40.    Subsequent to defendants' announcement to investors about Citigroup's cash infusion, and the fact that its terms had not yet been determined, defendants finally disclosed certain terms – although they have not yet disclosed all such terms.

41.    In the Memorandum, defendants indicated that in exchange for the equity contribution, Citigroup approved the issuance of MOF Five shares to itself at the "Clean NAV" price, as that term is defined in MOF Five's LLC Agreement (the "Citi MOF Shares").[8]

---

[7]    The Memorandum indicates that an aggregate of $246 million of this equity was distributed to MOF Five on February 29, 2008 and March 3, 2008.

42.    Moreover, in the Memorandum and other materials disseminated to investors, defendants indicate that Citigroup has made certain "concessions" regarding the manner in which the Citi MOF Shares will impact investors' interests.  Specifically, Citigroup indicates that it agrees that the shares issued to it in connection with the Tender Offer, and the Citi MOF Shares, "will have a reduced share in the March and April 2008 income gains as well as future net income and gains." Under the respective LLC agreements for MOF Five's respective portfolios, "net income and gains for each period are allocated among all MOF Five shares owned by the Company and Citi MOF Shares in proportion to the total number of MOF Five shares outstanding."  According to defendants, if the general allocation rules of those LLC agreements "were followed for March and April 2008, approximately 97.3% of the net income and gains of MOF Five for that period would have been allocated to the Citi MOF Shares."

43.    Under defendants' concessions, Citigroup has purportedly agreed that for the months of March and April 2008, 75% of the amounts that would otherwise be allocated to the Citi MOF Shares were instead allocated to the MOF Five shares owned by the Company and thereafter allocated to all of the investors' MAT Five shares; the remaining amounts were allocated to Citigroup.  Based on this allocation, the April 30, 2008 NAV of the MAT Five shares apparently increased in value.  In addition, after April 30, 2008, investors would "receive an enhanced share of interest income of MOF Five corresponding to Citi's reduced share of interest income with respect to its Citi MOF Shares."

---

[8]    In essence, with respect to a share, Clean NAV is defined in MOF Five's LLC Agreement as a pro rata portion of the net asset value of a given series of shares less the total amount of "Net Interest Income" earned and not yet distributed, which consists of certain earned interest income less accrued liabilities, "Operating Expenses" (*i.e.*, numerous costs associated with identifying and managing investments) and accrued and unpaid fees.

44.     Defendants claim that it was not necessary to obtain the investors' consent to amendments to the applicable LLC agreements in order to effectuate the change in allocation, or other associated transactions, because the allocations did not adversely affect the investors' shares.

45.     Nevertheless, as the defendants admitted in the March 20, 2008 letter to investors, the cash infusion and its related transactions adversely diluted the investors' interests.

**The Tender Offer and Liquidation are Commenced**

46.     On May 29, 2008, MAT Five commenced the Tender Offer and disseminated the Memorandum to investors.  In the Tender Offer, MAT Five has offered to pay $0.231 cents and issue a participation share for each share tendered by an investor, on the condition that the investor will tender all shares and unconditionally agree to the Release, which would cover any actual or potential legal claim against any of the defendants, their affiliates and numerous third-parties.  For each share tendered, MAT Five will contemporaneously issue one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities in exchange for a payment of $0.231 per share (which includes the interest allocation associated with Citigroup's equity contribution discussed above).  The proceeds from the sale of these shares to Citigroup will be used to pay the investors who tendered their shares.  In essence, therefore, Citigroup will be buying the shares investors tender.

47.     According to the Memorandum, defendants launched the Tender Offer in order to "create immediate liquidity" for investors because the suspension of redemptions and distributions deprive investors of the "ability to realize liquidity" on their investments.  At the same time, however, defendants have indicated that the Company will re-commence the distribution of income in the future, subject to CAI's "view of market conditions, cash balances and leverage in MOF Five."  In addition, defendants have begun liquidating the Company's assets and will continue to do

so concurrently with the Tender Offer, with the intention of completing the liquidation by March 31, 2011. Defendants have indicated that it is unclear whether the Company will resume distributing income to investors prior to the completion of the liquidation.

**The Memorandum Contains Material Omissions**

48.     As set forth in more detail herein, the Memorandum contains material omissions and misrepresentations that will prevent investors from making an informed decision about whether to tender their shares.

49.     In particular, the Memorandum does not disclose the manner in which Citigroup calculated the Tender Offer consideration. It also fails to disclose the bases of the assumptions disclosed in Annex B to the Memorandum, which portrays different financial scenarios for those investors who tender and those who do not. The omission of this information is particularly troublesome in this case because the investors are not privy to material information CAI and its affiliates possess.

50.     The Memorandum also fails to disclose enough information to enable investors to determine the nature of the claims that they have been asked to release. Thus, defendants must disclose in detail information regarding the events leading up to the Tender Offer, which relate to the management of the assets and the manner in which they were adversely affected by the strategies defendants employed and the subject of any regulatory, judicial or arbitration proceedings involving the Citigroup hedge funds or Citigroup affiliates.

51.     For example, in the Memorandum, defendants disclosed that the SEC is conducting an inquiry of Citigroup's hedge funds, and has issued two document requests to Citigroup. However, the Memorandum does not disclose the nature or scope of the inquiry or even the specific funds subject to the inquiry, or the position that Citigroup intends to take with respect to it. Nor does

the Memorandum reveal the nature, scope or subject matter of the document requests. Investors must know this information to determine the claims under investigation and that may be subject to the Release.

52.    The Memorandum also indicates that "certain affiliates" of MAT Five are "currently the subject of Financial Industry Regulatory Authority arbitration proceedings relating to sales practices relating to securities of the Company or its affiliates." Once again, however, the Memorandum fails to disclose the nature, scope or subject matter of those proceedings beyond the general description provided. The absence of this information is provocative, considering the fact that the Company disclosed information regarding a prior pending action involving MAT Five and some of the defendants named herein.

53.    By the same token, the Memorandum does not fully disclose the events resulting in the drastic decline in value of the Company's shares, other than providing a general description of market conditions. However, it is critical for investors to know whether MAT Five or MOF Five departed from their investment strategies at any point, including at which point they lowered their target leverage (as disclosed in the Memorandum). A complete description of these facts is essential to enable investors to determine the nature and viability of claims relating to the management of the Company that are subject to the Release.

54.    In addition, the Memorandum does not adequately disclose the reasons for the Tender Offer or Citigroup's involvement, other than noting that the Tender Offer aims to provide investors with liquidity. However, Citigroup is not merely acquiring shares in the Tender Offer; it is attempting to acquire the Company and a complete release of investor claims. How Citigroup came to participate in the Tender Offer, when it could have simply attempted to liquidate the Company's assets and distributed a *pro rata* portion to investors, is as yet unknown.

55.    The Memorandum also omits key details regarding the cash infusion, including why its terms were not determined prior to effectuating it and why the investors' consent was unnecessary when the infusion would adversely dilute their interests.  In fact, the Memorandum does not appear to even fully disclose the terms of the cash infusion (other than providing details regarding the allocation), since Citigroup evidently received shares of MOF Five in exchange for the contribution. The number of MOF Five shares that Citigroup received and its percentage of ownership must be disclosed, as well as the manner in which Citigroup determined the allocations to investors.

56.    Moreover, there is no information as to why defendants elected to obtain the contribution from Citigroup as opposed to pursuing an alternate course of action, such as a non-dilutive loan.

57.    Also absent from the Memorandum is information permitting investors to accurately value their shares, including an asset-by-asset description of the assets that will be liquidated and the assets of MOF Five that will remain under management.  In addition, whether defendants have placed a value on the Release, and the amount of the value, is not disclosed, although the value to defendants presumably far exceeds the offered consideration.

58.    Moreover, investors have been provided with a net asset value of their shares that is already more than a month old.  Defendants must produce a more current value, if they are able to do so, particularly in the context of the Tender Offer – a time-sensitive transaction.  By the same token, the data that defendants considered in calculating the net asset value must be disclosed to investors,

59.    Further, investors cannot determine whether the liquidation may generate proceeds that will exceed the amount of the Tender Offer consideration, because defendants have failed to disclose virtually any information regarding the liquidation other than the fact that it is ongoing and that the defendants intend to complete it by March 31, 2011.  Investors must know the manner in

60.    Finally, in a section entitled "Limited Information," the Memorandum contains an

express acknowledgement that certain key financial information has been withheld from investors:

> This Confidential Memorandum does not provide specific information with respect
> to any municipal bond, the issuers thereof, any tender option bond program, any
> TOB Dealer, any residual dealer, or any Residual Certificates, or with respect to any
> rights or obligations, legal, financial or otherwise, arising thereunder or related
> thereto, except information relating to the general characteristics thereof.  In addition,
> this Confidential Memorandum does not purport to disclose current material
> information concerning any specific municipal bonds or Residual Certificates.  The
> actual terms of the investment securities purchased by MOF Five and the Hedge
> Agreements and Synthetic Positions entered into MOF Five may vary significantly
> from the general terms described in this Confidential Memorandum.

61.    The unreliability of the information that investors have been provided with is further

evidenced by the fact that, in a section entitled "Limited Reliability of Forward-Looking Scenario

Analysis," defendants have cautioned investors not to rely upon the analyses that they have disclosed

with respect to potential scenarios involving the Company:

> Annex B to this Confidential Memorandum sets forth certain scenario analyses of the
> potential future results of MOF Five and the Company (for the purposes of this
> section, "Analyses") prepared by the Managing Agent using, among other things,
> assumed fund portfolio characteristics as of April 30, 2008 and assumed variations in
> 20-year AAA insured municipal yields projected on a forward looking basis. . . .
> EXISTING HOLDERS ARE CAUTIONED NOT TO PLACE ANY RELIANCE
> ON THE ANALYSES AND SHOULD READ ANNEX B IN CONJUNCTION
> WITH THE ENTIRE CONFIDENTIAL MEMORANDUM, PARTICULARLY
> THIS "RISK FACTORS" SECTION.

62.     Accordingly, the disclosures contained in the Memorandum are not only inadequate because they omit material facts but they are also unreliable and misleading.

**The Fiduciary Duties Owed to Plaintiffs and the Other Investors**

63.     As managers of MAT Five, defendants Citigroup, CAI, CFIA and Islam had and have an affirmative fiduciary obligation to refrain from self-dealing and to act in the best interests of MAT Five's members.  To diligently comply with these duties, the managers may not take any action that:

      (a)     adversely affects the value of the assets of the Company or the investments of MAT Five's members; or

      (b)     provides the managers with preferential treatment at the expense of, or separate from, MAT Five's members.

64.     In accordance with their duties of loyalty and good faith, the defendants, as managers of MAT Five, are also obligated to refrain from:

      (a)     participating in any transaction in which they will receive a personal financial benefit not equally shared by the members of MAT Five; and/or

      (b)     unjustly enriching themselves at the expense or to the detriment of the members; and/or

      (c)     eliciting member support of a corporate transaction, such as the Tender Offer, without disclosing all material information in a non-misleading manner to enable the members to make an informed decision with respect thereto.

65.     Plaintiffs allege that these defendants, separately and together, violated their fiduciary duties owed to plaintiffs and the other members of MAT Five in connection with their operation of MAT Five and the investments by Citigroup in the fund, including their duties of loyalty, good faith and candor.  Furthermore, defendants were at least grossly negligent in their management of the MAT Five fund's assets and engaged in self-dealing and/or obtained personal benefits for

- 24 -

themselves, and have attempted to obtain investor participation in the Tender Offer and a broad release from liability without disclosing all material information in a non-misleading manner.

**Defendants' Conduct Was Intentional, Reckless and/or Grossly Negligent**

66.     Charged with the responsibility of running the day-to-day operations of the Company, CAI, its parent company Citigroup, affiliate CFIA, and Islam, knew or recklessly disregarded the fact that certain of the investment strategies that they employed were ill-suited for plaintiffs and the other members' investment goals and risk tolerances.  These defendants were also aware of the immense adverse impact that changing market environments could – and did – have on the Company's investments.

67.     Throughout their tenure in managing the fund, these defendants gave investors the impression that their investments were conservatively managed, and that defendants were taking steps to insulate the investments from losses as a result of volatility in the marketplace.

68.     As demonstrated above, defendants knew or had reason to know that the markets were becoming increasingly volatile, yet they invested MAT Five's assets pursuant to strategies that exposed the Company to further losses, in contravention of the Company's stated investment strategies and the investors' known investment goals and risk tolerances.

69.     Moreover, defendants are charged with the responsibility of managing the Company's operations and investments and apprising themselves of all material information regarding same, and they have used this information to generate management and incentive fees for themselves in furtherance of a scheme to acquire the outstanding shares of MAT Five without disclosing all material information in a non-misleading manner.

70.     In addition, defendants knew or recklessly disregarded that the Memorandum contains materially misleading statements and omissions, and they participated or acquiesced in its

preparation and dissemination.  At all relevant times, each of the defendants occupied a position of power and control over the Company and/or the Tender Offer, and had the ability to issue statements on the Company's behalf or the opportunity to participate in the Company's formulation and dissemination of statements to investors.

71.     Defendants also have and had access to internal and other non-public information regarding the Company's operations.  In knowing or reckless disregard of the true facts concerning the Company and their management of the Company, defendants prepared and disseminated the Memorandum seeking to induce the investors to tender their shares and release defendants from liability for their wrongdoing.  They were thus active participants in the improprieties alleged herein, which will enable them to induce investors to agree to the Release and liquidate the Company for Citigroup's benefit to the detriment of the investors.

## CLAIM FOR RELIEF

72.     Plaintiffs incorporate each and every allegation set forth above as if set forth herein.

73.     The Tender Offer is wrongful, unfair and harmful to the investors and represents an effort by Citigroup, and its subsidiaries and affiliates named as defendants herein, to aggrandize its own financial position and interests at the expense and to the detriment of the investors, in breach of defendants' fiduciary duties.

74.     Moreover, defendants have violated their fiduciary duties to disclose all material information concerning the Company, the Tender Offer, the Release and other associated issues.  In addition, in having voluntarily disclosed some information on these subjects, defendants assumed the duty to make further disclosure necessary to render their statements non-misleading.

75.     The need for accurate disclosure of all material information is particularly acute here, because MAT Five and MOF Five are both private entities and information regarding their business

or operations is unavailable from any source other than defendants, who control the flow of disclosure to investors, but have capitalized on such inside information for themselves.

76.    Moreover, in drafting and disseminating the Memorandum, defendants have unfairly utilized confidential information regarding MAT Five to their advantage and to the detriment of the investors, who are being asked to tender their shares on the basis of incomplete and misleading information.  As a result, defendants must be compelled to disclose additional material and non-misleading information to plaintiffs and other investors in order to permit them to make an informed decision.

77.    In the absence of injunctive relief requiring defendants to issue supplemental and/or corrective disclosures to members, and enjoining defendants from proceeding with the Tender Offer and accepting any tendered shares, members will be irreparably harmed because they will be forced to determine whether to tender their shares in the Tender Offer on the basis of the materially misleading statements and omissions of fact contained in the Memorandum, as set forth above. Investors will thus be required to make a determination of whether to relinquish much of their interest in the Company on the basis of inadequate information, a situation created by defendants' violation of their fiduciary duties to the members.

78.    Investors will also be irreparably harmed without disclosure of the omitted information because, as a condition of tendering their shares, they are required to accept the Release, which purports to eliminate any legal claim members may have against any of the parties involved in operating the Company.

79.    In addition, to the extent that any of the defendants do not directly owe fiduciary duties to the investors, they aided and abetted the breaches of fiduciary duty alleged herein by the other defendants that owe such duties.  Accordingly, as a result of the defendants' conduct, MAT

Five investors have been and will continue to be irreparably harmed in the absence of injunctive relief enjoining defendants' pursuit of the Tender Offer and the Release unless defendants issue additional and corrective disclosures to the investors.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action as a class action pursuant to Court of Chancery Rule 23, individually and on behalf of MAT Five members/investors (excluding defendants and any person, firm, trust, corporation, or other entity related to or affiliated with them), who are being and will be harmed by defendants' actions.

81.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable, because, at a minimum, hundreds of investors purchased and hold the Company's shares;

(b)     There are questions of law and fact which are common to the Class, including, among other things, whether: (i) defendants have breached their fiduciary duties owed to the Class; (ii) plaintiffs and the other Class members would be irreparably damaged in the absence of injunctive relief; and (iii) defendants have engaged in conduct which requires dissolution of MAT Five;

(c)     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature; plaintiffs' claims are typical of the Class's claims and they have the same interests; and plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of

conduct for the defendants or otherwise substantially impair or impede the members' ability to protect their interests; and

82.    Defendants have acted in a similar, consistent and uniform manner toward the members of the Class, causing them similar injury.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Declaring that this action is properly maintainable as a class action, certifying plaintiffs as Class representatives and certifying their counsel as class counsel;

B.    Preliminarily and permanently enjoining the Tender Offer, and restraining defendants or any others acting in concert with them from proceeding with it;

C.    Imposing a constructive trust, in favor of plaintiffs and the Class, upon any proceeds, profits or other benefits improperly received by, or inuring to the benefit of, any of the defendants as a result of the wrongful conduct alleged herein;

D.    Awarding damages to the Class in an amount that must be determined at trial in connection with the claims asserted herein;

E.    Awarding plaintiffs the costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      Granting such other, further or different relief as this Court may deem just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.


/s/ Joseph A. Rosenthal
Joseph A. Rosenthal (Del. Bar No. 234)
919 North Market Street, Suite 1401
P.O. Box. 1070
Wilmington, DE  19899
(302) 656-4433

Attorneys for Plaintiffs

OF COUNSEL:

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
Samuel H. Rudman
Robert M. Rothman
Joseph Russello
58 South Service Road, Suite 200
Melville, NY  11747
631/367-7100

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
Darren J. Robbins
David C. Walton
Eric I. Niehaus
655 West Broadway, Suite 1900
San Diego, CA  92101
619/231-1058

JOHNSON BOTTINI, LLP
Frank J. Johnson
655 W. Broadway, Suite 1400
San Diego, CA  92101
619/230-0063

JANIS LAW GROUP
Dean T. Janis
550 West C Street, Suite 2000
San Diego, CA  92101
619/814-3525

# EXHIBIT 4

Click to Print    Printed on: Friday, August 01, 2008 11:26:54 PDT

## Case History Search
Search Created:
Friday, August 01, 2008 11:26:54 PDT

| | | | | | |
|---|---|---|---|---|---|
| **Court:** | DE Court of Chancery Civil Action | **Judge:** | Lamb, Stephen P | **File & Serve Live Date:** | 6/19/2008 |
| **Division:** | N/A | **Case Number:** | 3843-VCL | **Document(s) Filed:** | 207 |
| **Case Type:** | Breach of Fiduciary Duties | **Case Name:** | CONF ORDER Raymond, Marie Trust vs M A T Five LLC | **Date Range:** | 01/31/2007 to 8/1/2008 |

1-50 of 57 transactions    <<Prev Page 1 of 2 Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Size |
|---|---|---|---|---|---|---|---|---|
| 20839267 | 7/29/2008 12:54 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Dawn M Jones, Young Conaway Stargatt & Taylor LLP-Wilmington | 84 | Notice of Service | Notice of Service to Defendants' Responses and Objections to Plaintiffs' Second Request for Production of Documents ● Linked to (1) | 0.1MB |
| 20763625 | 7/23/2008 1:03 PM EDT | File Only | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Diane McGrellis, DE Court of Chancery Civil Action | 83 | Official Transcript (Addl Fees Apply) | Oral Argument July 15, 2008 | 0.2MB |
| 20728145 | 7/21/2008 3:19 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 82 | Notice of service of Request for Production | Notice Of Service of Plaintiffs' Second Request For The Production Of Documents ● Linked to (1) ● Linked from (1) | 0.1MB |
| 20694613 | 7/17/2008 5:13 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kerrianne Marie Fay, Young Conaway Stargatt & Taylor LLP-Wilmington | 81 | Notice | Notice of Filing Errata Sheet of Jonathan Dorfman (Deposition taken July 8, 2008) ● Linked to (1) | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to Notice of Filing Errata Sheet of Jonathan Dorfman (Deposition taken July 8, 2008) | 0.1MB |
| | | | | | | Exhibits | Exhibit A- Errata Sheet of Jonathon Dorfman deposition taken July 8, 2008 | 0.1MB |
| 20684848 | 7/17/2008 1:01 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Dawn M Jones, Young Conaway Stargatt & Taylor LLP-Wilmington | 80 | Redacted Document | (Public Version)- Answering Brief of Defendants in Opposition to Plaintiffs' Motion for a Preliminary Injunction ● Linked to (1) | 1.2MB |
| | | | | | | Certificate of Rule 5(G) | Joint Certification Pursuant to Court of Chancery Rule 5(g) to Defendants Answering Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to (Public Version) of Answering Brief of Defendants in Opposition to Plaintiffs' Motion for a Preliminary Injunction | 0.1MB |
| 20682285 | 7/17/2008 11:26 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Martin S Lessner, Young Conaway Stargatt & Taylor LLP-Wilmington | 79 | Letter | Letter to the Honorable Stephen P. Lamb from Martin S. Lessner regarding letter send July 14, 2008 by Seth Rigrodsky, Esq. ● Linked to (1) | 0.1MB |
| | | | | | | Exhibits | Exhibit A- Letter to The Honorable John W. Noble from Seth D. Rigrodsky dated June 2, 2008 asking Court to withold scheduling of settlement hearing | 0.1MB |
| | | | | | | Exhibits | Exhibit B- Seth Rigrodsky attaching letter from New York litigation counsel requesting witholding scheduling of settlement hearing until counsel in New York can review settlement terms | 0.1MB |
| | | | | | | Exhibits | Exhibit C- Vice Chancellor Noble letter dated June 3, 2008 to Seth Rigrodsky | 0.1MB |
| | | | | | | Exhibits | Exhibit D- Copy of Letter from Vice Chancellor Noble to Stuart M. Grant dated | 0.1MB |

June 2, 2008 sent to Seth Rigrodsky by
Vice Chancellor Noble

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 20679535 | 7/16/2008 11:04 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kristen Salvatore DePalma, Young Conaway Stargatt & Taylor LLP-Wilmington | 77 Certificate of Rule 5(G) | Certification Pursuant to Rule 5(G) - Redacted Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction with Certificate of Service | 0.1MB |
| | | | | | 78 Redacted Document | Redacted Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction<br>● Linked to (1) | 0.8MB |
| 20677289 | 7/16/2008 6:18 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kristen Salvatore DePalma, Young Conaway Stargatt & Taylor LLP-Wilmington | 76 Redacted Document | Answering Brief of Defendant Reaz Islam in Opposition to Plaintiffs' Motion for a Preliminary Injunction with Certificate of Service [Redacted]<br>● Linked to (1) | 0.2MB |
| | | | | | Certificate of Rule 5(G) | Certification Pursuant to Rule 5(g) to the Redacted Answering Brief of Defendant Reaz Islam in Opposition to Plaintiffs' Motion for a Preliminary Injunction | 0.1MB |
| 20675570 | 7/16/2008 5:32 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Martin S Lessner, Young Conaway Stargatt & Taylor LLP-Wilmington | 75 Letter | Letter to The Honorable Stephen P. Lamb from Martin S. Lessner regarding the status on disclosure documents<br>● Linked to (1) | 0.1MB |
| 20651877 | 7/15/2008 4:25 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Patricia G Randolph, DE Court of Chancery Civil Action | 74 Judicial Action Form | Preliminary Injunction Hearing Held Before VCL on 7.15.08; Decison Reserved, Counsel to Report Back On Status by 7.16.08<br>● Linked from (1) | 0.1MB |
| 20638552 | 7/14/2008 10:07 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kerrianne Marie Fay, Young Conaway Stargatt & Taylor LLP-Wilmington | 73 Motion to Dismiss | Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives and Reaz Islam's Motion to Dismiss the Verified Class Action Complaint<br>● Linked to (3) | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives and Reaz Islam's Motion to Dismiss the Verified Class Action Complaint | 0.1MB |
| | | | | | Proposed Order | Order of Dismissal [granting Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives and Reaz Islam's Motion to Dismiss the Verified Class Action Complaint ] | 0.1MB |
| 20623574 | 7/14/2008 12:41 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Norman M Monhait, Rosenthal Monhait & Goddess PA | 72 Affidavit | Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Reply Brief in Further Support of Their Motion for a Preliminary Injunction | 0.1MB |
| | | | | | Exhibits | Exhibit 1 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Reply Brief in Further Support of Their Motion for a Preliminary Injunction | 1.3MB |
| | | | | | Exhibits | Exhibit 2 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Reply Brief in Further Support of Their Motion for a Preliminary Injunction | 0.1MB |
| | | | | | Exhibits | Exhibit 3 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Reply Brief in Further Support of Their Motion for a Preliminary Injunction | 0.8MB |

| | | | | | | Certificate of Service | Certificate of Service to Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Reply Brief in Further Support of Their Motion for a Preliminary Injunction | 0.1MB |
|---|---|---|---|---|---|---|---|---|
| 20620919 | 7/14/2008 12:33 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Norman M Monhait, Rosenthal Monhait & Goddess PA | 71 | Reply Brief | FILED UNDER SEAL: Plaintiffs' Reply Brief In Further Support Of Their Motion For Preliminary Injunction <br>● Linked to (4) | 0.1MB |
| | | | | | | Exhibits | Exhibits A-D To Plaintiffs' Reply Brief In Further Support Of Their Motion For Preliminary Injunction (Filed Under Seal) | 1.9MB |
| | | | | | | Certificate of Service | Certificate Of Service To Plaintiffs' Reply Brief In Further Support Of Their Motion For Preliminary Injunction (Filed Under Seal) | 0.1MB |
| | | | | | | Letter | Letter To The Honorable Stephen P. Lamb From Norman M. Monhait, Esquire Dated July 14, 2008 Transmitting Plaintiffs' Reply Brief In Further Support Of Their Motion For Preliminary Injunction (Filed Under Seal) And Supporting Papers <br>● Linked from (1) | 0.1MB |
| 20621853 | 7/14/2008 11:44 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Carmella P Keener, Rosenthal Monhait & Goddess PA | 70 | Exhibits | [CORRECTED] Exhibit 5 to the Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Motion for a Preliminary Injunction, which was filed on July 11, 2008 (Transaction ID 20600337) [CONFIDENTIAL -- FILED UNDER SEAL] <br>● Linked to (3) | 0.1MB |
| | | | | | | Letter | Letter to The Honorable Stephen P. Lamb from Carmella P. Keener, Esquire regarding courtesy copies of Corrected Exhibit 5 to the Transmittal Affidavit of Joseph Russello, Esquire in Support of Plaintiffs' Motion for a Preliminary Injunction (Transaction ID 20600337), which was filed on July 11, 2008 | 0.1MB |
| 20621913 | 7/14/2008 11:35 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Martin S Lessner, Young Conaway Stargatt & Taylor LLP-Wilmington | 69 | Letter | Letter to The Honorable Stephen P. Lamb from Martin S. Lessner regarding extension of expiration date of tender and exchange offer to July 31, 2008 <br>● Linked to (2) | 0.1MB |
| 20621597 | 7/14/2008 11:33 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kerrianne Marie Fay, Young Conaway Stargatt & Taylor LLP-Wilmington | 67 | Notice | Notice of Lodging to Deposition of Richard Brower dated July 12, 2008 <br>● Linked to (1) | 0.1MB |
| | | | | | 68 | Deposition | Deposition of Richard Brower dated July 12, 2008 | 4.4MB |
| | | | | | | Certificate of Service | Certificate of Service to Notice of Lodging of Richard Brower dated July 12, 2008 | 0.1MB |
| 20618725 | 7/13/2008 5:00 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Dawn M Jones, Young Conaway Stargatt & Taylor LLP-Wilmington | 66 | Declaration | Declaration of Dawn M. Jones <br>● Linked to (1) | 0.1MB |
| | | | | | | Exhibits | (Under Seal) Exhibits A-C to Declaration of Dawn M. Jones | 0.6MB |
| | | | | | | Certificate of Service | Certificate of Service to the Declaration of Dawn M. Jones | 0.1MB |
| 20618674 | 7/13/2008 4:17 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Martin S Lessner, Young Conaway Stargatt & Taylor LLP-Wilmington | 63 | Affidavit | Affidavit of Kristie M. Tillman in Support of Answering Brief of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 0.1MB |
| | | | | | 64 | Exhibits | (Under Seal) Exhibits 19 - 20 in Support of Answering Brief of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed | 4.1MB |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | |
| | | | | 65 Letter | Letter The Honorable Stephen P. Lamb from Christian Douglas Wright enclosing courtesy copies of answering briefs and related documents | 0.1MB |
| | | | | Exhibits | (Under Seal) Exhibits 1 - 9 to Affidavit of Kristie M. Tillman in Support of Answering Brief of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 5.8MB |
| | | | | Exhibits | (Under Seal) Exhibits 10 - 15 to Affidavit of Kristie M. Tillman in Support of Answering Brief of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 4.2MB |
| | | | | Exhibits | (Under Seal) Exhibits 16 - 18 to Affidavit of Kristie M. Tillman in Support of Answering Brief of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 3.3MB |
| | | | | Certificate of Service | Certificate of Service to Affidavit of Kristie M. Tillman in Support of Answering Brief of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 0.1MB |
| 20618653 | 7/13/2008 3:38 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Martin S Lessner, Young Conaway Stargatt & Taylor LLP-Wilmington | 59 Answering Brief | (Under Seal) Answering Brief Of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction<br>● Linked to (1)<br>● Linked from (2) | 0.1MB |
| | | | | 60 Certificate of Service | Certificate of Service to Answering Brief Of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 0.1MB |
| | | | | 61 Affidavit | (Under Seal) Affidavit of Jeffrey Traum in Support of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To Plaintiffs' Motion For A Preliminary Injunction | 0.2MB |
| | | | | 62 Certificate of Service | Certificate of Service to Affidavit of Jeffrey Traum in Support of Defendants MAT Five LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, And Citigroup Fixed Income Alternatives In Opposition To | 0.1MB |

| | | | | | | Plaintiffs' Motion For A Preliminary Injunction | |
|---|---|---|---|---|---|---|---|
| 20618655 | 7/13/2008 3:19 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Christian Douglas Wright, Young Conaway Stargatt & Taylor LLP-Wilmington | 58 Answering Brief | Sealed Answering Brief of Defendant Reaz Islam In Opposition to Plaintiffs' Motion for a Preliminary Injunction<br>● Linked to (2)<br>● Linked from (2) | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Sealed Answering Brief of Defendant Reaz Islam In Opposition to Plaintiffs' Motion for a Preliminary Injunction | 0.1MB |
| 20612037 | 7/11/2008 4:33 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Dawn M Jones, Young Conaway Stargatt & Taylor LLP-Wilmington | 57 Notice | Notice of Filing of Errata Sheets of James O'Brien and Jeffrey Traum<br>● Linked to (1) | 0.1MB |
| | | | | | Exhibits | Exhibits A & B to Notice of Filing of Errata Sheets of James O'Brien and Jeffrey Traum | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Notice of Filing of Errata Sheets of James O'Brien and Jeffrey Traum | 0.1MB |
| 20611685 | 7/11/2008 4:21 PM EDT | File Only | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Diane McGrellis, DE Court of Chancery Civil Action | 56 Official Transcript (Addl Fees Apply) | Teleconference June 25, 2008<br>● Linked from (1) | 0.1MB |
| 20611324 | 7/11/2008 4:16 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Dawn M Jones, Young Conaway Stargatt & Taylor LLP-Wilmington | 55 Notice | Notice of Filing of Errata Sheet of Reaz Islam<br>● Linked to (1) | 0.1MB |
| | | | | | Exhibits | Exhibit A to Notice of Filing of Errata Sheet of Reaz Islam | 0.2MB |
| | | | | | Certificate of Service | Certificate of Service to Notice of Filing of Errata Sheet of Reaz Islam | 0.1MB |
| 20600337 | 7/11/2008 11:25 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 54 Affidavit | Transmittal Affidavit Of Joseph Russello, Esquire In Support Of Plaintiffs' Motion For A Preliminary Injunction (Part 2 of 2)<br>● Linked to (1)<br>● Linked from (1) | 0.1MB |
| | | | | | Exhibits | (Under Seal) Exhibit 10 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.1MB |
| | | | | | Exhibits | (Under Seal) Exhibit 11 to Transmittal Affidavit Of Joseph Russello, Esquire | 1.6MB |
| | | | | | Exhibits | (Under Seal) Exhibit 12 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.2MB |
| | | | | | Exhibits | (Under Seal) Exhibit 13 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.1MB |
| | | | | | Exhibits | (Under Seal) Exhibit 14 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.1MB |
| | | | | | Exhibits | (Under Seal) Exhibit 15 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.2MB |
| | | | | | Exhibits | (Under Seal) Exhibit 16 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.2MB |
| | | | | | Exhibits | (Under Seal) Exhibit 17 to Transmittal Affidavit Of Joseph Russello, Esquire | 2.1MB |
| | | | | | Exhibits | (Under Seal) Exhibit 18 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.3MB |
| | | | | | Exhibits | (Under Seal) Exhibit 19 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.2MB |
| | | | | | Exhibits | (Under Seal) Exhibit 20 to Transmittal Affidavit Of Joseph Russello, Esquire | 1.0MB |
| | | | | | Exhibits | (Under Seal) Exhibit 21 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.8MB |
| | | | | | Certificate of Service | Certificate Of Service of Transmittal Affidavit Of Joseph Russello, Esquire In Support Of Plaintiffs' Motion For A Preliminary Injunction | 0.1MB |
| 20595836 | 7/11/2008 11:24 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 53 Affidavit | Transmittal Affidavit Of Joseph Russello, Esquire In Support Of Plaintiffs' Motion For A Preliminary Injunction (Part 1 of 2)<br>● Linked to (1)<br>● Linked from (1) | 0.1MB |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Exhibits | Exhibit 1 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.8MB |
| | | | | | Exhibits | Exhibit 2 to Transmittal Affidavit Of Joseph Russello, Esquire | 1.9MB |
| | | | | | Exhibits | Exhibit 3 to Transmittal Affidavit of Joseph Russello, Esquire | 4.5MB |
| | | | | | Exhibits | (Under Seal) Exhibit 4 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.1MB |
| | | | | | Exhibits | (Under Seal) Exhibit 6 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.6MB |
| | | | | | Exhibits | (Under Seal) Exhibit 7 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.7MB |
| | | | | | Exhibits | Exhibit 8 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.2MB |
| | | | | | Exhibits | Exhibit 9 to Transmittal Affidavit Of Joseph Russello, Esquire | 0.6MB |
| | | | | | Certificate of Service | Certificate of Service of Transmittal Affidavit Of Joseph Russello, Esquire In Support Of Plaintiffs' Motion For A Preliminary Injunction | 0.1MB |
| 20567362 | 7/10/2008 2:46 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 52 Motion | Plaintiffs' Motion For A Preliminary Injunction<br>● Linked to (1)<br>● Linked from (7) | 0.1MB |
| | | | | | Proposed Order | Order On Plaintiffs' Motion For A Preliminary Injunction<br>● Linked from (1) | 0.1MB |
| | | | | | Certificate of Service | Certificate Of Service of Plaintiffs' Motion For A Preliminary Injunction | 0.1MB |
| | | | | | Opening Brief | (Under Seal) Plaintiffs' Opening Brief In Support Of Their Motion For A Preliminary Injunction<br>● Linked from (4) | 0.1MB |
| | | | | | Letter | Letter to Vice Chancellor Lamb from Jessica Zeldin providing copies of Plaintiffs' Motion For A Preliminary Injunction and supporting documents | 0.1MB |
| | | | | | Certificate of Service | Certificate Of Service of Plaintiffs' Opening Brief In Support Of Their Motion For A Preliminary Injunction | 0.1MB |
| | | | | | Exhibits | Compendium Of Unreported Cases Cited In Plaintiffs' Opening Brief In Support Of Their Motion For A Preliminary Injunction | 0.1MB |
| | | | | | Letter | Letter from Jessica Zeldin to opposing counsel advising that Plaintiffs' Opening Brief In Support Of Their Motion For A Preliminary Injunction is being filed under seal | 0.1MB |
| | | | | | Certificate of Service | Certificate Of Service of Compendium Of Unreported Cases Cited In Plaintiffs' Opening Brief In Support Of Their Motion For A Preliminary Injunction | 0.1MB |
| | | | | | Exhibits | Tabs A - D To Compendium Of Unreported Cases Cited In Plaintiffs' Opening Brief In Support Of Their Motion For A Preliminary Injunction | 1.9MB |
| 20571124 | 7/10/2008 2:08 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 51 Notice | Plaintiffs' Notice Of Lodging<br>● Linked to (1) | 0.1MB |
| | | | | | Exhibits | (Under Seal) Exhibits A and B to Plaintiffs' Notice Of Lodging | 3.0MB |
| | | | | | Exhibits | (Under Seal) Exhibits C and D to Plaintiffs' Notice Of Lodging | 3.1MB |
| | | | | | Certificate of Service | Certificate Of Service of Plaintiffs' Notice Of Lodging | 0.1MB |
| 20581157 | 7/10/2008 9:55 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kristen Salvatore DePalma, Young Conaway | 49 Redacted Document | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam with Certificate of | 0.4MB |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Stargatt & Taylor LLP-Wilmington | | Service [Redacted - Public Version]<br>● Linked to (1) | |
| | | | | 50 Certificate of Rule 5(G) | Certification Pursuant to Rule 5(g) with Certificate of Service<br>● Linked to (1) | 0.1MB |
| 20562226 | 7/9/2008<br>9:46 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 48 Stipulation | Stipulation Concerning Administration Of The Oath In Foreign Deposition<br>● Linked to (1) | 0.1MB |
| 20556868 | 7/8/2008<br>5:08 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Stephen P Lamb, DE Court of Chancery Civil Action | 47 Order | Granted (Stipulation and Order On Briefing Schedule)<br>● Linked to (1)<br>● Linked from (1) | 0.1MB |
| 20535008 | 7/7/2008<br>4:50 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Stephen P Lamb, DE Court of Chancery Civil Action | 45 Order | Granted ([Proposed] Order for Pro Hac Vice Admission of Robert M. Rothman)<br>● Linked to (1) | 0.1MB |
| 20534129 | 7/7/2008<br>4:46 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 46 Stipulation & (Proposed) Order | Stipulation and Order On Briefing Schedule<br>● Linked to (2)<br>● Linked from (1) | 0.1MB |
| 20533034 | 7/7/2008<br>4:24 PM EDT | File Only | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Norman M Monhait, Rosenthal Monhait & Goddess PA | 44 Motion for Pro Hac Vice | Motion for Admission Pro Hac Vice (of Robert M. Rothman, Esquire)<br>● Linked to (1) | 0.1MB |
| | | | | | Certification for Pro Hac Vice | Certification of Robert M. Rothman (for admission pro hac vice) | 0.1MB |
| | | | | | Proposed Order | [Proposed] Order for Pro Hac Vice Admission of Robert M. Rothman<br>● Linked from (1) | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Motion for Admission Pro Hac Vice (of Robert M. Rothman, Esquire) | 0.1MB |
| 20529912 | 7/7/2008<br>2:49 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Norman M Monhait, Rosenthal Monhait & Goddess PA | 42 Reply Brief | Plaintiffs' Reply Memorandum in Further Support of Their Motion for a Protective Order<br>● Linked to (2)<br>● Linked from (1) | 0.1MB |
| | | | | | 43 Letter | Letter addressed to Vice Chancellor Stephen P. Lamb from Norman M. Monhait enclosing courtesy copies of Plaintiffs' Reply Memorandum in Further Support of Their Motion for a Protective Order<br>● Linked to (2) | 0.1MB |
| | | | | | Exhibits | Exhibit Tab 1 - Unreported Opinion | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Plaintiffs' Reply Memorandum in Further Support of Their Motion for a Protective Order | 0.1MB |
| 20529419 | 7/7/2008<br>2:27 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Christian Douglas Wright, Young Conaway Stargatt & Taylor LLP-Wilmington | 40 Reply Brief | Reply Memorandum in Support of Defendants' Motion for a Protective Order to Quash the Notice of Deposition of Reaz Islam<br>● Linked to (1) | 0.1MB |
| | | | | | 41 Letter | Letter to The Honorable Stephen P. Lamb from Christian Douglas Wright enclosing courtesy copies of Reply Memorandum in support of Defendants' Motion for a Protective Order<br>● Linked to (1) | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Reply Memorandum in Support of Defendants' Motion for a Protective Order to Quash the Notice of Deposition of Reaz Islam | 0.1MB |
| 20522396 | 7/7/2008<br>9:59 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T | Norman M Monhait, Rosenthal Monhait & | 39 Letter | Letter addressed to Vice Chancellor Stephen P. Lamb from Norman M. Monhait enclosing courtesy copies of Plaintiffs' Memorandum of Law in Opposition to | 0.1MB |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Five LLC | | Goddess PA | | Defendants' Motion for Protective Order to Quash the Notices of Deposition of Sally Krawcheck and Defendant Reaz Islam and the supporting Transmittal Affidavit of Joseph Russello, Esquire<br>● Linked to (2) | |
| 20521802 | 7/6/2008 7:02 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Christian Douglas Wright, Young Conaway Stargatt & Taylor LLP-Wilmington | 38 Opposition | Defendants' Opposition To Plaintiffs' Motion For A Protective Order<br>● Linked to (1)<br>● Linked from (2) | 0.1MB |
| | | | | | Exhibits | Exhibits A through D to Defendants Opposition to Plaintiffs Motion for a Protective Order | 1.0MB |
| | | | | | Exhibits | Tabs 1 through 3 to Defendants Opposition to Plaintiffs Motion for a Protective Order | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Defendants' Opposition To Plaintiffs' Motion For A Protective Order | 0.1MB |
| | | | | | Letter | Letter to Vice Chancellor Lamb from Christian Douglas Wright | 0.1MB |
| 20521464 | 7/5/2008 6:48 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Norman M Monhait, Rosenthal Monhait & Goddess PA | 36 Memorandum | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam (under seal)<br>● Linked to (2)<br>● Linked from (4) | 0.1MB |
| | | | | | 37 Affidavit | Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam (under seal)<br>● Linked to (2)<br>● Linked from (1) | 0.1MB |
| | | | | | Exhibits | Tabs 1 and 2 Unreported Opinions attached to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibit 1 to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.2MB |
| | | | | | Exhibits | Exhibit 2 to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibit 3 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibit 4 to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Exhibits | Exhibit 5 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibit 6 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibit 7 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.6MB |
| | | | | | Exhibits | Exhibit 8 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibit 9 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.4MB |
| | | | | | Exhibits | Exhibit 10 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.4MB |
| | | | | | Exhibits | Exhibit 11 (under seal) to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Transmittal Affidavit of Joseph Russello, Esquire in Opposition to Defendants' Motions for a Protective Order to Quash the Notices of Deposition of Sallie Krawcheck and Defendant Reaz Islam | 0.1MB |
| 20520727 | 7/3/2008 10:45 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Christian Douglas Wright, Young Conaway Stargatt & Taylor LLP-Wilmington | 31 Motion for protective order | Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Sallie L. Krawcheck with Certificate of Service <br> • Linked to (1) | 0.1MB |
| | | | | | 32 Memorandum | Memorandum of Law in Support of Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Sallie L. Krawcheck with Certificate of Service | 0.1MB |
| | | | | | 33 Motion for protective order | Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Reaz Islam with Certificate of Service <br> • Linked to (1) <br> • Linked from (3) | 0.1MB |
| | | | | | 34 Memorandum | Memorandum Of Law In Support Of Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Reaz Islam with Certificate of Service | 0.1MB |
| | | | | | 35 Letter | Letter to Vice Chancellor Stephen P. Lamb from Christian Douglas Wright enclosing copies of Defendants' Motions for Protective Orders and supporting papers | 0.1MB |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Proposed Order | Proposed Order to Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Sallie L. Krawcheck | 0.1MB |
| | | | | | Exhibits | Exhibits A - B to Memorandum of Law in Support of Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Sallie L. Krawcheck | 0.7MB |
| | | | | | Proposed Order | Proposed Order to Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Reaz Islam | 0.1MB |
| | | | | | Exhibits | Exhibits A - D to Memorandum Of Law In Support Of Defendants' Motion For A Protective Order To Quash The Notice Of Deposition Of Reaz Islam | 1.1MB |
| 20512112 | 7/3/2008 3:07 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Norman M Monhait, Rosenthal Monhait & Goddess PA | 29 Motion for protective order | Plaintiffs' Motion for a Protective Order<br>● Linked to (1)<br>● Linked from (3) | 0.2MB |
| | | | | | 30 Letter | Letter to Vice Chancellor Stephen P. Lamb from Norman M. Monhait providing two copies of Plaintiffs' Motion for a Protective Order<br>● Linked to (1) | 0.1MB |
| | | | | | Exhibits | Exhibits A through E to Plaintiffs' Motion for a Protective Order | 0.7MB |
| | | | | | Proposed Order | Exhibit F - [Proposed] Order | 0.1MB |
| | | | | | Proposed Order | Exhibit G - [Proposed] Order | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Plaintiffs' Motion for a Protective Order | 0.1MB |
| 20504008 | 7/3/2008 9:51 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Stephen P Lamb, DE Court of Chancery Civil Action | 28 Order | Granted (Stipulation And Proposed Order Governing The Protection And Exchange Of Confidential Information)<br>● Linked to (1)<br>● Linked from (3) | 0.1MB |
| 20503058 | 7/2/2008 11:57 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kerrianne Marie Fay, Young Conaway Stargatt & Taylor LLP- Wilmington | 27 Notice of Service | Notice of Service (1) Defendants' First Set of Requests For Production Of Documents And Things Directed to Plaintiffs<br>● Linked to (2)<br>● Linked from (2) | 0.1MB |
| 20502467 | 7/2/2008 9:27 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kerrianne Marie Fay, Young Conaway Stargatt & Taylor LLP- Wilmington | 25 Stipulation & (Proposed) Order | Stipulation And Proposed Order Governing The Protection And Exchange Of Confidential Information<br>● Linked to (2)<br>● Linked from (1) | 0.1MB |
| | | | | | 26 Letter | Letter To The Honorable Vice Chancellor Lamb from Kerriane Fay re: Courtesy copies of Stipulation And Order Governing The Protection and Exchange of Confidential Information | 0.1MB |
| | | | | | Exhibits | Exhibit A to Stipulation And Proposed Order Governing The Protection And Exchange Of Confidential Information | 0.1MB |
| | | | | | Exhibits | Exhibit B to Stipulation And Proposed Order Governing The Protection And Exchange Of Confidential Information | 0.1MB |
| 20494773 | 7/2/2008 4:06 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Kerrianne Marie Fay, Young Conaway Stargatt & Taylor LLP- Wilmington | 24 Notice of service of Objections to Discovery | Notice of Service of Defendants' Responses and Objections to Plaintiffs' First Request for Production of Documents<br>● Linked to (1)<br>● Linked from (1) | 0.1MB |
| 20477100 | 7/1/2008 4:41 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Jessica Zeldin, Rosenthal Monhait & Goddess PA | 23 Notice of Deposition | Notice Of Depositions<br>● Linked to (1)<br>● Linked from (6) | 0.1MB |
| | | | | | Certificate of Service | Certificate Of Service of Notice Of Depositions | 0.1MB |
| 20423766 | 6/26/2008 5:11 PM EDT | File And | 3843-VCL CONF ORDER | Stephen P Lamb, | 22 Opinion | Letter Opinion and Order<br>● Linked from (1) | 0.1MB |

| | | Serve | Raymond, Marie Trust vs M A T Five LLC | DE Court of Chancery Civil Action | | | |
|---|---|---|---|---|---|---|---|
| 20392962 | 6/25/2008 12:15 PM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Joseph A Rosenthal, Rosenthal Monhait & Goddess PA | 21 Letter | Letter addressed to Vice Chancellor Stephen P. Lamb from Joseph A. Rosenthal in a brief response to certain issues in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Expedited Proceedings<br>• Linked to (2) | 0.1MB |
| 20393868 | 6/25/2008 11:07 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Stephen P Lamb, DE Court of Chancery Civil Action | 18 Order | Granted (Proposed Order for Pro Hac Vice of Charles E. Davidow)<br>• Linked to (1) | 0.1MB |
| | | | | | 19 Order | Granted (Proposed Order for Pro Hac Vice of Sean R. O' Brien)<br>• Linked to (1) | 0.1MB |
| | | | | | 20 Order | Granted (Proposed Order for Pro Hac Vice of Kristy M. Tillman)<br>• Linked to (1) | 0.1MB |
| 20393834 | 6/25/2008 11:06 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Stephen P Lamb, DE Court of Chancery Civil Action | 17 Order | Granted ([Proposed] Order for Pro Hac Vice Admission of Joseph Russello)<br>• Linked to (1) | 0.1MB |
| 20393398 | 6/25/2008 10:54 AM EDT | File And Serve | 3843-VCL CONF ORDER Raymond, Marie Trust vs M A T Five LLC | Joseph A Rosenthal, Rosenthal Monhait & Goddess PA | 16 Motion for Pro Hac Vice | Motion for Admission Pro Hac Vice (Joseph Russello)<br>• Linked to (1) | 0.1MB |
| | | | | | Certification for Pro Hac Vice | Certification of Joseph Russello (pursuant to Court of Chancery Rule 170(b)) | 0.1MB |
| | | | | | Proposed Order | [Proposed] Order for Pro Hac Vice Admission of Joseph Russello<br>• Linked from (1) | 0.1MB |
| | | | | | Certificate of Service | Certificate of Service to Motion for Admission Pro Hac Vice (Joseph Russello) | 0.1MB |

1-50 of 57 transactions    <<Prev Page 1 of 2 Next>>

# EXHIBIT 5

EFiled: Jun 26 2008 5:11PM EDT
Transaction ID 20423766
Case No. 3843-VCL

COURT OF CHANCERY

OF THE

STATE OF DELAWARE

STEPHEN P. LAMB
VICE CHANCELLOR

New Castle County Court House
500 N. King Street, Suite 11400
Wilmington, Delaware 19801

Submitted: June 25, 2008
Decided: June 26, 2008

Joseph A. Rosenthal, Esquire
Rosenthal, Monhait & Goddess, P.A.
Suite 1401, Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070

David C. McBride, Esquire
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street
P.O. Box 391
Wilmington, DE 19899-0391

> RE:  *Marie Raymond Revocable Trust and*
> *Richard and Sharon Brower v. MAT Five LLC, et al.*
> *C.A. No. 3843-VCL*

Dear Counsel:

This putative class action is before the court on a motion to expedite

proceedings leading to a preliminary injunction hearing.  For the following

reasons, the motion is granted.

## I.

On June 19, 2008, the plaintiffs, Marie Raymond Revocable Trust and

Richard and Sharon Brower, stockholders of defendant MAT Five LLC ("MAT"),

filed this purported class action suit.  The suit claims that the defendants breached

their fiduciary duties by omitting material information from an "Exchange Offer

Memorandum" sent to investors on May 29, 2008 in advance of a tender offer.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 2

MAT is a Delaware limited liability company operating as a private hedge fund.

Substantially all of MAT's assets were invested in Municipal Opportunity Fund

Five LLC ("Municipal Opportunity") which, according to MAT's initial private

placement memorandum, is an affiliated fund that "makes economically leveraged

investments in fixed-rate tax-exempt municipal bonds and seeks to mitigate the

interest rate risks through proprietary hedging strategies."[1]  Defendant Citigroup

Alternative Investments LLC ("CAI"), an indirect subsidiary of Citigroup Inc., is a

Delaware limited liability company that acts as MAT's investment manager.

According to the complaint, Citigroup and its affiliates also manage Municipal

Opportunity.

Defendant Reaz Islam allegedly served as the managing director and senior

investment officer of CAI.  Islam purportedly managed the day-to-day operations of

MAT until May 2008, when he reportedly announced his resignation.  Defendant

Citigroup Fixed Income Alternatives LLC ("CFIA") operates as a business unit of

CAI and, according to the complaint, assisted in the sale of MAT shares.  Islam

allegedly served as CFIA's managing director.

MAT was formed on June 10, 2005 and commenced operations in 2007,

issuing unregistered shares in several series to "accredited investors" and "qualified

---

[1] PPM at i.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 3

investors," as those terms are defined by federal securities laws, for $1 per share.

These investors began suffering losses in 2007 as volatility in global credit markets

increased in the latter part of the year.  By 2008, this volatility affected the market

for municipal bonds, disrupting key assumptions upon which Municipal

Opportunity's investment strategy was based, and dramatically reducing the value

of its assets, as well as MAT's net asset value.  On February 29, 2008, Municipal

Opportunity's liabilities exceeded its capital value, rendering it unable to meet

possible margin calls.  MAT's net asset value had allegedly fallen to approximately

$.02 per share.

In order to keep Municipal Opportunity, and affiliated funds such as MAT,

solvent, Citigroup allegedly contributed a total of approximately $246 million to

Municipal Opportunity on February 29 and March 3.  In return for this cash

infusion, Citigroup allegedly received Municipal Opportunity shares equaling

approximately 97% of the interest in Municipal Opportunity.  In the following

weeks, the value of Municipal Opportunity's holdings allegedly appreciated.

According to the complaint and the exchange memorandum, Citigroup

agreed that for the months of March and April, 75% of the gains normally allocable

to the shares Citigroup received as part of its cash infusion would instead be

allocated to Municipal Opportunity shares owned by MAT.  This arrangement

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 4

purportedly raised MAT's April 2008 net asset value to approximately $.23 a share. In addition, after April 30, 3008, investors would "receive an enhanced share of interest income of [Municipal Opportunity] corresponding to Citi's reduced share of interest income" with respect to its new Municipal Opportunity shares. Citigroup's reduced share of interest income was determined by a formula (the "special interest allocation") that is outlined in the exchange memorandum.[2] On March 20, 2008, CAI suspended redemptions and quarterly income distributions from MAT and Municipal Opportunity.

As noted, on May 29, 2008, MAT commenced a tender offer and sent the exchange memorandum to investors. Pursuant to the offer, these investors have two choices. Those who tender their shares will receive the net asset value of their shares as of April 30, 2008–approximately $.23–in cash, and a "participation share" entitling them to the interest payments their shares would have received (including the special interest allocation) and 75% of the future gains (if any) Citigroup's new shares would receive as a result of MAT's liquidation. The cash for the tender offer will come from Citigroup: for each share tendered, MAT will sell one share of a new class of stock for a purchase price equal to the payment made to the tendering investor, the proceeds of which will be used to pay the tendering investor.

---

[2] Exch. Mem. at 5.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 5

By executing the exchange memorandum, tendering investors also agree to a release of legal claims. That release purports to release MAT, CAI, Citigroup and its subsidiaries, Municipal Opportunity, the selling broker of MAT shares, and employees, officers, directors, partners, past and present counsel, and agents of these parties, among others, from all claims directly or indirectly arising from, *inter alia*, the operation, management, supervision, or investment of any MAT's assets, or any actions taken by these parties in connection with the acquisition, ownership, or disposition of MAT shares, regardless of whether those claims are known or unknown at the time of tender.[3]

Non-tendering investors will retain their shares in MAT, share fully in any gain or loss realized through the liquidation of the portfolio, retain the right to interest payments, and retain all legal rights to sue. Unlike tendering investors, these investors do not receive any portion of future gains from liquidation (if any) attributable to Citigroup's new shares, although they will continue receiving the special interest allocation. The tender offer is set to expire on July 15, 2008.

## II.

The plaintiffs seek expedited treatment of their request for preliminary injunctive relief. "This Court does not set matters for an expedited hearing or

---

[3] *Id.* at 28.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 6

permit expedited discovery unless there is a showing of good cause why that is

necessary."[4]  "To make the necessary showing, a plaintiff must articulate a

sufficiently colorable claim and show a sufficient possibility of a threatened

irreparable injury to justify imposing on the defendants and the public the extra (and

sometimes substantial) costs of an expedited preliminary injunction proceeding."[5]

The plaintiffs premise their request for an injunction primarily on allegations

that the exchange memorandum contains material omissions.  Given the expedited

nature of this decision, the court does not address every allegation the plaintiffs

make, instead focusing on the most important allegations that justify granting the

present motion.  First, the plaintiffs argue that the memorandum does not disclose

the manner in which MAT calculates net asset value, or the value of Municipal

Opportunity's assets, and therefore they cannot understand the true value of the

tender offer consideration.

Second, the plaintiffs maintain that the disclosures fail to provide information

necessary to determine the nature of the claims they have been asked to release.  For

instance, the plaintiffs contend that the defendants disclosed that the SEC is

conducting an inquiry into Citigroup's hedge funds and issued two document

---

[4] *See, e.g.*, *In re SunGard Data Sys., Inc. S'holders Litig.*, 2005 WL 1653975 (Del. Ch. July 8,
2005) (citation omitted).
[5] *Id.* (citation omitted).

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 7

requests to Citigroup, but have not disclosed the nature or scope of that inquiry.[6]  In

addition, the plaintiffs argue that more information regarding Citigroup's February

29 and March 3 cash infusion is needed to make an informed decision whether to

tender their shares.  Specifically, they maintain that the exchange memorandum

does not disclose the terms of the contribution, including how those terms were

determined and negotiated, how Citigroup decided the manner in which they

allocated March and April gains, or why the defendants elected a cash infusion

rather than an alternative course of action, such as a non-dilutive loan.

In addition, the plaintiffs argue they will be irreparably harmed because they

will be "forced to determine whether to tender their shares in the Tender Offer on

the basis of the materially misleading statements and omissions of fact contained in

the Memorandum . . . [and] will thus be required to make a determination of

whether to relinquish much of their interest in the Company on the basis of

inadequate information."[7]  Further, the plaintiffs allege "[i]nvestors will also be

irreparably harmed without disclosure of the omitted information because, as a

condition of tendering their shares, they are required to accept the Release, which

---

[6] Similarly, the plaintiffs allege the memorandum discloses that certain affiliates of MAT are the
subject of Financial Industry Regulatory Authority arbitration proceedings relating to the
company's sales practices without disclosing the nature, scope, or subject matter of those
proceedings.
[7] Compl. ¶ 77.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 8

purports to eliminate any legal claim members may have against any of the parties

involved in operating the Company."[8]

The defendants respond with several arguments.  First, they argue that the

plaintiffs have filed a putative class action in the United States District Court for the

Souther District of New York ("*Raymond I*")[9] that arises out of the same nucleus of

facts as the this action and involves the same defendants.[10]  Therefore, the

defendants argue, the plaintiffs filed in this court simply to engage in impermissible

forum-shopping, and that, under the *McWane* doctrine,[11] this court should defer to

the first-filed New York action.  Second, the defendants argue that the plaintiffs

cannot demonstrate a colorable claim because the information they seek is not

material.

---

[8]  *Id.* at ¶ 78.

[9]  *Marie Raymond Revocable Trust v. MAT Five LLC, et al.,* No. 08 Civ. 4152 (S.D.N.Y. 2008).

[10] The plaintiffs' attorneys, representing other individuals invested in a different Citigroup hedge fund, have filed a separate putative class action in federal court seeking to enjoin a similar tender offer.  That claim was premised on federal antifraud statutes and Delaware law.  On June 17, 2008, that court denied the motion for preliminary injunction, holding that the plaintiffs' request was premised on claims that the exchange memorandum contained untrue or misleading statements, yet they had not identified any such statements. O'Brien Aff. Ex. I at 32 (Transcript of Oral Ruling, *Ferguson Family Trust v. Falcon Strategies Two LLC et al.*, No. 08 Civ. 4723 (S.D.N.Y. June 17, 2008)).  That court did not render an opinion as to whether the memorandum contained material omissions.  *Id.*

[11] That doctrine holds that "Delaware courts should liberally exercise their discretion in favor of a stay when (1) a first-filed prior pending action exists in another jurisdiction, (2) that action involves similar parties and issues, and (3) the court in the other jurisdiction is capable of rendering prompt and complete justice."  *Enodis Corp. v. Amana Co.*, 2007 WL 1242193, at *2 (Del. Ch. Apr. 26, 2007); *see also McWane Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970).

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 9

Next, the defendants argue there is no threat of irreparable harm because those who choose not to tender will be in the exact same position as if there had been no tender offer.  Further, they contend that any damages could be readily calculable based on the difference between the amount per share being offered and the value ultimately realized when MAT is liquidated.  In addition, the defendants argue that the right to make an informed decision on a tender offer, in and of itself, does not constitute irreparable harm.  In any event, the defendants argue, laches applies because the plaintiffs delayed in bringing this action.  Finally, the defendants argue that the plaintiffs are not entitled to discovery because the discovery sought is additional disclosure equivalent to the relief they seek and are not entitled to, and contravenes the Congressional intent found in 15 U.S.C. § 78u-5(f).[12]

## III.

As an initial matter, the record does not support a conclusion that the plaintiffs unduly delayed in making their application.  Of course, the plaintiffs could have filed their application a few days earlier than they did, but that delay by itself is not fatal.  This is especially so given that "the optimal time to bring a

---

[12] 15 U.S.C. § 78u-5(f) provides that a court must stay discovery in actions arising under federal securities laws during the pendency of specific types of motions for summary judgment.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 10

disclosure claim in connection with a proposed merger, or in a like context . . ., is before the [action] is taken and the deal closes."[13]

The court also declines to apply the *McWane* doctrine in this case. Under that doctrine, a duplicative action that "aris[es] from a common nucleus of operative facts" raised in an earlier-filed suit may be dismissed or stayed.[14] "To grant a stay, it is not required that the parties and issues in both actions be identical. Substantial or functional identity is sufficient."[15] In this case, that substantial or functional identity is lacking. *Raymond I* has nothing to do with the disclosures made in the exchange memorandum. Indeed, the *Raymond I* complaint was filed before the exchange memorandum was sent to investors. Although there are some overlapping facts between the two cases, this action centers on a very specific set of facts–the disclosures made in the exchange memorandum–that did not even exist at the time *Raymond I* was filed.[16]

Further, the court finds that the plaintiffs have articulated a colorable claim. As this court recently explained:

---

[13] *In re SunGard*, 2005 WL 1653975 at *2.
[14] *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *4 (Del. Ch. Apr. 12, 1994).
[15] *AT&T Corp. v. Prime Sec. Distribs., Inc.*, 1996 WL 633300, at *2 (Del. Ch. Oct. 24, 1996).
[16] For the same reasons, allowing discovery in this action does not constitute an "end run" around the PSLRA stay on discovery that the federal court imposed in *Raymond I*.

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 11

> The duty of disclosure is not an independent duty, but derives from
> the duties of care and loyalty.  Corporate fiduciaries can breach their
> duty of disclosure under Delaware law . . . by making a materially
> false statement, by omitting a material fact, or by making a partial
> disclosure that is materially misleading . . . .  To state a claim for
> breach by omission of any duty to disclose, a plaintiff must plead facts
> identifying (1) material, (2) reasonably available (3) information that
> (4) was omitted from the proxy materials.  Omitted information is
> material if a reasonable stockholder would consider it important in
> deciding whether to tender his shares or would find that the
> information has altered the "total mix" of information available.[17]

First, a reasonable investor deciding whether to release all potential claims against a

fund and its managers would consider it important to know how a manager of that

fund came to obtain a substantial equity interest in that fund cheaply, and at a time

the fund was vulnerable.  Such an investor would also consider it important to know

the scope and subject matter of an SEC investigation into similar funds or other

pending litigation.  Likewise, given that MAT is an unregistered company with no

public filings, the method by which the April 30 net asset value was determined, as

well as how the underlying assets were valued (and what their value was), is likely

to alter the total mix of information available to an investor.[18]

---

[17] *Pfeffer v. Redstone,* 2008 WL 308450, at *8-9 (Del. Ch. Feb. 1, 2008) (citations omitted); *see also Berger v. Pubco Corp.*, 2008 WL 2224107, at *2 (Del. Ch. May 30, 2008) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (citing *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[18] *Cf. Berger*, 2008 WL 2224107 at *3 (Del. Ch. May 30, 2008) (noting that "where so little information is available about [an unregistered] company . . . a disclosure [as to how the price offered was set] would significantly change the landscape" of information).

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 12

      In addition, the plaintiffs have shown a sufficient possibility of a threatened irreparable injury.  As the defendants point out, where a tender offer does not involve assumption of control over the issuer or some other transaction that cannot be undone, "the remedy of rescission or money damages will give full relief."[19] Indeed, in this case if the plaintiffs are correct and tendering investors sell their stock for less than its fair value based on incomplete information, any damages could be readily calculable based on the difference between the amount per share being offered and the value ultimately realized when MAT is liquidated.  Further, the fact that the plaintiffs must make a decision without being fully informed cannot in and of itself constitute irreparable harm if compensable by damages.[20]  Rather, this harm must be coupled with some other form of irreparable harm.

      Here, that irreparable harm can be found in the release that tendering investors must sign.  In the event that the tender offer is later found defective after it is completed, tendering investors may be unable to bring claims seeking money damages due to this release.  Thus, if the plaintiffs are ultimately found correct in this case and investors tender their shares with incomplete information, they will

---

[19] *See Cottle v. Carr,* 1988 WL 10415, at *5 (Del. Ch. Feb. 9, 1988).
[20] *Id.* at *5; *see also Gilmartin v. Adobe Ress. Corp.*, 1992 WL 71510, at *13 (Del. Ch. Apr. 6, 1992) (finding irreparable harm where material information was withheld, and the merger could not be reversed because it involved the issuance of new securities that would be publicly traded on the national securities market).

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 13

suffer the irreparable harm of not being able to bring further litigation seeking

money damages without first having to overcome the effect of the release.

Moreover, as this court has previously held, after-the-fact damages are not a precise

or efficient method to remedy disclosure deficiencies.[21]  "Therefore, our cases

recognize that it is appropriate for the court to address material disclosure problems

through the issuance of a preliminary injunction that persists until the problems are

corrected."[22]

The court will allow expedited discovery in this case.  It is not true that the

plaintiffs' "end game" in this action is simply gaining access to the information

allegedly omitted from the exchange memorandum.  Rather, the plaintiffs' ultimate

goal is to enjoin the tender offer until this information is properly disclosed to MAT

stockholders so that the stockholders may make an informed decision.  Further, to

the extent that the information is highly confidential or potentially damaging to

MAT if widely distributed, the parties can negotiate an appropriate confidentiality

agreement or, in the absence of agreement, ask for the court's assistance.  Similarly,

if this court ultimately orders disclosures that the defendants believe are potentially

damaging, the defendants can request that any such disclosures be made subject to

stockholders signing confidentiality agreements.

---

[21] *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001).
[22] *Id.*

*Marie Raymond Revocable Trust, et al.*
*v. MAT Five LLC, et al.*
*C.A. No. 3843-VCL*
June 26, 2008
Page 14

## IV.

For these reasons, the motion to expedite proceedings is GRANTED.  A

hearing on the plaintiffs' motion for a preliminary injunction will be held on July

15, 2008 at 10 a.m.  The parties are directed to submit a stipulated schedule.  IT IS

SO ORDERED.

<u>/s/ Stephen P. Lamb</u>
Vice Chancellor

# EXHIBIT 6

# RIGRODSKY & LONG, P.A.

### ATTORNEYS AT LAW

919 NORTH MARKET STREET, SUITE 980
WILMINGTON, DELAWARE 19801

SETH D. RIGRODSKY*
BRIAN D. LONG**

*ALSO ADMITTED IN NY
**ALSO ADMITTED IN PA

TELEPHONE (302) 295-5310
FACSIMILE (302) 654-7530
WWW.RIGRODSKYLONG.COM

July 14, 2008

**VIA HAND DELIVERY AND**
**LEXISNEXIS FILE & SERVE**

The Honorable Stephen P. Lamb
Vice Chancellor
Court of Chancery
500 N. King Street
Wilmington, DE 19801

      Re:    *Marie Raymond Revocable Trust v. MAT Five LLC, et al.*, C.A. No. 3843-VCL

Dear Vice Chancellor Lamb:

      I write as liaison counsel for lead plaintiffs and counsel in the federal class action case captioned *Marie Raymond Revocable Trust v. MAT Five LLC, et al.* No. 08 Civ. 4152 (S.D.N.Y. 2008) ("*Raymond I*"). As indicated in the attached letter, lead counsel in *Raymond I* are concerned about the possibility that the parties to the above referenced action might seek to compromise the claims pending in *Raymond I*. In addition, as indicated in the attached letter, lead plaintiffs and counsel in *Raymond I* respectfully request the Court to lift the confidentiality designation of documents filed in connection with the preliminary injunction proceedings in this case.

      Should the Court have any questions, the undersigned counsel and counsel for Lead Plaintiffs in *Raymond I* are available at the Court's convenience.

Respectfully,

Seth D. Rigrodsky (#3147)

SDR/nrw
Enclosure

cc:    Register in Chancery (via LexisNexis File & Serve)
       Joseph A. Rosenthal, Esquire (via LexisNexis File & Serve)
       David C. McBride, Esquire (via LexisNexis File & Serve)



## The Rosen Law Firm
### I N V E S T O R   C O U N S E L

July 14, 2008

Vice Chancellor Stephen P. Lamb
Delaware Chancery Court
500 N. King Street
Wilmington, DE 19801

Re: _Marie Raymond Revocable Trust v. MAT Five LLC, et al._ C.A. No. 3843-VCL

Dear Vice Chancellor Lamb:

Judge Buchwald recently appointed the Michael Joel Stone Revocable Trust and Albeco, Inc. as lead plaintiffs, and appointed Hulett, Harper Stewart as lead counsel and our law firm as liaison counsel in the class action _Marie Raymond Revocable Trust v. MAT Five LLC, et al._ No. 08 Civ. 4152 (S.D.N.Y. 2008) ("Raymond I").

We write in regard to the related action _Marie Raymond Revocable Trust v. MAT Five LLC, et al._ C.A. No. 3843-VCL pending in the Chancery Court ("Raymond II"). A hearing on plaintiff's motion for a TRO to enjoin the Mat Five tender offer is scheduled fro 10:30 a.m. on Tuesday July 15, 2008.

We wish to bring to your attention two issues. Firstly, we are concerned that the parties in the Delaware action may seek to settle or compromise the class members' claims in the New York action. As the Court noted in your June 26, 2008 decision granting expedited proceedings, the Delaware and New York actions are not identical and allege distinct wrongs. Nevertheless, the tender offer is not merely an offer to purchase, but requires execution of complete releases of all claims relating to the purchase of these securities from a broad set of parties. The Raymond I complaint was filed before the exchange memorandum was sent to investors and it alleges misrepresentations and breaches of fiduciary duty occurring well before the tender offer and related disclosures that are the subject of Raymond II were communicated to investors.

We recently notified counsel for the defendants in Raymond I that the Mat Five tender offer is an unauthorized communication to Raymond I class members improperly offering to settle their claims because the tender offer was commenced a full month after the Raymond I class action was filed. _See, In re Currency Conversion Fee Antitrust Litig._, 361 F.Supp.2d 237, 253 (S.D.N.Y 2005) ("_Currency Conversion II_") ("[W]hen a defendant contacts putative class members for the purpose of altering the status of a pending litigation, such communication is improper without judicial authorization."). Here as in _Currency Conversion II_, the defendants' "unsupervised communications [are]

improper because they [seek] to eliminate putative class members' rights in the litigation." *Currency Conversion II*, 361 F.Supp.2d at 254.

Here, the unauthorized communications are more egregious than in the *Currency Conversion* case because defendants' release seeks to eliminate class members' legal claims with respect to the litigation completely, not just alter the forum where those rights are adjudicated. Indeed, the only business purpose behind the tender offer is to extinguish Raymond I class members' claims. This is not a typical situation in which a tender offer seeks to gain control of a valuable operating business or assets. Defendants already own 95% of Mat Five's equity and control the fund completely. The only reason for the tender offer is to extinguish the Raymond I claims and obtain a release of liability.

We respectfully request that the Court prohibit the parties to the Raymond II litigation in Delaware to compromise or release the claims asserted in the Raymond I litigation in New York. The claims asserted in Raymond II are separate and distinct from those in Raymond I. Any resolution of the Raymond II litigation should carve out and preserve the claims of the class members' in Raymond I.

Secondly, we understand that all of the briefs and supporting evidence regarding the motion for a temporary restraining order have been filed under seal. We respectfully request that the Court lift the seal to permit lead counsel in the Raymond I litigation to have access to those documents. This will permit us to adequately protect the interests of the Raymond I class members in the context of any proposed resolution of the Delaware and New York litigation.

We will be present in court at the hearing on the TRO Tuesday July 15th and will be prepared to answer any questions the Court may have on these two issues.

Thank you very much for your consideration.

Respectfully yours.

Laurence Rosen, Esq.


cc:    Joseph Rosenthal, Esq.
       Charles Davidow, Esq.
       Samuel Rudman, Esq.
       Sean R. O'Brien, Esq.



# EXHIBIT 7

EFiled: Jul 16 2008 5:32PM EDT
Transaction ID 20675570
Case No. 3843-VCL

YOUNG CONAWAY STARGATT & TAYLOR, LLP

BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON

ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
EDMON L. MORTON
JOHN E. TRACEY

RYAN M. BARTLEY
SEAN M. BEACH
DONALD J. BOWMAN, JR.
MICHELE SHERRETTA BUDICAK
JEFFREY T. CASTELLANO
DOUGLAS T. COATS (MD ONLY)
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
KERRIANNE MARIE FAY
JAMES J. GALLAGHER
WILLIAM E. GAMGORT
SEAN T. GREECHER
NATHAN D. GROW
STEPHANIE L. HANSEN
JAMES L. HIGGINS
PATRICK A. JACKSON
DAWN M. JONES
KAREN E. KELLER
JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI

EVANGE...
JOHN C. ...
TIMOTH...
ANDRE...
MATTH...
ADRIA B. MARTINELLI
KATHALEEN MCCORMICK
MICHAEL W. MCDERMOTT
TAMMY L. MERCER
MARIBETH L. MINELLA
D. FON MUTTAMARA-WALKER
MICHAEL S. NEIBURG
(PA & NJ ONLY)
JENNIFER R. NOEL
ADAM W. POFF
ROBERT F. POPPITI, JR.
SARA BETH A. REYBURN
CHERYL A. SANTANIELLO
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
RICHARD J. THOMAS
TRAVIS N. TURNER
MARGARET B. WHITEMAN
SHARON M. ZIEG

SPECIAL COUNSEL
JOHN D. MCLAUGHLIN, JR.
KAREN L. PASCALE
SETH J. REIDENBERG
PATRICIA A. WIDDOSS

SENIOR COUNSEL
CURTIS J. CROWTHER

OF COUNSEL
BRUCE M. STARGATT
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND
JOSY W. INGERSOLL

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE  19801

P.O. BOX 391
WILMINGTON, DELAWARE  19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

WWW.YOUNGCONAWAY.COM

DIRECT DIAL:  (302) 571-6698
DIRECT FAX:  (302) 576-3309
mlessner@ycst.com

July 16, 2008

**BY HAND DELIVERY &
LEXISNEXIS FILE & SERVE**

The Honorable Stephen P. Lamb
Court of Chancery of the State of Delaware
New Castle County Courthouse
500 North King Street
Suite 1100
Wilmington, DE  19801

Re:    *Marie Raymond Revocable Trust, et al. v. MAT Five LLC, et al.,*
       *C.A. No. 3843-VCL*

Dear Vice Chancellor Lamb:

On behalf of the Citigroup-related defendants, and as directed by the Court at yesterday's hearing, we write to report back on status. Defendants plan to prepare supplemental disclosure documents regarding the tender offer for MAT Five LLC shares, and will solicit comments from counsel for plaintiffs before distributing them to the MAT Five stockholders. If after consultation the parties are unable agree on the supplement disclosure documents, plaintiffs will have the opportunity to approach the Court prior to the distribution of the disclosures to the stockholders, should plaintiffs so choose. In order to accomplish these steps, the tender and exchange offer is being extended until August 8, 2008.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Stephen P. Lamb
July 16, 2008
Page 2

In light of the extended date and the planned supplemental disclosures, we respectfully submit that the Court need not take any further action with respect to the pending motion for a preliminary injunction (such as preparing an opinion).

Respectfully submitted,

Martin S. Lessner (#3109)

MSL:zj
cc:     Register in Chancery (by Lexis File & Serve)
        Joseph A. Rosenthal, Esq. (by Lexis File & Serve)

# EXHIBIT 8

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000
FACSIMILE (212) 757-3990

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(202) 223-7380

WRITER'S DIRECT FACSIMILE

(202) 223-7480

WRITER'S DIRECT E-MAIL ADDRESS

cdavidow@paulweiss.com

1615 L STREET, NW
WASHINGTON, DC 20036-5694
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101
FACSIMILE (81-3) 3597-8120

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO. 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300
FACSIMILE (86-10) 6530-9070/9080

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2536-9933
FACSIMILE (852) 2536-9622

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600
FACSIMILE (44 20) 7367 1650

MATTHEW W. ABBOTT
MARK H. ALCOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
RICHARD S. BORISOFF
HENK BRANDS
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JEANETTE K. CHAN
YVONNE Y.F. CHAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
JAMES M. DUBIN
LESLIE GORDON FAGEN
MARC FALCONE
PETER L. FELCHER
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
KENNETH A. GALLO
ANDREW G. GORDON
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
JOYCE S. HUANG
JEH CHARLES JOHNSON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER

DAVID K. LAKHDHIR
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
JULIA TARVER MASON
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
ALEX YOUNG K. OH
JOHN J. O'NEIL
KELLEY D. PARKER
ROBERT P. PARKER
MARC E. PERLMUTTER
MARK F. POMERANTZ
VALERIE E. RADWANER
CAREY R. RAMOS
CARL L. REISNER
WALTER G. RICCIARDI
RICHARD A. ROSEN
ANDREW N. ROSENBERG
STEVEN B. ROSENFELD
PETER J. ROTHENBERG
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE E. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
JUDITH R. THOYER
DANIEL J. TOAL
MARK A. UNDERBERG
LIZA M. VELAZQUEZ
MARIA T. VULLO
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
JORDAN E. YARETT
KAYE N. YOSHINO
ALFRED D. YOUNGWOOD
TONG YU
TRACEY A. ZACCONE
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 10, 2008

The Honorable Naomi Reice Buchwald
United States District Judge
U.S. District Court for the Southern District of New York
500 Pearl Street, Room 2270
New York, NY 10007

Re: *In re MAT Five Securities Litigation*, Case No. 08-civ-4152 NRB

Dear Judge Buchwald:

I write on behalf of defendants MAT Five LLC, Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives, and Citigroup Global Markets Inc. ("Citi Defendants") to advise you of certain developments with respect to the investment that underlies this litigation. Counsel for the recently appointed lead plaintiffs in this action has raised concerns about the possible effect of these developments on this litigation in communications with us, and we therefore wish to call them to your attention. The Citi Defendants are not requesting your intervention at this time.

This litigation was commenced on May 1, 2008 by plaintiff Marie Raymond Revocable Trust, represented by the law firm of Coughlin, Stoia, Geller, Rudman & Robbins LLP ("Coughlin Stoia"). It alleges that defendants violated the Securities Act of 1933 by making false and misleading statements in connection with their sale of MAT Five LLC ("MAT Five"), a hedge fund offered only to investors meeting SEC standards for high net worth and sophistication. That hedge fund subsequently suffered substantial losses.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
The Honorable Naomi Reice Buchwald                                      2

Since May 1, 2008, certain of the Citi Defendants have commenced tender and exchange offers for the shares of a number of hedge funds, including MAT Five, and have accordingly distributed the required tender and exchange offer memoranda to holders. In the case of MAT Five, this memorandum was dated May 29, 2008. A copy is attached hereto as Exhibit A. The offer is currently scheduled to expire on July 15, 2008, unless extended. The terms of the offer are complex, but they include: (1) tendering shareholders will receive approximately 23 cents per share (compared to the offering price of $1), giving them liquidity for what is otherwise an illiquid investment and preventing further losses; (2) tendering shareholders will receive 75% of any future gains the Citi Defendants may receive by virtue of certain shares of MAT Five they own; and (3) tendering shareholders will release any claims they have against the Citi Defendants and certain others. Any shareholders wishing to tender may do so without regard to how many other shareholders tender, and those not tendering will retain their current shares without any change in rights.

After the tender and exchange offer for shares of MAT Five was commenced, the named plaintiff in this action, Marie Raymond Revocable Trust, again represented by Coughlin Stoia, commenced a new class action in Delaware Chancery Court seeking injunctive relief against the offer. That lawsuit challenges the adequacy of disclosures in the tender and exchange offer memorandum, including disclosures surrounding the release of claims. A copy of that complaint is attached hereto as Exhibit B. Vice Chancellor Lamb granted the plaintiffs expedited discovery, and has scheduled a hearing on the motion for a preliminary injunction for next week, on July 15, 2008. A copy of his ruling is attached hereto as Exhibit C.

In the litigation before Your Honor, plaintiff Marie Raymond Revocable Trust – the original plaintiff in this lawsuit – did not apply for lead plaintiff status. The only putative class members who sought lead plaintiff status, the Michael Joel Stone Revocable Trust and Albeco, Inc., were appointed to that role yesterday, July 9, and their proposed counsel, Hulett Harper Stewart LLP and The Rosen Law Firm, P.A., were appointed lead and liaison counsel, respectively.

On Monday of this week, July 7, Kirk B. Hulett of Hulett Harper Stewart LLP sent us a letter asserting that the tender and exchange offer, because it includes a release, amounts to an improper, unauthorized communication with class members in violation of Rule 23 of the Federal Rules of Civil Procedure. The letter also asserts that further communications with shareholders in furtherance of the offer are improper. The letter comes more than five weeks after his clients received the tender and exchange offer, and only one week before the expiration date of the offer. A copy of the letter is attached hereto as Exhibit D. The letter relies principally on the case of *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005). In that case, the defendant credit card issuer, during the pendency of a class action, added arbitration clauses to the card-holder agreements, automatically binding unless the card-holders took action, without informing them of the existence of the class action or the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Naomi Reice Buchwald                                           3

effect of the arbitration clause on their rights as class members.  The court held that this was misleading and that the court, pursuant to its authority under Rule 23(d) to protect the integrity of the class action, would invalidate those arbitration clauses.

We do not believe that case governs the present situation, for a number of reasons.  *First*, the tender and exchange offer memorandum expressly describes the release and informs shareholders of the existence of this lawsuit and the claims made in it.  *See* Exhibit A at cover, v, 7, 16, 17, 28.  *Second*, shareholders are subject to the release only if they take the affirmative step of electing to tender, and not by inaction.  *Third*, these are high net worth, sophisticated investors, unlike the credit card holders in the *Currency Conversion Fee* case.  *Fourth*, the adequacy of disclosure to putative class members concerning the release is being actively litigated in a court with jurisdiction over the matter – indeed, *in the court in which the plaintiff in this lawsuit, represented by the counsel that filed this complaint, chose to litigate this issue before the new lead plaintiffs or their counsel had even applied for those positions.*  The very issue on which the new lead plaintiffs predicate their objection – whether "any necessary disclosures and/or relevant information concerning the claims are provided to the class" (Exhibit D at 3) – is the precise issue now before the Delaware court chosen by plaintiffs on behalf of this class.  *See* Exhibit C at 11-13.

We therefore believe that the assertions of impropriety by the new lead counsel for the plaintiff class before this Court are without merit.  We further believe that their assertion that the Citi Defendants cannot engage in the communications that are legally necessary to consummate the tender and exchange offer, unless done through them and approved by this Court, are also without merit.  We nevertheless believe it appropriate to inform the Court of these matters.

Very truly yours,

*Charles E. Davidow* /JHH

Charles E. Davidow

cc:      Kirk B. Hulett
         Laurence M. Rosen
         Samuel Rudman
         Sean R. O'Brien

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MAT FIVE SECURITIES LITIGATION | : **Civil Action No. 08 CIV 4152 NRB** |
| | : |
| | : <u>**CLASS ACTION**</u> |

**LEAD PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS**

Lead Plaintiff The Michael Joel Stone Revocable Trust and Albeco, Inc., by through counsel, hereby requests, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of this Court, that Defendants MAT Five LLC, Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives, Citigroup Global Markets Inc., and Reaz Islam, produce for inspection and copying at the offices of Hulett Harper Stewart LLP located at 550 West C Street, Suite 1600, San Diego, CA 92101, the following documents within their possession, custody, or control, or that of any of their agents, within such time as the Court orders or as otherwise agreed by the parties, and in accordance with the definitions set forth below.

## I.    DEFINITIONS

1.    "PLAINTIFF" shall mean court-appointed Lead Plaintiff The Michael Joel Stone Revocable Trust and Albeco, Inc.

2.    "YOU" and "YOUR" shall mean the person or entity responding to these Requests.

3.    "DEFENDANTS" shall mean MAT Five LLC, Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives, Citigroup Global Markets, and Reaz Islam, or any of them (separately and together), and any of their predecessors, successors, divisions, subsidiaries, officers, directors, employees, agents, or anyone acting or purporting to act on its behalf.

4.    "TENDER MEMO" shall mean the Confidential Tender and Exchange Memorandum dated May 29, 2008 from the MAT Five LLC National Portfolio.

5.    "TENDER OFFER" shall mean the tender and exchange offer set forth in the TENDER MEMO.

6.    "RELEASE" or "RELEASES" shall mean the release set forth in the TENDER MEMO.

7.    "DELAWARE ACTION" shall mean the action entitled *Marie Raymond Revocable Trust and Richard and Sharon Brower, as JTWROS v. MAT Five LLC, et al*., Case No. 3843-VCL pending in the Delaware Chancery Court.

8.    "DELAWARE DISCOVERY MATERIALS" shall mean all documents and communications YOU produced to, and/or received from, any party and/or non-party in the DELAWARE ACTION pursuant to any formal or informal discovery permitted by the Chancery Court or any rule or statute, including, but not limited to: (i) the actual discovery demand or request and the responses thereto; and (ii) deposition notices and subpoenas and the transcripts created in relation or response thereto.

9.    "AND" and "OR" shall each be construed in the disjunctive AND conjunctive AND shall not limit the scope of this Request.

## II.    DOCUMENT REQUESTS

1.    Copies of all DELAWARE DISCOVERY MATERIALS AND any briefs OR other court filings filed in the DELAWARE ACTION that reference the DELAWARE DISCOVERY MATERIALS.

2.    All communications between YOU AND any shareholder of MAT Five LLC concerning the RELEASE.

3.    Copies of all RELEASES YOU received from any MAT Five LLC shareholders in connection with the TENDER OFFER OR that otherwise RELEASE OR compromise the claims in this action.

DATED: August 1, 2008
New York, NY

THE ROSEN LAW FIRM, P.A.
LAURENCE M. ROSEN (LR 5733)
PHILLIP KIM (PK 9384)


    /s/ Phillip Kim

350 Fifth Avenue, Suite 5508
New York, NY  10118
Telephone:    (212) 686-1060
Facsimile:    (212) 202-3827

Liaison Counsel for Movant Michael J. Stone,
Trustee, FBO Michael Joel Stone Revocable Trust
Dated October 1999

2

HULETT HARPER STEWART LLP
KIRK B. HULETT (KBH 2281)
BLAKE MUIR HARPER (BMH-0479)
SARAH P. WEBER (SPW 9296)
BRIDGET F. GRAMME
550 West C Street, Suite 1600
San Diego, CA  92101
Telephone:     (619) 338-1133
Facsimile:     (619) 338-1139

Lead Counsel for Movant Michael J. Stone, Trustee,
FBO Michael Joel Stone Revocable Trust Dated
October 1999

# EXHIBIT 10

731 Lexington Avenue
New York, NY 10022

Citi Alternative Investments



July 16, 2008

Dear MAT Five LLC (the "Company") Investor:

Enclosed is Supplement No. 2 to the Company's Confidential Tender and Exchange Offer Memorandum dated May 29, 2008 with respect to its National, National II, New York and California portfolios, as previously supplemented (the "Confidential Memorandum"). This Supplement should be read with the Confidential Memorandum.

This Supplement discloses certain recent developments with respect to outstanding litigation regarding the Company and others. In addition, Appendix A to the Supplement contains a press release issued on behalf of the Company on July 15, 2008 extending the Expiration Date to 5:00 p.m., New York City time, on August 8, 2008, unless further extended by the Company.

This Supplement is for informational purposes only. If you have already tendered your Existing Shares you do not need to take any further action.

If you have any questions regarding the terms of the Tender and Exchange Offer, please direct your questions to CAI Investor Services at (212) 783-1330.

Sincerely,

Citigroup Alternative Investments LLC

## SUPPLEMENT NO. 2

### TO

### MAT FIVE LLC
### NATIONAL PORTFOLIO
### NATIONAL PORTFOLIO II
### CALIFORNIA PORTFOLIO
### NEW YORK PORTFOLIO

## CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM

This supplement ("Supplement") is being furnished by MAT Five LLC ("we," "us" or the "Company"), with respect to our National, National II, California and New York Portfolios (collectively, the "Portfolios") in connection with the offer to exchange for each share of limited liability company interest of each Portfolio ("Existing Shares" and the holders of Existing Shares, "Existing Holders"), one (1) share of limited liability company participation interest (a "Participation Share") together with a cash payment equal to the net asset value ("NAV") per Existing Share as of April 30, 2008 (the "Exchange Payment" and, together with the Participation Share, the "Exchange Consideration"), as described in each Portfolio's respective confidential tender and exchange offer memorandum, each dated May 29, 2008, and each as previously supplemented (collectively, the "Confidential Memoranda" and the transactions contemplated thereby, the "Exchange Offers"). This Supplement amends and supplements, and should be read in conjunction with, the Confidential Memorandum applicable to the Portfolio in which you hold Existing Shares. Capitalized terms used herein but not otherwise defined shall have the respective meanings assigned to such terms in the applicable Confidential Memorandum.

**This Supplement is for informational purposes only. If you have already tendered Existing Shares, you do not need to take any further action with respect to such Existing Shares unless you wish to revoke your prior tender thereof.**

#### Recent Developments

We have extended the Exchange Offers as described below. In addition, with respect to the Complaint filed on June 19, 2008 and previously disclosed in Supplement No. 1 to each Confidential Memorandum, the Court of Chancery in the State of Delaware (the "Court") did not rule on the motion for preliminary injunction, but indicated its view that the disclosures contained in the Confidential Memoranda, as supplemented through the date hereof, should be supplemented further, including with respect to the description of the events leading up to and including the Citi MOF Investments and the Exchange Offers and that, if required to rule immediately the Court would grant an injunction against the completion of the Exchange Offers until sufficient disclosures are made. The Company intends to provide further disclosure on these and other matters (including the NAV per Existing Share as of June 30, 2008) by means of additional supplements in order to address the Court's concerns prior to the new Expiration Date (defined below).

#### Extension of Expiration Date

The Exchange Offers will now expire at 5:00 p.m., New York City time, on August 8, 2008 (the "Expiration Date"), unless further extended by the Company. A copy of the press release announcing the extension is attached as Appendix A to this Supplement. Other than with respect to Existing Holders who previously tendered Existing Shares pursuant to Early Settlement, the applicable Portfolio will issue the Participation Shares and pay the Exchange Payment promptly following the new Expiration Date. All holders, including those who tendered pursuant to Early Settlement, continue to have revocation rights as described below.

#### Revocation Rights

Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be revoked at any time prior to the new Expiration Date. For a revocation of a tender to be effective, a written notice of revocation (the form of which is attached as Annex A to the Exchange Offer Subscription Agreement previously provided) must be received by the appropriate party prior to the new Expiration Date in accordance with the instructions set forth in the Exchange Offer Subscription Agreement. Existing Holders who have tendered Existing Shares for Early Settlement who wish to revoke such tenders must also return the Exchange Consideration received prior to the new Expiration Date. See "The Exchange Offer—Revocation Rights" (and, if applicable, "—Early Settlement") in the Confidential Memorandum.

**Additional Information**

Except as described in this Supplement the information provided in the Confidential Memoranda continues to apply and this Supplement should be read in conjunction with the Confidential Memorandum applicable to the Portfolio in which you hold Existing Shares. To the extent information in this Supplement differs from, updates or conflicts with information contained in such Confidential Memorandum, the information in this Supplement is more current. If you need another copy of the applicable Original PPM, Confidential Memorandum or the Exchange Offer Subscription Agreement, please contact Citigroup Alternative Investments LLC, Attn: Investing Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022, or by telephone at (212) 783-1330.

MAT Five LLC

July 16, 2008

Appendix A

## Citi Alternative Investments



**July 15, 2008**

### MAT Five LLC

#### Extends Tender and Exchange Offers for Any and All of Its Existing Shares of Limited Liability Company Interest in the National, National II, California and New York Portfolios

NEW YORK – Citigroup Alternative Investments LLC ("CAI"), on behalf of each of the National, National II, California and New York Portfolios (the "National Portfolio," National Portfolio II," "California Portfolio" and "New York Portfolio," respectively, and collectively, the "Portfolios") of MAT Five LLC, a Delaware limited liability company (the "Company") announced today that the Company has extended the expiration date of the tender and exchange offers for each Portfolio (collectively, the "Exchange Offers"). The terms of each Exchange Offer are set forth in confidential tender and exchange offer memoranda for each Portfolio, each dated May 29, 2008, and each as supplemented by Supplement No. 1, dated June 23, 2008 (so amended and as may be further amended, collectively, the "Exchange Memoranda"). The Exchange Offers, which had been scheduled to expire on July 15, 2008 at 5:00 p.m., New York City time, will now expire at 5:00 p.m., New York City time, on August 8, 2008 (the "Expiration Date"), unless further extended by the Company.

Pursuant to the terms of the applicable Exchange Memorandum, as of 5:00 p.m., New York City time, on July 14, 2008, holders of existing shares of limited liability company interest ("Existing Shares" and the holders thereof, the "Existing Holders") had tendered approximately (i) 55% (166,550,000) of the Existing Shares of the National Portfolio; (ii) 22% (43,000,000) of the Existing Shares of the National Portfolio II; (iii) 42% (61,550,000) of the Existing Shares of the California Portfolio; and (iv) 73% (111,125,000) of the Existing Shares of the New York Portfolio.

Existing Holders who have previously tendered their Existing Shares (including pursuant to Early Settlement) continue to have the right to revoke such tenders at any time prior to the new Expiration Date by complying with the revocation procedures set forth in the applicable Exchange Memorandum.

The Company's obligation to consummate the Exchange Offers and accept tenders of Existing Shares is conditioned on the completion of the other components of the related transactions and other conditions, as more fully set forth in the Exchange Memoranda.

This press release is not a solicitation of tenders with respect to Existing Shares of any Portfolio. The Exchange Offers are being made solely by the applicable Exchange Memoranda and related supplements and documents, each of which sets forth the complete terms of the respective Exchange Offers.

# # #

Appendix A

**For Further Information Contact:**

Citi Alternative Investments LLC
731 Lexington Avenue, 27th Floor
New York, NY  10022
Attn: Investing Services
Telephone: (212) 783-1330

**Media Contact:**

Jon Diat                    (212) 793-5462      jon.diat@citi.com